**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA, by and through its Attorney General, JEFF LANDRY; AMERICAN PETROLEUM INSTITUTE, and CHEVRON U.S.A. INC. | |
| Plaintiffs, | Hon. ___ |
| v. | |
| DEB HAALAND, in her official capacity as Secretary of the Interior; LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management; ELIZABETH KLEIN, in her official capacity as Director of the Bureau of Ocean Energy Management; JAMES KENDALL, in his official capacity as Director of the Gulf of Mexico Regional Office of the Bureau of Ocean Energy Management; U.S. DEPARTMENT OF THE INTERIOR; and BUREAU OF OCEAN ENERGY MANAGEMENT, | Case No. ___ |
| Defendants. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs State of Louisiana, American Petroleum Institute, and Chevron U.S.A. Inc. bring this civil action against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

**PRELIMINARY STATEMENT**

1.      This case challenges arbitrary and unlawful last-minute changes by the Bureau of Ocean Energy Management ("BOEM") to the terms of Lease Sale 261, a lease sale under the Outer

Continental Shelf Lands Act ("OCSLA") covering much of the western and central Gulf of Mexico that Congress has instructed must occur by September 30, 2023.

2. The leasing of offshore parcels in the Outer Continental Shelf ("OCS") for oil and gas activities is no simple matter.  The development and implementation of a lease program is a multi-year process that implicates several federal statutes and involves extensive consultations between multiple federal agencies, States, local governments, oil and gas companies, environmentalists, and other interested parties.  All of this is meant to ensure that the numerous competing interests in the OCS are taken into account and that the full range of possible effects from development activity are considered.

3. Over the course of years, BOEM engaged with all those stakeholders to prepare for Lease Sale 261.  That process culminated in the release of the Proposed Notice of Sale in March 2023, which set out in detail the area that Lease Sale 261 would cover and the stipulations that would attach to any leases sold, including the environmental protections that BOEM considered appropriate.

4. The Proposed Notice of Sale announced that Lease Sale 261 would cover "all of the available unleased acreage" in the Gulf of Mexico's OCS, *see* Oil and Gas Lease Sale 261, Proposed Notice of Sale 3 (Mar. 15, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/proposed-nos-261.pdf, with the exception of certain blocks that had been identified in BOEM's environmental analysis based on "their ecological importance and sensitivity to OCS oil- and gas-related activities."  Lease Sales 259 and 261 Final Supplemental Environmental Impact Statement 2-9 (Jan. 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/GOM_LS259-261_SEIS_FINAL.pdf ("Final Supplemental EIS").  The Proposed Notice also proposed the same lease stipulations as in past sales, including that the lessees comply with a  biological opinion issued by the National Marine Fisheries Services ("NMFS") implementing certain restrictions for vessels travelling in the "core" habitat of a species of whale known as

the Rice's whale (formerly called the Bryde's whale)—a precisely defined area located in the eastern portion of the Gulf already subject to a congressional moratorium on leasing.  That requirement that lessees comply with the existing biological opinion was therefore largely seen by interested parties as uncontroversial and unobjectionable.

5.      But just yesterday, in its Final Notice of Sale and Record of Decision, BOEM changed the rules and dramatically altered the terms of Lease Sale 261.  Specifically, BOEM imposed a new lease stipulation (Stipulation No. 4, Item (B)(4)) containing burdensome operating restrictions across a newly defined and vastly enlarged "expanded Rice's Whale area" that more than doubled the size of the former Rice's whale area and extended it across the entire stretch of the Gulf.  Furthermore, BOEM withdrew from Lease Sale 261 all the acreage falling within this expanded area.

6.      These last-minute changes are unlawful several times over.  The new stipulation and acreage withdrawal ("the challenged provisions") contravene the letter and spirit of Congress' command in the Inflation Reduction Act ("IRA"), which explicitly directed BOEM to conduct Lease Sale 261 in accordance with BOEM's previously adopted Five-Year Plan for oil and gas leasing—not to introduce substantial new conditions and complications, let alone withdraw millions of acres, at the last minute.  The challenged provisions also contravene OCSLA's procedural requirements and implementing regulations, which instruct BOEM to provide notice of the terms of the lease sale in the Proposed Notice of Sale, not radically change them in the Final Notice.  And they contravene the Administrative Procedure Act ("APA"), as they are a wholly arbitrary and capricious departure from BOEM's prior position without adequate explanation for the change, and otherwise exceed BOEM's statutory and regulatory authority.

7.      This Court should declare that the challenged provisions are unlawful and vacate just those aspects of the Proposed Notice of Sale and Record of Decision, while otherwise leaving the Sale intact to proceed as directed by Congress.  And because the challenged provisions will cause enormous

distortions to Lease Sale 261 if they remain in the Final Notice of Sale and Record of Decision when Lease Sale 261 proceeds on September 27, 2023, this Court should declare that the challenged provisions are unlawful *before* the sale proceeds, order them removed from the Final Notice of Sale and Record of Decision, and compel BOEM to complete the sale on September 27 without the challenged provisions.[1]

## THE PARTIES

8.      Plaintiff State of Louisiana is a sovereign State of the United States of America.  Below Louisiana's borders, and in the waters of the adjoining Gulf of Mexico, lies vast stores of oil and natural gas.  Louisiana is the nation's number two producer of oil, producing almost 1.6 million barrels a day in October 2017 when including production from the Federal OCS.  This represents 16.1% of the nation's crude oil production, behind Texas, with North Dakota in a close third place.  Louisiana is also in the top five of the nation's producers of natural gas, a critical bridge fuel that supplies the nation's electricity plants, among other critical infrastructure.  Louisiana and its parishes and municipalities receive hundreds of millions of dollars every year from leasing sales under OCSLA and the Gulf of Mexico Energy Security Act ("GOMESA").  Additionally, critical coastal restoration projects and hurricane protection projects are funded in part by the proceeds of OCSLA lease sales and royalties.  These funds are vital to the preservation of Louisiana's coastline and the protections of its ports, through which billions of dollars in U.S. gross domestic product pass annually, bringing fuel and food to the rest of the country.  Oil and gas development in the Gulf of Mexico and on public lands are key parts of Louisiana's economy—generating substantial tax revenue and jobs.  Jeff Landry is the Attorney General of the State of Louisiana and is authorized by Louisiana law to sue on the State's behalf.  His offices are located at 1885 North Third Street, Baton Rouge, LA 70802.

---

[1] Plaintiffs do not seek to delay or stop Lease Sale 261 from proceeding as planned on September 27, 2023.  They seek only to have the unlawful and arbitrary Stipulation No. 4, Part (B)(4) and acreage withdrawal removed from Lease Sale 261.

9.     Plaintiff American Petroleum Institute ("API") is a national trade association that represents nearly 600 members involved in all aspects of the oil and natural gas industry, including the exploration and production of both onshore and offshore federal resources.  API's members include oil and gas producers that have bid in the past on federal oil and gas leases during federal lease sales and intend to bid on federal oil and gas leases in Lease Sale 261.

10.    Plaintiff Chevron U.S.A. Inc. ("Chevron") is a leader in the oil-and-gas industry with interests in hundreds of leases in the Gulf of Mexico.  Chevron intends to bid on leases offered in Lease Sale 261.

11.    Defendant Deb Haaland is sued in her official capacity as Secretary of the Interior ("Secretary").  She is the chief officer of the Department of the Interior ("Interior") charged with overseeing the proper administration and implementation of OCSLA.  OCSLA vests authority in the Secretary to hold oil and gas lease sales on the OCS and to issue leases, and the IRA directs that, "not later than September 30, 2023, the Secretary shall conduct Lease Sale 261." §50264(e), Pub. L. No. 117-169, 136 Stat 1818 (Aug. 16, 2022).

12.    Defendant Laura Daniel-Davis is sued in her official capacity as Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management.  The Principal Deputy Assistant Secretary for Land and Minerals Management is the official to whom the Secretary has delegated authority to sign records of decision to hold lease sales under OCSLA.

13.    Defendant Elizabeth Klein is sued in her official capacity as Director of BOEM.

14.    Defendant James Kendall is sued in his official capacity as Regional Director of BOEM's Gulf of Mexico Office.  BOEM's Gulf of Mexico Region is responsible for administering Gulf of Mexico lease sales and associated operations on Gulf of Mexico leases.  Kendall maintains an office in Louisiana.

15.     Defendant U.S. Department of the Interior is the federal department with authority, through the Secretary, to hold oil and gas lease sales on the OCS and to issue leases.

16.     Defendant BOEM is a federal agency within the Department of the Interior to which the Secretary has delegated authority to hold oil and gas lease sales on the OCS and to issue leases.  30 C.F.R §550.101.

## JURISDICTION AND VENUE

17.     The Court has jurisdiction over this action under 28 U.S.C. §1346(a)(2) because an agency of the United States government is a named defendant; 28 U.S.C. §1331 because this action arises under the laws of the United States; and 28 U.S.C. §1361 because this is an action to compel officers of the United States to perform their duty.

18.     Venue is proper in this Court under 28 U.S.C. §1391(e)(1) because Defendants are federal agencies of the United States or officers sued in their official capacities or under color of legal authority; a substantial part of the events or omissions giving rise to the Complaint occurred within this judicial district; the State of Louisiana resides in this judicial district; some of API's members are located in this district; and no real property is involved in this action.

## BACKGROUND

**A.     Legal Background**

19.     The OCS is an area of submerged land lying beyond the outer boundary of state territorial waters but within the outer boundary of United States territorial waters.  *See* 43 U.S.C. §1301(a), 1312, 1331(a).  The OCS spans approximately 2.5 billion acres and contains enormous reserves of oil and natural gas.

20.     In 1953, recognizing that the OCS is a "vital national resource," Congress passed, and President Eisenhower signed OCSLA to facilitate the exploration and development of offshore oil and gas wells on the OCS.

21.     After the 1973 oil crisis and years of declining domestic production, Congress amended OCSLA in 1978 to "establish policies and procedures for managing the oil and natural gas resources of the Outer Continental Shelf which are intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national and economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *Id.* §1802(1); *see also Ensco Offshore Co. v. Salazar*, 781 F.Supp.2d 332, 339 (E.D. La. 2011) (emphasizing "OCSLA's overriding policy of expeditious development").

22.     To those ends, OCSLA directs the Secretary to make the OCS "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." 43 U.S.C. §1332(3).  The Secretary, in turn, has delegated the authority to "regulate oil, gas, and sulphur exploration, development and production operations on the Outer Continental Shelf" to BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE").  30 C.F.R. §§250.101, 550.101.

23.     OCSLA facilitates the expeditious development of the OCS' oil-and gas resources by directing the Secretary to administer a competitive-leasing program.  That program consists of four stages, each involving a multitude of procedural obligations that include "specific requirements for consultation with Congress, between federal agencies, or with the States." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984).

24.     The first stage of the leasing process requires BOEM to formulate a five-year leasing plan. *See* 43 U.S.C. §1344(a).  The five-year plan "achieves important practical and legal significance" because it serves as "the basis for future planning by all affected entities, from federal, state and local governments to the oil industry itself." *California ex rel. Brown v. Watt*, 668 F.2d 1290, 1299 (D.C. Cir. 1981).  The creation of a five-year plan is a massive undertaking.  It consists of mandatory consultation requirements, environmental assessments, and multiple comment periods. *See California*, 464 U.S. at

337-38.  In assembling that plan, the Secretary must balance the "potential for the discovery of oil and gas," the "potential for environmental damage," and "the potential for adverse impact on the coastal zone."  43 U.S.C. §1344(a)(3).  BOEM must also develop a programmatic environmental impact statement ("EIS") addressing potential environmental impacts from the program, *id.* §§1344(b)(3), 4332(2)(C), which BOEM can supplement (referred to as "tiering") as needed at later site-specific stages, 40 C.F.R. §1508.28.

25.     In addition, OCSLA requires the Secretary to consider the "laws, goals, and policies of affected States."  43 U.S.C. §1344(a)(2)(F).  To that end, OCSLA requires the Secretary to invite and consider suggestions from the governors of all affected states, *id.* §1344(c)(1), submit copies of the proposed program to those governors for review and comment, and reply in writing to any governor's request for modification, *id.* §1344(c)(2).  The proposed leasing program is then submitted to the President and Congress, together with comments received by the Secretary from the governors of the affected States.  *Id.* §1344(d).

26.     The second stage of the leasing process—the stage at issue here—consists of holding individual lease sales.  BOEM begins this stage by issuing a "call for information and nominations" on an area proposed for leasing in the five-year program, in which BOEM requests information from "industry and the public" on the proposed area's potential for drilling as well as "socioeconomic, biological, and environmental information."  30 C.F.R. §556.301.  BOEM uses that information to designate the area to lease and also considers that information in "develop[ing] measures to mitigate adverse impacts" to "human, marine, and coastal environments"—including through "lease stipulations and conditions."  *Id.* §§556.302(b), 556.304(a).

27.     BOEM then prepares a proposed notice of sale that must be sent to the governors of affected States and published in the Federal Register, which must "contain[] a description of the area

proposed for leasing, the proposed lease terms and conditions of sale, and proposed stipulations to mitigate potential adverse impacts on the environment." *Id.* §556.304(c).

28.     OCSLA grants "[a]ny Governor of any affected State or the executive of any affected local government" the right to "submit recommendations to the Secretary" within 60 days after receiving notice of the proposed lease sale "regarding the size, timing, or location of a proposed lease sale or with respect to a proposed development and production plan." 43 U.S.C. §1345(a); *see* 30 C.F.R. §556.304(c). The Secretary "shall accept" those recommendations if the Secretary "determines, after having provided the opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." 43 U.S.C. §1345(c); *see* 30 C.F.R. §556.307(c). The Secretary "shall communicate to the Governor, in writing, the reasons for his determination to accept or reject such Governor's recommendations, or to implement any alternative means identified in consultation with the Governor to provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." 43 U.S.C. §1345(c); *see* 30 C.F.R. §556.307(c).

29.     BOEM then publishes a final notice of sale in the Federal Register, 40 C.F.R. §556.308(a)(2), and proceeds with the lease sale.

30.     The third stage of the leasing process is known as the "exploration stage," during which the Secretary "reviews the lessee's exploration plan." *Oceana v. BOEM*, 37 F.Supp.3d 147, 150 (D.D.C. 2014) (citing 43 U.S.C. §1340).

31.     The fourth stage of the leasing process is development and production. 43 U.S.C. §1351. The lessee must submit another plan to the Secretary. The Secretary must forward the plan to the governor of any affected State for comment and review, *id.* §1351(a)(3), and a governor's recommendations must be accepted if they strike a reasonable balance between local and national

9

interests.  Reasons for accepting or rejecting a governor's recommendations must be communicated in writing to the governor.  *Id.* §1345(c); *California*, 464 U.S. at 340.

32.     In addition to complying with the terms of OCSLA, the Secretary's leasing activities must comply with federal environmental laws, including the Endangered Species Act.

33.     The Endangered Species Act requires BOEM to "consult[] with" NMFS before taking "any action" to ensure that the proposed action "is not likely to jeopardize" listed species or adversely modify critical habitat.  16 U.S.C. §1536(a)(2).

34.     To "facilitate" the consultation process, BOEM must ask NMFS "whether any species which is listed or proposed to be listed may be present in the area of such proposed action."  *Id.* §1536(c)(1).  If NMFS "advises, based on the best scientific and commercial data available, that such species may be present," BOEM must then "conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action."  *Id.* If BOEM determines that its proposed action is "not likely" to jeopardize or adversely affect listed species and critical habitat, and if NMFS agrees, no further consultation is necessary.  50 C.F.R. §402.12(k).  Otherwise, BOEM and NMFS engage in a formal consultation process, at the end of which NMFS issues a biological opinion setting forth its view as to "how the agency action affects" any endangered species, 16 U.S.C. §1536(b)(3)(A), and specifically, whether the action "is likely to jeopardize the continued existence" of the species, 50 C.F.R. §402.14(g)(4), (h).

35.     If NMFS issues a "jeopardy" opinion, it "shall" suggest "reasonable and prudent alternatives" that are "economically and technologically feasible" and that (in NMFS' view) will avoid jeopardy.  16 U.S.C. §1536(b)(3)(A); 50 C.F.R. §402.02.  These alternatives must be "economically and technologically feasible," "within the scope of the federal agency's legal authority and jurisdiction," and "implemented in a manner consistent with the intended purpose of the action."  50 C.F.R. §402.14(h).  BOEM then has the choice to "terminate the [proposed] action, implement the proposed

alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. §1536(e)." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007).

36.     If the proposed action is likely to result in the "take" (*i.e.*, "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct") of a listed species, 16 U.S.C. §1532(19), the biological opinion will dictate "the impact, i.e., the amount or extent, of such incidental taking on the species" that is permissible, 50 C.F.R. §402.14(i); *see* 16 U.S.C. §1536(b)(4)(C).  The resulting "incidental take statement" must also specify the "reasonable and prudent measures" that NMFS "considers necessary or appropriate to minimize such impact."  50 C.F.R. §402.14(i)(1)(ii); *see* 16 U.S.C. §1536(b)(4)(C)(ii).  These "[r]easonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes."  50 C.F.R. §402.14(i)(2).

37.     Under the relevant statutes, coastal States are entitled to significant portions of the proceeds from OCS leasing and production.  GOMESA provides for the sharing of 37.5% of "qualified Outer Continental Shelf revenues" among Louisiana, Alabama, Mississippi, and Texas to aid in coastal-restoration efforts.  P.L. 109-432, 120 Stat. 3000 §105(a)(2), 43 U.S.C. §1331 note.  Since 2017, the geographic area of "qualified" revenues encompasses the entire Gulf of Mexico OCS available for leasing.  P.L. 109-432, 120 Stat. 3000 §105(b)(2).  In addition, 12.5% of "qualified" revenues is shared with the Land and Water Conservation Fund, which provides matching grants to assist States with outdoor recreation programs.  *Id.* §105(a)(2).

38.     These revenue-sharing programs provide States with substantial funds; for example, in 2022 alone, Louisiana received $112 million in direct revenue sharing, and the Land and Water Conservation Fund received $84 million for state assistance programs.  *See* Cong. Research Serv., *Gulf of Mexico Energy Security Act (GOMESA): Background and Current Issues*, at 6 (Dec. 21, 2022), bit.ly/45e7hS9.  Louisiana annually deposits the funds it receives from the revenue-sharing program

in the State Coastal Protection and Restoration Fund, a constitutionally dedicated fund in the State Treasury that provides a recurring source of revenue for the development and implementation of a program to protect and restore Louisiana's coastal area.  La. Const. art. VII, §10.2(E)(1).

39.     Under Louisiana's Coastal Master Plan, those funds are used for various projects throughout the State, including within this judicial district.  Indeed, the 2023 Coastal Master Plan selected at least 16 projects located within this judicial district, including several specifically within the Lake Charles Division.  *See* 2023 Louisiana's Comprehensive Master Plan for a Sustainable Coast 104-08 (May 25, 2023), https://coastal.la.gov/wp-content/uploads/2023/06/230531_CPRA_MP_Final-for-web_spreads.pdf.

**B.     Factual Background**

**i.     The Secretary of the Interior Approves the 2017-2022 Five-Year Leasing Program.**

40.     After years of careful planning, including BOEM's review of over two million comments, *see* 80 Fed. Reg. 4,941 (Jan. 29, 2015); 81 Fed. Reg. 14,881 (Mar. 18, 2016), scores of public meetings, and numerous environmental reviews, the Secretary approved the 2017-2022 Leasing Program (the first stage of the OCSLA leasing process described above).  The Record of Decision—the Secretary's final written approval of the 2017-2022 leasing program—directed BOEM to proceed with 10 scheduled lease sales in the Gulf of Mexico over the five program years:  one sale in 2017, two each year from 2018 to 2021, and one—Lease Sale 261—in 2022.  These sales were to be "region-wide and include unleased acreage not subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf of Mexico," with the goal of "provid[ing] greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks."  Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program 3 (Jan. 2017) (2017 Record of Decision), https://www.boem.gov/sites/default/files/oil-

and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-Record-of-Deci-sion.pdf.

41. The Secretary made that decision based on the Proposed Final Program and Program-matic EIS, which considered the environmental impacts of sales of differing scope.[2]  Among other things, the Programmatic EIS concluded that the "biologically important area" for the Rice's whale (then called the Bryde's whale) in the northeastern Gulf did not "overlap[] with the GOM Program Area" due to a congressional moratorium on leasing in most of the eastern Gulf.  Final Programmatic Environmental Impact Statement, Vol. I, 2-26.  The "Programmatic EIS assume[d] continuing imple-mentation of protective measures required by statute, regulation, or current lease sale stipulations that would likely continue to be adopted in the future."  *Id.* at 2-3; *see also* Final Programmatic Environ-mental Impact Statement, Vol. II, I-3 ("[T]he impact analysis assumes that sale-specific stipulations that were commonly adopted in past lease sales are in effect.").  For the Gulf of Mexico, the Pro-grammatic EIS discussed six "common lease stipulations"— protections for "military areas" (includ-ing measures for "evacuation" and "coordination"), "topographic features," and "live bottom," *id.* Vol. II, I-3 to I-4, E-34; *see id.* Vol. I, 3-52, as well as a "15-mile buffer south of Baldwin County, Alabama," that "traditionally has been subject to a lease sale stipulation that requires no new surface structures," *id.* Vol. I, 2-3.

42. The Gulf sale immediately preceding the adoption of the Five-Year Plan included those same six stipulations, in addition to four others involving international agreements or federal

---

[2]  *See* 2017–2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program (Nov. 2016), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-OCS-Oil-and-Gas-Leasing-PFP.pdf; Outer Continental Shelf Oil and Gas Leasing Program: 2017-2022 Final Pro-grammatic Environmental Impact Statement, Vol. I (Nov. 2016), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2012-2017/BOEMOceanInfo/fpeis_volume1.pdf;   Outer   Continental Shelf Oil and Gas Leasing Program: 2017-2022 Final Programmatic Environmental Impact Statement, Vol. II (Nov. 2016), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/national-program/Outer%20Continen-tal%20Shelf%20Oil%20and%20Gas%20Leasing%20Program%2C%202017-2022%20Final%20Program-matic%20EIS%20Volume%20II%20Appendices.pdf.

statutes: "United Nations Convention on the Law of the Sea Royalty Payment," "Below Seabed Operations" (regarding rights-of-use and easements for floating production facilities granted pursuant to the Energy Policy Act), "Agreement between the United States of America and the United Mexican States Concerning Transboundary Hydrocarbon Reservoirs in the Gulf of Mexico," and measures for "Protected Species" under the Endangered Species Act and the Marine Mammal Protection Act. *See* Oil and Gas Lease Sale 247, Final Notice of Sale, 81 Fed. Reg. 95,185, 95,187 (Dec. 27, 2016); *see* Final Programmatic Environmental Impact Statement, Vol. II, J-11.

43. BOEM continued to assess potential environmental impacts of oil and gas leasing after approving the 2017-2022 Leasing Program. BOEM issued a "Multisale EIS," tiered from the Programmatic EIS, analyzing the potential environmental impacts of a single region-wide lease sale that "would apply to any of the 10 proposed GOM lease sales."[3] BOEM later issued the 2018 Supplemental EIS—tiered from the Multisale EIS and the Programmatic EIS—"for each of the remaining proposed regionwide lease sales scheduled in the 2017-2022 Five-Year Program."[4] And in January 2023, BOEM issued another Supplemental EIS—tiered from the 2018 Supplemental EIS, Multisale EIS, and Programmatic EIS—for the final two Gulf sales.[5] All three EIS documents listed the same 10 common lease stipulations drawn from the Programmatic EIS and Lease Sale 247: (1) Military Areas; (2) Evacuation; (3) Coordination; (4) Protected Species; (5) Topographic Features; (6) United

---

[3] *See* Final Multisale Environmental Impact Statement, Vol. I (Mar. 2017), https://www.boem.gov/sites/default/files/environmental-stewardship/Environmental-Assessment/NEPA/BOEM-EIS-2017-009-v1.pdf; Final Multisale Environmental Impact Statement, Vol. II (Mar. 2017), https://www.boem.gov/sites/default/files/environmental-stewardship/Environmental-Assessment/NEPA/BOEM-EIS-2017-009-v2.pdf; Final Multisale Environmental Impact Statement, Vol. III (Mar. 2017), https://www.boem.gov/sites/default/files/environmental-stewardship/Environmental-Assessment/NEPA/BOEM-EIS-2017-009-v3.pdf.

[4] Final Supplemental Environmental Impact Statement 2018, Vol. I (Dec. 2017), https://www.boem.gov/sites/default/files/environmental-stewardship/Environmental-Assessment/NEPA/BOEM-EIS-2017-074_v1.pdf; Final Supplemental Environmental Impact Statement 2018, Vol. II (Dec. 2017), https://www.boem.gov/sites/default/files/environmental-stewardship/Environmental-Assessment/NEPA/BOEM-EIS-2017-074_v2.pdf.

[5] Gulf of Mexico OCS Oil and Gas Lease Sales 259 and 261, Final Supplemental Environmental Impact Statement (Jan. 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/GOM_LS259-261_SEIS_FINAL.pdf

Nations Convention on the Law of the Sea Royalty Payment; (7) Agreement between the United States of America and the United Mexican States Concerning Transboundary Hydrocarbon Reservoirs in the Gulf of Mexico; (8) Live Bottom; (9) Blocks South of Baldwin County, Alabama; (10) Below Seabed Operations for Rights-of-Use and Easement for Floating Production Facilities. *See* Final Multisale Environmental Impact Statement, Vol. I, 2-24 to 2-28; Final Supplemental Environmental Impact Statement 2018, Vol. I, 2-14 to 2-15; Lease Sales 259 and 261 Final Supplemental Environmental Impact Statement A-3 to A-4.[6]

### ii.    BOEM Adopts Measures to Protect the Rice's Whale.

44.    In parallel with the leasing process, BOEM and BSEE have engaged in numerous consultations with NMFS over the years to ensure that authorizing oil and gas leasing activity in the Gulf of Mexico is consistent with the Endangered Species Act.  After the 2010 Deepwater Horizon event, BOEM and BSEE reinitiated the consultation process to determine whether they could continue to authorize oil and gas leasing activity in the Gulf of Mexico.

45.    In a biological opinion issued in March 2020 (the "2020 BiOp"), NMFS concluded that oil and gas activity in the Gulf was not likely to jeopardize the continued existence of endangered species like the sperm whale, blue whale, sei whale, loggerhead sea turtle, leatherback sea turtle, hawksbill sea turtle, and the Gulf sturgeon.  However, NMFS determined that oil and gas activity in the Gulf did pose a risk to the Rice's whale (also known as the "Bryde's whale"), due to potential vessel strikes in the whale's habitat, located in a small portion of the eastern Gulf of Mexico dubbed "the Bryde's whale area," represented in purple on the map below:[7]

---

[6]  Section 50263 of the IRA required BOEM to add one additional lease stipulation for "Royalties on All Produced Gas."

[7]  Plaintiffs do not concede that the Rice's whale has been properly listed as endangered and preserve the right to challenge that designation in separate litigation.  For the purposes of this suit, however, even assuming the Rice's whale is properly listed, BOEM's actions are unlawful.



**Figure 96. Image of the Bryde's whale area mitigation overlaying Roberts et al. (2016b) density model.**

46.     No oil-and-gas leasing occurs in this region, as it falls within the portion of the eastern Gulf that was subject to congressional moratorium and is now under Presidential withdrawal.  *See* Presidential Determination on the Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition (Sept. 25, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/presidential-determination-withdrawal-certain-areas-united-states-outer-continental-shelf-leasing-disposition/.

47.     Nevertheless, NMFS concluded that BOEM and BSEE could adequately mitigate any oil and gas-related risks by adopting a "reasonable and prudent alternative" to protect the Rice's whale, consisting of operating conditions on oil and gas service "vessel[s] transiting through the Bryde's whale area" to limit the risk of oil and gas service vessel strikes, including prohibitions on transit at night or in low visibility conditions; a 10-knot, year-round speed restriction during daylight hours; a 500-meter minimum separation distance from any whale that could be a Rice's whale; and requiring all vessels 65 feet or greater to have a functioning Automatic Identification System ("AIS").  Nat'l

Marine Fisheries Serv., *Biological Opinion* 597 (Mar. 2020), https://repository.library.noaa.gov/view/noaa/23738 ("2020 BiOp").

48. BOEM disagreed with NMFS' analysis, finding that "the activities and effects from a lease sale" on the Rice's whale "are not reasonably foreseeable" since "vessels expected to service leases issued as a result of a lease sale are … unlikely to transit across" the Bryde's/Rice's whale's habitat. Final Supplemental EIS, at 5-5. But BOEM nevertheless agreed to adopt NMFS' reasonable and prudent alternative for the "Bryde's whale area" and began including it in the "Protected Species" lease stipulation in the lease sales. *See* Lease Sale 256, Lease Stipulations 8 (Jan. 2020), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/Sale-256-Lease-Stipulations.pdf ("Lease Stipulations 256"); Lease Sale 257, Lease Stipulations 8 (Oct. 2021), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-257-Lease-Stipulations.pdf.

49. In October 2020, environmental groups sued NMFS (but not BOEM) in the District of Maryland, arguing (among other things) that the 2020 BiOp understated the risk that oil and gas leasing activity posed to listed species in the Gulf, including the Rice's whale. *See* Compl. ¶¶142-55, *Sierra Club v. NMFS*, No. 8:20-cv-3060 (D. Md. filed Oct. 21, 2020). They also argued that NMFS' proposed "reasonable and prudent alternative" was insufficient to protect the Rice's whale and that the agency had issued an insufficient "incidental take statement" under the Endangered Species Act. *Id.* ¶¶156-70. API, Chevron, the EnerGeo Alliance, and the National Ocean Industries Association intervened to defend the 2020 BiOp.

### iii. The Federal Pause on Oil and Gas Leasing Disrupts the Planned Sales.

50. While that lawsuit remained pending, BOEM conducted seven of the 10 scheduled Gulf-wide lease sales consistent with the 2017-2022 Five-Year Plan's direction that the sales be

"region-wide and include unleased acreage not subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf of Mexico." Jan. 2017 Record of Decision 3.[8]

51.    BOEM also implemented the same 10 lease stipulations for each of those sales: (1) Military Areas; (2) Evacuation; (3) Coordination; (4) Protected Species[9]; (5) Topographic Features; (6) United Nations Convention on the Law of the Sea Royalty Payment; (7) Agreement between the United States of America and the United Mexican States Concerning Transboundary Hydrocarbon Reservoirs in the Gulf of Mexico; (8) Live Bottom; (9) Blocks South of Baldwin County, Alabama; (10) Below Seabed Operations for Rights-of-Use and Easement for Floating Production Facilities. *See* Lease Sale 249, 82 Fed. Reg. at 32,579; Lease Sale 250, 83 Fed. Reg. at 7,072; Lease Sale 251, 83 Fed. Reg. at 32,900; Lease Sale 252, 84 Fed. Reg. at 4,527-28; Lease Sale 253, 84 Fed. Reg. at 34,940; Lease Sale 254, 85 Fed. Reg. at 8,013; Lease Sale 256, 85 Fed. Reg. at 66,351.[10]

52.    BOEM initially scheduled Lease Sale 257 in accordance with the Five-Year Plan, proposing to "lease all available, unleased blocks within the proposed regionwide lease sale area for oil and gas operations" with the same lease stipulations. 86 Fed. Reg. 6,365, 6,365-66 (Jan. 21, 2021).

53.    But in January 2021, President Biden issued an executive order directing Interior to "pause new oil and natural gas leases … in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices." 86 Fed. Reg.

---

[8] *See* Lease Sale 249, Final Notice of Sale, 82 Fed. Reg. 32,577, 32,577 (July 14, 2017) ("offer[ing] for bid in this lease sale all of the available unleased acreage in the GOM"); Lease Sale 250, Final Notice of Sale, 83 Fed. Reg. 7,070, 7,070 (Feb. 16, 2018) (same); Lease Sale 251, Final Notice of Sale, 83 Fed. Reg. 32,897, 32,897 (July 16, 2018) (same); Lease Sale 252, Final Notice of Sale, 84 Fed. Reg. 4,525, 4,525 (Feb. 15, 2019) (same); Lease Sale 253, Final Notice of Sale, 84 Fed. Reg. 34,937, 34,937 (July 19, 2019) (same); Lease Sale 254, Final Notice of Sale, 85 Fed. Reg. 8,010, 8,010 (Feb. 12, 2020) (same); Lease Sale 256, Final Notice of Sale, 85 Fed. Reg. 66,348, 66,348 (Oct. 19, 2020) (same).

[9] The "Protected Species Stipulation" was "updated" after the 2020 BiOp issued, Oil and Gas Lease Sale 256, Notice of Availability of a Record of Decision, 85 Fed. Reg. 66,346, 66,348 (Oct. 19, 2020), to specify that lessees and operators must "[c]omply with the Reasonable and Prudent Measures and implementing Terms and Conditions of the Biological Opinion," Lease Stipulations 256, at 8.

[10] Lease Sales 256 and 257 included an additional eleventh stipulation, "Timeframe for Decisions on an Application for Permit to Drill and an Application for Permit to Modify," to codify limits on agency review time as part of an efficiency effort.

7,619, 7,624 (Jan. 27, 2021).  Interior accordingly cancelled Lease Sale 257 "to comply with [the] Executive Order," 86 Fed. Reg. 10,132, 10,123 (Feb. 18, 2021), and did not schedule the Five-Year Plan's two remaining sales, Lease Sales 259 and 261, *Louisiana v. Biden*, 622 F.Supp.3d 267, 287-288 (W.D. La. 2022).

54.     Thirteen States, including Louisiana, soon sought to enjoin the "pause" directed by the Executive Order.  The district court concluded that "pausing, stopping and/or cancelling lease sales scheduled in the OCSLA Five-Year Plan would be significant revisions of the plan" that "the Agency Defendants have no authority to make … without going through the procedure mandated by Congress" and preliminarily enjoined the leasing pause.  *Louisiana v. Biden*, 543 F.Supp.3d 388, 413, 417 (W.D. La. 2021).  The Fifth Circuit later vacated that injunction as insufficiently specific, 45 F.4th 841, 846 (5th Cir. 2022), and the district court reissued a permanent injunction the next day, 622 F.Supp.3d at 299-300.  The district court reiterated that the Executive Order's direction to pause leasing "was a 'significant' revision of the 2017-2022 Five-Year Plan that violated the OCSLA," and the court concluded that Interior's cancellation of Lease Sale 257 was contrary to law, arbitrary and capricious, and violated notice and comment requirements under the Administrative Procedure Act. *Id.* at 289, 294. The court permanently enjoined Interior from implementing the Executive Order to halt "new oil and gas leases … in offshore waters." *Id.* at 298-99.  In accordance with the preliminary injunction, Interior issued a new record of decision "to hold oil and gas Lease Sale 257 as a [Gulf of Mexico] region-wide lease sale."  Record of Decision for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 257, at 2 (Aug. 31, 2021), https://rb.gy/1ztq7.

55.     BOEM accordingly held Lease Sale 257 in November 2021.  Like previous Gulf sales, BOEM offered "all the available unleased acreage in the GOM" with the same familiar 10 lease stipulations.  Lease Sale 257 Final Notice of Sale, 86 Fed. Reg. 54,728, 54,728, 54,730-31 (Oct. 4, 2021).  Industry bid nearly $200 million for 308 tracts covering 1.7 million acres in the Gulf.  *See* Oil and Gas

Lease Sale 257 Final Bid Recap 1-2 (Nov. 9, 2022), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale%20257%20Final%20Bid%20Recap.pdf.

56.     But before BOEM could issue leases to the winning bidders, environmental organizations persuaded a district court to vacate the results of the sale on grounds that the pre-sale environmental analysis failed to consider foreign oil consumption.  *See Friends of the Earth v. Haaland*, 583 F.Supp.3d 113, 128 (D.D.C. 2022), *vacated and remanded*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) (per curiam).  The district court's decision prevented BOEM from issuing leases to the winning bidders.  *Id.* at 162.

### iv.     Congress Passes The Inflation Reduction Act To Require BOEM To Conduct Remaining Lease Sales According To The Five-Year Plan.

57.     While the vacatur of Lease Sale 257 was on appeal, Congress intervened by passing the IRA in August 2022.  As part of Congress's strategy to address rising inflation in the United States by lowering energy bills for everyday citizens and to save them money at the pump, the law included several provisions designed to spur domestic energy production.

58.     Among other things, the IRA changed the law for the remaining "lease sales under the 2017-2022 Outer Continental Shelf Leasing Program," including the three remaining sales in the Gulf of Mexico: Lease Sales 258, 259, and 261.  IRA §50264 (capitalization altered).

59.     Congress overrode the district court's order vacating Lease Sale 257 in a section entitled "Lease Sale 257 Reinstatement."  *Id.* §50264(b) (capitalization altered).  Because Lease Sale 257 had already occurred, Congress directed the Secretary to "accept the highest valid bid for each tract or bidding unit of Lease Sale 257 for which a valid bid was received," "provide the appropriate lease form to the winning bidder to execute and return," and "promptly issue to the high bidder a fully executed lease."  *Id.*  And because the IRA "required issuance of the leases won in Lease Sale 257," the D.C. Circuit ordered the environmental groups' challenge to Lease Sale 257 dismissed as moot. *Friends of the Earth*, 2023 WL 3144203, at *1.  BOEM subsequently issued the leases.

60.     The IRA likewise listed specific "requirement[s]" for the two other Gulf sales, Lease

Sales 259 and 261.  *Id.* §50264(d)-(e) (capitalization altered).  Congress specified:  "Notwithstanding

the expiration of the 2017-2022 leasing program, not later than September 30, 2023, the Secretary

shall conduct Lease Sale 261 in accordance with the Record of Decision approved by the Secretary

on January 17, 2017" for the 2017-2022 Leasing Program.  *Id.* §50264(e).  And Congress defined "[t]he

term 'Lease Sale 261' [as] mean[ing] the lease sale numbered 261 described in the 2017-2022 [OCS]

Oil and Gas Leasing Proposed Final Program."  *Id.* §50264(a)(4).  The IRA contained identical re-

quirements for Lease Sale 259, except that the statute required that sale to be held "not later than

March 31, 2023."  *Id.* §50264(a)(3), (d).

61.     BOEM acknowledged that "the Inflation Reduction Act of 2022 … requires BOEM

to hold both GOM Lease Sales 259 and 261."  Final Supplemental EIS, at viii.  Although BOEM had

"no discretion on whether to hold these lease sales," it chose to prepare a "Supplemental EIS to follow

its normal leasing process to the fullest extent possible."  *Id.* at 1-3.  BOEM received nearly 76,000

public comments on the draft, including several comments from environmental groups discussing

their views of the impact that the lease sale would have on the Rice's whale.

62.     BOEM issued its Final Supplemental Environmental Impact Statement for Sales 259

and 261 in January 2023.  It concluded that, although leasing a smaller area could theoretically reduce

the likelihood that oil- and gas-related activities would affect the Rice's whale, "there are not enough

conclusive data on the density, general distributions, and possible migratory behaviors of [the] marine

mammal populations in the [Gulf of Mexico] throughout the year to support a reasonable conclusive

analysis."  *Id.* at C-126.

63.     BOEM reiterated that "[b]ased on vessel and aerial survey sightings, the primary core

habitat of Rice's whale … is in the northeastern [Gulf of Mexico], centered in De Soto Canyon in

water depths between approximately 100 and 400 m"—an area already excluded from leasing and in

which BOEM already required protections in accordance with the 2020 BiOp.  *Id.* at 4-59 (emphasis added).  BOEM also observed that "the persistent occurrence of Rice's whales" had been documented only for the "core area" identified in the 2020 BiOp, not the "100-400m isobath across the Gulf."  *Id.* at C-122, C-125.

64.     BOEM specifically noted that it had "reviewed the recent July 2022 publication (Soldevilla et al. 2022) that evaluated passive acoustic data indicating that it is plausible that the Rice's whale's distribution is broader," but determined that even taking that study into account, "not enough information is available at this time to confirm [the Rice's whale] distribution or any seasonal move-ments outside the core area that is already considered."  *Id.* at C-125.

65.     BOEM accordingly concluded that it had "not identified justifiable reasons to restrict the lease sale area" by "exclud[ing] blocks from leasing in … the 100-400m isobath in the western and central Gulf" and that its existing lease stipulations covering the core Rice's whale habitat "provide adequate environmental protection."  *Id.* at C-34; *see id.* at C-123 to -124.  While recognizing that an individual lease sale "could be scaled back … to offer a smaller area should circumstances warrant," BOEM concluded that "a reduced lease sale alternative" for Lease Sale 261 "based on sensitive bio-logical habitat … had no additional benefits" over BOEM's preferred approach of Gulf wide leasing with the existing protections.  *Id.* at C-34 to -35.

66.     BOEM noted that it would instead "consider[] the use of mitigation, including measures to reduce vessel strikes and overall avoidance, at all phases of energy development and plan-ning," including the "review of any planned transits through Rice's whale core habitat" during "review of plans, permits, and/or authorizations at the post-lease stage."  *Id.* at C-122-24.  BOEM also noted that it considered "the potential for vessel strikes to sperm and Rice's whale" to be "extremely unlikely to occur," given "the generally slow vessel transiting and surveying speeds, limited vessel routes

originating from the eastern [Gulf of Mexico], and the additional mitigations on vessels within the Rice's whale core area (as defined by the [2020 BiOp])." *Id.* at 4-59.

67.    BOEM accordingly held Lease Sale 259 on March 29, 2023, as a "regionwide lease sale" of "all available unleased blocks." Oil and Gas Lease Sale 259, Final Notice of Sale, 88 Fed. Reg. 12,404, 12,405 (Feb. 27, 2023). BOEM included the usual list of stipulations with a few alterations: BOEM converted three of the stipulations (for Baldwin County, topographic features, and live bottom) into area exclusions and added a stipulation for "Royalties on All Produced Gas" that was required by Section 50263 of the Inflation Reduction Act. *Id.* at 12,409. Industry bid nearly $310 million for 313 tracts covering 1.6 million acres of the Gulf. *See* Oil and Gas Lease Sale 259 Final Bid Recap 1-2 (Mar 29, 2023), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-259-Final-Bid-Recap.pdf. BOEM accepted bids and issued leases for 295 tracts. *Id.* at 2.

68.    In March 2023, BOEM published a Proposed Notice of Sale for Lease Sale 261. 88 Fed. Reg. 16,030 (Mar. 15, 2023); Lease Sale 261 Proposed Notice of Sale 1 (Mar. 15, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/proposed-nos-261.pdf. Just like the nine preceding Gulf-wide sales, "BOEM propose[d] to offer for bid in this lease sale all of the available unleased acreage in the GOM OCS." *Id.* at 3.

69.    The Proposed Notice of Sale package for Lease Sale 261 also listed "[t]he final terms, conditions, and stipulations applicable to this sale." *Id.* at 8. That included the same, familiar lease stipulations as in Lease 259 and preceding sales. *Id.* at 10. And just like the three preceding Gulf sales, the Proposed Notice of Sale included stipulations requiring lessees to comply with the reasonable and prudent alternative recommended by NMFS in the 2020 BiOp to protect the Rice's whale in its core habitat. *See* Proposed Notice of Sale for Lease Sale 261, Lease Stipulations 8 (Mar. 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/proposed-

nos-261-lease-stipulations.pdf; *see also* Proposed Notice of Sale for Lease Sale 261, Information to Lessees 8 (Mar. 15, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Proposed-NOS-261-Information-to-Lessees.pdf ("The relevant terms and conditions, reasonable and prudent measures, reasonable and prudent alternative for the Rice's whale (formerly the GOM Bryde's whale), the Notification of Intention to Transit Rice's Whale Area COA, and protocols from the 2020 NMFS BiOp and 2021 Amended ITS and Revised Appendices are incorporated by reference and made a binding part of the lease in the 'Protected Species' Stipulation."). But in keeping with BOEM's analysis in its Final Supplemental Environmental Impact Statement, the Proposed Notice of Sale did not require the same protective measures for the 100-400m isobath across the entire Gulf or exclude blocks from leasing across that entire range.

70.     The Proposed Notice of Sale triggered the 60-day period for "Governors of affected States and the executive of any affected local government" to "review and comment" on the proposal. 88 Fed. Reg. 16,030 (Mar. 15, 2023).

>     **v.     BOEM Previews Then Adopts the Challenged Provisions in the Final Notice of Sale for Lease Sale 261.**

71.     In July 2023, the government previewed that BOEM's approach to the Rice's whale was about to take a 180-degree turn:  BOEM had apparently embraced the very additional "protections" for the Rice's whale that it had deemed unwarranted in the Supplemental EIS just months earlier.

72.     BOEM's preview of its about-face came in an unusual form:  buried in a legal filing in the pending District of Maryland case against another agency challenging the 2020 BiOp.  The plaintiffs reached agreement with NMFS to stay the proceedings so that NMFS could re-assess the 2020 BiOp.  *See* Dkt.147, *Sierra Club*, No. 8:20-cv-3060 (D. Md. filed July 21, 2023).

73.     The background recitals of the agreement between the plaintiffs and NMFS represented that BOEM would soon take independent actions "concerning the Rice's whale and [to] reduce

or eliminate possible disturbance to the species," including by imposing a slew of additional operating restrictions via a new lease stipulation in Lease Sale 261, purportedly to protect the Rice's whale and excluding the area in the 100-400m isobath across the entire northern Gulf of Mexico from that sale—measures that neither NMFS nor BOEM had previously considered necessary.  *Id.* at 3-4.  The agreement made those representations even though BOEM determined just a few months earlier that there was no basis to impose any additional protections for the Rice's whale.  Final Supplemental EIS, at 5-5.

74.    Underpinning these previewed actions was a region identified as the new "Expanded Rice's Whale Area," shaded in dark blue on the map below.  Covering millions of acres, this region stretches between the 100- to 400-meter isobaths and runs the full length of the coasts of Texas, Louisiana, Mississippi, and Alabama—representing a significant expansion of the Rice's whale habitat identified in the 2020 BiOp, surrounded by the yellow/black hashed line on the map below.



**Figure 1.  Expanded Rice's Whale Area**

75.     According to the preview of BOEM's upcoming actions, the new lease stipulation it planned to issue would significantly restrict oil and gas vessel transit through the "Expanded Rice's Whale Area" with a slew of conditions drawn nearly verbatim from the 2020 BiOp's reasonable-and-prudent alternative, which the 2020 BiOp applied only to the Rice's whale's core habitat (or "Bryde's whale area") already excluded from leasing.  ECF No. 147-2 at 2.  The planned stipulation would impose a "10-knot or less, year-round speed restriction," require lessees, operators, and vessels servicing their operations to "avoid transit through the Expanded Rice's Whale Area after dusk and before dawn, and during other times of low visibility to further reduce the risk of vessel strike of Rice's whales."  *Id.*  According to the planned stipulations, all vessels servicing oil and gas activities on these leases would also have to "maintain a minimum separation distance of 500 m from Rice's whales," and all vessels "65 feet or greater associated with oil and gas activity … must have a functioning [Automatic Identification System] onboard and operating at all times."  *Id.* ¶4(c)-(d).  The planned stipulation would also impose various training, monitoring, record-keeping, and reporting requirements on vessel operators and crews.  *Id.* ¶4(a), (e)-(f).  The stay agreement also announced that BOEM would release a Notice to Lessees ("NTL") that would recommend—but purportedly not require—all operators to follow the same restrictions, even if they do not participate in Lease Sale 261.  Dkt.147-1 at 2.

76.     BOEM soon followed through on all counts.

77.     On August 21, 2023, BOEM released the NTL's "guidance appl[ying] to the area comprising the entire northern Gulf of Mexico Outer Continental Shelf (OCS) between the 100- and 400-m isobaths (Expanded Rice's Whale Area)."  BOEM NTL No. 2023-G01, Expanded Rice's Whale Protection Efforts During Reinitiated Consultation with NMFS 1 (Aug. 17, 2023), https://www.boem.gov/sites/default/files/documents/about-boem/regulations-guidance/BOEM%20NTL%202023-G01.pdf.  The NTL explained that "[t]his delineation is based on one

recent study"—the 2022 Soldevilla study—"that Rice's whale occur in portions of this area," and, "[t]herefore, the possibility of incidental take of Rice's whale in the Expanded Rice's Whale Area cannot be dismissed at this time." *Id.* at 1 & n.2. Yet BOEM also cautioned that the NTL "is not meant to be construed as a blanket determination as to whether BOEM, at present, has determined that there is a 'reason to believe' that incidental take may occur, within the meaning of the ESA, the consultation regulations, or BOEM's regulations." *Id.* at 1 n.3.

78.     Although BOEM touted the NTL as merely "voluntary precautionary measures,"[11] BOEM quickly made clear that the same measures *were not* voluntary for leases obtained in Lease Sale 261.

79.     On August 23, 2023, BOEM issued the Final Notice of Sale for Lease and Record of Decision for Lease Sale 261. *See* Final Notice of Sale for Lease Sale 261 (Aug. 23, 2023), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-261-%20FNOS.pdf; Record of Decision for Lease Sale 261 (Aug. 23, 2023), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leas-ing/GOM%20LS%20261%20ROD.pdf. In addition to withdrawing the so-called expanded Rice's whale area between the 100- and 400-meter isobaths, BOEM also added the new stipulation containing an identical list of "precautionary measures"—only not voluntary. *See* Lease Sale 261, Lease Stipula-tions, Stipulation No. 4, Part (B)(4) (Aug. 23, 2023), https://www.boem.gov/sites/default/files/doc-uments/oil-gas-energy/leasing/Sale-261-Lease-Stipulations.pdf ("Lease Stipulations 261").

---

[11] *See* BOEM Issues Voluntary Precautionary Measures for Rice's Whale in Gulf of Mexico (Aug. 21, 2023), https://www.boem.gov/newsroom/notes-stakeholders/boem-issues-voluntary-precautionary-measures-rices-whale-gulf-mexico; *see also* BOEM NTL No. 2023-G01 Fact Sheet (Aug. 21, 2023), https://www.boem.gov/sites/de-fault/files/documents/about-boem/Facts_QA%20NTL%20Rice%26%23039%3Bs%20Whale%20FINAL_0.pdf ("Question: Does the NTL have the effect of law? Answer: No, the NTL contains recommendations for suggested precautionary measures during the reinitiated consultation."),

80.     The new Stipulation No. 4, Part (B)(4) requires Lease Sale 261 bidders to agree that they will (among other things) "implement the following measures for all oil and gas activities occurring" in the "Expanded Rice's Whale Area":

a. Vessel operators and crews must maintain a vigilant watch for Rice's whales and slow down, stop their vessel, or alter course, as appropriate and regardless of vessel size, to avoid striking any Rice's whale. Visual observers monitoring the vessel strike avoidance zone (500 m) may be either third-party observers or crew members, but crew members responsible for these duties must be provided sufficient training to distinguish aquatic protected species to broad taxonomic groups. If transiting within the Expanded Rice's Whale Area (as described in this paragraph), operators must document details of the transit (e.g., date time, Automatic Identification System (AIS) data or tracklines, port, vessels) and other information necessary to demonstrate compliance with the provisions of this stipulation. Other specific requirements for documentation are described below in paragraph (f).

b. All vessels, regardless of size, must observe at all times a 10-knot or less, year-round speed restriction in the Expanded Rice's Whale Area. This restriction does not apply when compliance would place the safety of the vessel or crew, or the safety of life at sea, in doubt. To the maximum extent practicable, lessees and operators should avoid transit through the Expanded Rice's Whale Area after dusk and before dawn, and during other times of low visibility to further reduce the risk of vessel strike of Rice's whales.

c. All vessels must maintain a minimum separation distance of 500 m from Rice's whales. If a whale is observed but cannot be confirmed as a species other than a Rice's whale, the vessel operator must assume that the whale is a Rice's whale and take appropriate action.

d. All vessels 65 feet or greater associated with oil and gas activity (e.g., source vessels, chase vessels, supply vessels) must have a functioning AIS onboard and operating at all times as required by the U.S. Coast Guard. If the vessel does not require AIS, BOEM strongly encourages lessees and operators to obtain and use AIS and, at minimum, the lessee or operator must document relevant information, including trackline (e.g., time and speed) data and visual marine mammal sightings, during every crossing between the 100- to 400-m -isobaths across the northern Gulf of Mexico on the OCS. Lessees and operators must document vessel names and call signs.

e. If an operator or lessee is in violation of these conditions/protocols, the operator or lessee must generate a record of said noncompliance and present the report, within 24 hours the noncompliance, to BSEE by emailing protectedspecies@bsee.gov. The title of the email should include "Transit through Expanded Rice's Whale Area."

f. Lessees and operators must maintain records necessary to document their compliance with the measures required under paragraph (4), including any reasons why it is impracticable for the lessees or operators to avoid transit after dusk and before dawn, or

> during other periods of low visibility. Lessees and operators must retain the records
> necessary to document compliance, for at least 3 years from the date of the activity or
> activities subject to paragraph (4). The records must be made available to BOEM and
> BSEE for inspection, upon request.

Lease Stipulations 261, at 10-11.

81.    Even though BOEM concluded just a few months ago that additional restrictions be-
tween the 100-meter and 400-meter isobaths were not necessary, it stated in the Record of Decision
that "excluding whole and partial blocks between the 100-meter and 400-meter isobaths across the
northern Gulf of Mexico could reduce potential conflicts with the endangered Rice's whale." Record
of Decision for Lease Sale 261, at 2.

82.    According to BOEM, "[r]ecent limited evidence shows that the Rice's whale may be
present in this area and removing the area reduces risks from new leasing while BOEM and the Bureau
of Safety and Environmental Enforcement (BSEE) are engaged in a reinitiated consultation with Na-
tional Marine Fisheries Service (NMFS)." *Id.* The Record of Decision continued:

> "[B]ased on a recent study that the endangered Rice's whale occurs in portions of the
> northern Gulf of Mexico between the 100-meter and 400-meter isobaths eastward
> from the Mexico border with Texas and westward of the Rice's Whale Core Area iden-
> tified in the 2020 Biological Opinion (as amended in April 2021), removing this area
> from the lease sale could reduce risks to this species while reinitiated consultation with
> NMFS is ongoing. Further, the updated Protected Species Stipulation includes interim
> measures to require certain speed restrictions and other measures between the 100-
> meter to 400-meter isobaths. These measures will remain in place while the reinitiated
> consultation is ongoing and until a new or amended biological opinion is issued by
> NMFS. BOEM has documented that nothing in this lease sale or the reasonably fore-
> seeable post-lease activities will prevent the Bureaus and Department from complying
> with their obligations under Section 7 of the ESA to prevent jeopardy to listed species
> or adverse modification of designated critical habitat. The impacts to ESA-listed spe-
> cies from an oil and gas lease sale were addressed in the 2017-2022 GOM Multisale
> EIS, 2018 GOM Supplemental EIS and GOM Lease Sales 259 and 261 Supplemental
> EIS, and were used to support the proposed action; the completion of the two Bio-
> logical Opinions and the reinitiation of consultation do not significantly alter the con-
> clusions in those EISs and thus supplementation is not required."

*Id.* at 12-13.

83.     While the Record of Decision does not identify the "recent study" that BOEM used to justify the new restrictions, the NTL that BOEM released just two days earlier explained that this "one recent study" was the "Soldevilla, … (2022)" study.  NTL at 1 & n.2.  BOEM did not mention that it had already "reviewed the recent July 2022 publication (Soldevilla et al. 2022)" just months ago and concluded that it did not provide "enough information … to confirm [the Rice's whale] distribution or any seasonal movements outside the core area that is already considered."  Final Supplemental EIS, at C-125.  BOEM did not offer any explanation in the Record of Decision for why it changed its mind about the study.

## CLAIMS FOR RELIEF

### COUNT ONE
### (Administrative Procedure Act - Inflation Reduction Act)

84.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

85.     The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law" or "in excess of statutory … limitations."  5 U.S.C §706(2)(A), (C).

86.     Section 50264(d) of the IRA provides that, "not later than September 30, 2023, the Secretary shall conduct Lease Sale 261 in accordance with the Record of Decision approved by the Secretary on January 17, 2017."  IRA §50264(d).

87.     The January 2017 Record of Decision approved a plan for lease sales that would be "region-wide" across the "Western, Central, and Eastern Gulf of Mexico" and "include unleased acreage not subject to moratorium or otherwise unavailable … to provide greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks."  2017 Record of Decision, at 3.

88.     Nothing in the January 2017 Record of Decision—including the hundreds of pages of attachments—contemplated withdrawing a massive 6 million acres from those region-wide sales to

provide additional protection to the Rice's whale or imposing burdensome vessel traffic restrictions for all leases auctioned at Lease Sale 261. On the contrary, BOEM's Final Programmatic Environmental Impact Statement specifically recognized that the "Biologically Important Area" for Rice's whale had no "overlap[] with the [Gulf of Mexico] Program Area," and so its "exclusion would not constitute a meaningful alternative." Final Programmatic Environmental Impact Statement, Vo. I, 2-26 (Nov. 2016).

89. By contrast, the January 2017 Record of Decision did consider other "landscape-scale mitigation measures" and specifically adopted two such "programmatic mitigation measures" as part of the agency's five-year plan, including a measure protecting biologically sensitive underwater features in the Gulf that likewise span large areas. 2017 Record of Decision, at 2; *see* Final Programmatic Environmental Impact Statement, at 2-18 -19.

90. While the January 2017 Record of Decision preserved the possibility that "site- or resource-specific mitigation measures" might potentially be warranted "at the lease sale stage," it does not give BOEM a free hand to radically revise the scope and terms of Lease Sale 261, let alone revoke millions of acres and impose severe restrictions in service of environmental goals that the agency had already considered at the time. 2017 Record of Decision, at 2; *see* Final Programmatic Environmental Impact Statement, Vol. I, at 1-10 (finding that proposed Environmentally Important Area for Rice's whale "lacked adequate scientific support" or was "not appropriate for programmatic mitigation," but "could warrant further analysis at the lease sale stage").

91. The challenged provisions in the Lease Sale 261 Final Notice of Sale and Record of Decision are therefore not "in accordance with" the January 2017 Record of Decision, and so are contrary to IRA §50264(e).

92. Plaintiff Louisiana receives millions of dollars as a result of lease sales in the OCS. If the challenged provisions are allowed to remain in force, Louisiana will be harmed by the loss of funds

that would otherwise be generated by the sale of the withdrawn acreages and by the depressed bidding that will result from the burdensome new stipulation. Moreover, offshore oil and gas support and services is a key industry in Louisiana's economy, including the processing of natural gas which occurs in the Calcasieu and Cameron Parishes within the Lake Charles Division of this District.

93.     Plaintiff API's members include oil and gas companies that intend to bid on leases in Lease Sale 261. If the challenged provisions are allowed to remain in force, API's members will suffer irreparable harm, including that their bids and potential purchases will be affected by the unlawful lease stipulation, and they will be denied the opportunity to bid on the unlawfully withdrawn acreage.

94.     Plaintiff Chevron intends to bid on leases in Lease Sale 261. If the challenged provisions are allowed to remain in force, Chevron will suffer irreparable harm, including that its bids and potential purchases will be affected by the unlawful lease stipulation.

95.     Plaintiffs are without an adequate remedy at law because of the unique nature of the harm they would suffer absent injunctive relief.

96.     The intent of Congress will be served by an Order striking, setting aside, and enjoining the challenged provisions from the Final Notice of Sale and Record of Decision for Lease Sale 261. The public interest will also be served by such an Order.

## COUNT TWO
### (Administrative Procedure Act - Outer Continental Lands Shelf Act)

97.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

98.     The APA requires courts to "hold unlawful and set aside agency action" if it is taken "without observance of procedure required by law." 5 U.S.C. §706(2)(D).

99.     OCSLA provides that, "within sixty days after notice of [a] proposed lease sale," States and local governments are entitled to "submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale." 43 U.S.C. §1345(a)-(b). The Secretary then "shall" accept

any such state recommendations as long as they "provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State," and "shall communicate to the [State], in writing, the reasons for his determination to accept or reject" those recommendations.  *Id.* §1345(c).

100.    BOEM's implementing regulations require the proposed notice of sale to contain "a description of the area proposed for leasing, the proposed lease terms and conditions of sale, and proposed stipulations to mitigate adverse impacts on the environment." 30 C.F.R. §556.304(c); *see id.* §556.304(a) ("lease stipulations and conditions, to mitigate adverse impacts on the environment … will be contained, or referenced, in the proposed notice of sale"). The regulations further require BOEM to "send [the] proposed notice of sale to the governors of affected States and publish the notice of its availability in the Federal Register." *Id.* §556.304(c). This includes the State of Louisiana.

101.    BOEM's regulations confirm that it "will consider all comments and recommendations received in response to the proposed notice of sale" and "will accept the recommendations of a State and/or local government(s)" as long as they "provide a reasonable balance between the national interest and the well-being of the citizens of the State."  30 C.F.R. §556.307(a)-(b); *see* 43 U.S.C. §1345(c).

102.    Despite BOEM's clear and explicit regulation requiring that the Proposed Notice of Sale contain the "proposed lease terms and conditions of sale" and "proposed stipulations to mitigate potential adverse impacts on the environment," 30 C.F.R. §556.304(c), the Proposed Notice of Sale here said not one word about the challenged lease stipulation imposing burdensome operating restrictions purportedly to protect the Rice's whale—that BOEM has since attempted to add to the Final Notice of Sale.

103.    As to the challenged acreage withdrawal, the Proposed Notice of Sale included only a single sentence stating that "BOEM is considering removing the area comprising the northeastern

Gulf of Mexico and continental shelf break between the 100 meters and 400 meters in depth isobaths to protect Rice's Whales that may transit through the area." Lease Sale 261 Proposed Notice of Sale, at 7. That notice that BOEM was considering removing areas in the *northeastern* Gulf provided little indication that BOEM was considering removing the whole 100-400m isobath across the entire *western and central* Gulf, let alone explain the basis for such a draconian restriction.

104.    Adding insult to injury, BOEM's decision to adopt the last-minute changes appears to have been developed with environmental groups in conjunction with a lawsuit against a different government agency in the *Sierra Club* litigation in Maryland. In other words, rather than consult with the stakeholders with whom BOEM is statutorily obligated to confer, BOEM effectively made this decision based on *ex parte* contacts with a small and hardly disinterested subset of stakeholders.

105.    Because BOEM failed to provide adequate notice in the Proposed Notice of Sale that it was considering adopting the challenged provisions, the challenged provisions deny Plaintiffs their statutory rights to participate in the leasing process and the challenged provisions are therefore procedurally invalid under OCSLA and its implementing regulations and must be set aside.

106.    Plaintiff Louisiana has a statutory right to participate in the leasing process and is irreparably harmed by being denied those rights. Additionally, Louisiana receives millions of dollars as a result of lease sales in the OCS. If the challenged provisions are allowed to remain in force, Louisiana will be harmed by the loss of the funds that would otherwise be generated by the sale of the withdrawn acreages and by the depressed bidding that will result from the burdensome new stipulation. Moreover, offshore oil and gas support and services is a key industry in Louisiana's economy, including the processing of natural gas which occurs in the Calcasieu and Cameron Parishes within the Lake Charles Division of this Judicial District.

107.    Plaintiff API's members include oil and gas companies who intend to bid on leases in Lease Sale 261. If the challenged provisions are allowed to remain in force, API's members will suffer

irreparable harm, including that their bids and potential purchases will be affected by the unlawful lease stipulation, and they will be denied the opportunity to bid on the unlawfully withdrawn acreage.

108.     Plaintiff Chevron intends to bid on leases in Lease Sale 261.  If the challenged provisions are allowed to remain in force, Chevron will suffer irreparable harm, including that its bids and potential purchases will be affected by the unlawful lease stipulation.

109.     Plaintiffs are without an adequate remedy at law because of the unique nature of the harm they would suffer absent injunctive relief.

110.     The intent of Congress will be served by an Order striking, setting aside, and enjoining the challenged provisions from the Final Notice of Sale and Record of Decision for Lease Sale 261. The public interest will also be served by such an Order.

### COUNT THREE
### (Administrative Procedure Act – Arbitrary and Capricious)

111.     Plaintiffs re-allege and incorporate by reference the preceding allegations as though fully set out herein.

112.     The APA requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. §706(2)(A).

113.     Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action," which requires "a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In particular, agency action is arbitrary and capricious if the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  When an agency changes its views, moreover, the agency must "'display awareness that it is changing position' and 'show that there are good reasons for the new

policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). An "unexplained inconsistency" with the agency's prior views is therefore sufficient to find the agency's action arbitrary and capricious. *Id.* (brackets omitted).

114.    BOEM extensively considered protections for the Rice's/Bryde's whale throughout the development of its 2017-2022 Five-Year Plan, in subsequent environmental reviews, and in developing the Proposed Notice of Sale for Lease Sale 261—and repeatedly concluded that no additional protections were needed beyond the existing measures covering the core Rice's whale habitat. *See, e.g.,* Final Programmatic Environmental Impact Statement, Vo. I, at 1-10 (finding that proposed Environmentally Important Area for Rice's whale "lacked adequate scientific support" or was "not appropriate for programmatic mitigation,"); *id.* at 2-26 (finding that the "Biologically Important Area" for Rice's whale had no "overlap[] with the [Gulf of Mexico] Program Area," and so its "exclusion would not constitute a meaningful alternative"); Final Supplemental EIS, at c-126 (Jan. 2023) (finding "not enough conclusive data on the density, general distributions, and possible migratory behaviors" of the Rice's whale "to support a reasonable conclusive analysis"); *id.* at C-34 (finding no "justifiable reasons to restrict the lease sale area" by "exclud[ing] blocks from leasing in … the 100-400m isobath in the western and central Gulf," and that existing lease stipulations "provide adequate environmental protection"); *id.* at 4-59 (finding "the potential for vessel strikes" to be "extremely unlikely to occur").

115.    Nothing in the Final Notice of Sale or the Record of Decision for Lease Sale 261 provides an adequate explanation for BOEM's decision to change its position and conclude that further measures to protect the Rice's whale were necessary. The Record of Decision explains that BOEM based its decision on "a recent study that the endangered Rice's whale occurs" the Expanded Rice's Whale area. Record of Decision at 12. But it reviewed that same exact study months ago and concluded that it did not provide "enough information … to confirm [the Rice's whale] distribution or any seasonal movements outside the core area that is already considered." Final Supplemental EIS,

at C-125.  BOEM did not offer any explanation whatsoever for why it changed its mind about the study.

116.    BOEM's failure to justify its actions suggests that its decision to expand the Rice's whale area was pretextual and therefore arbitrary and capricious.  *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573-76 (2019).  The surrounding context presents a "strong showing," *id.* at 2574, that BOEM decided to include the challenged provisions in conjunction with NMFS in order to placate environmental groups into agreeing to stay separate litigation, *see* Dkt.147, *Sierra Club*, No. 8:20-cv-3060 (D. Md. filed Oct. 21, 2020).  That pretextual reasoning fails to satisfy the reasoned decision-making required by the APA.

117.    Moreover, nothing in the Final Notice of Sale rationally justifies the protections that BOEM seeks to impose, or shows that the agency rationally balanced the purported need for those protections against all the other factors that Congress has required BOEM to consider.

118.    BOEM's sudden decision to add the challenged provisions to the Final Notice of Sale—without any adequate explanation of why BOEM was departing from its prior position that existing measures provide sufficient protection for the Rice's whale, why the specific measures at issue were chosen, or why those measures were warranted in light of the other relevant factors—is accordingly arbitrary and capricious, and therefore unlawful.  And BOEM may not impose restrictions "by relying upon worst-case scenarios or pessimistic assumptions."  *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 586 (D.C. Cir. 2023).

119.    BOEM also does not explain why applying the vessel restrictions to only vessels servicing the oil and gas industry would protect the Rice's whale, particularly when cruise liners, cargo ships, and other vessels of all kinds will continue to travel through the "Expanded Rice's Whale Area" without any new restrictions.  Vessels servicing the oil and gas industry constitute only a fraction of the vessels traveling through the "Expanded Rice's Whale Area."

120.    Plaintiff Louisiana has a statutory right to participate in the leasing process and is ir-reparably harmed by being denied those rights.  Additionally, Louisiana receives millions of dollars as a result of lease sales in the Outer Continental Shelf.  If the challenged provisions are allowed to remain in force, Louisiana will be harmed by the loss of the funds that would otherwise be generated by the sale of the withdrawn acreages and by the depressed bidding that will result from the burden-some new stipulation.  Moreover, offshore oil and gas support and services is a key industry in Loui-siana's economy, including the processing of natural gas which occurs in the Calcasieu and Cameron Parishes within the Lake Charles Division of this Judicial District.

121.    Plaintiff API's members include oil and gas companies who intend to bid on leases in Lease Sale 261.  If the challenged provisions are allowed to remain in force, API's members will suffer irreparable harm, including that their bids and potential purchases will be affected by the unlawful lease stipulation, and they will be denied the opportunity to bid on the unlawfully withdrawn acreage.

122.    Plaintiff Chevron intends to bid on leases in Lease Sale 261.  If the challenged provi-sions are allowed to remain in force, Chevron will suffer irreparable harm, including that its bids and potential purchases will be affected by the unlawful lease stipulation.

123.    Plaintiffs are without an adequate remedy at law because of the unique nature of the harm they would suffer absent injunctive relief.

124.    The intent of Congress will be served by an Order striking, setting aside, and enjoining the challenged provisions from the Final Notice of Sale and Record of Decision for Lease Sale 261. The public interest will also be served by such an Order.

## **PRAYER FOR RELIEF**

Plaintiffs pray for the following relief from the Court:

1.    A declaration, pursuant to 28 U.S.C §2202, that the challenged provisions of the Final Notice of Sale and Record of Decision for Lease Sale 261 imposing the new lease Stipulation No. 4,

Part (B)(4) and withdrawing all acreage between the 100 to 400-meter isobaths violate the Inflation Reduction Act, the Outer Continental Shelf Lands Act, and the Administrative Procedure Act and are therefore unlawful;

2.      A preliminary and permanent injunction striking, setting aside, and enjoining BOEM from implementing the specific challenged provisions of the Final Notice of Sale and Record of Decision for Lease Sale 261;

3.      An order vacating the specific challenged provisions of the Final Notice of Sale and Record of Decision for Lease Sale 261;

4.      An order compelling Defendants to proceed with Lease Sale 261 on September 27, 2023, without the challenged provisions;

5.      An order awarding Plaintiffs their costs, reasonable attorneys' fees, and other expenses pursuant to 28 U.S.C. §2412; and

6.      Any further relief the Court deems just and proper.

Respectfully submitted,

August 24, 2023

By: */s/ James A. Holmes*

/s/ *Joseph Scott St. John*
Jeff Landry
   Attorney General of Louisiana
Elizabeth B. Murrill (La #20685)
   Solicitor General
Joseph S. St. John (La #36682)
   Deputy Solicitor General
Jordan B. Redmon (La #37272)
   Assistant Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

James A. Holmes (LA #20571)
Kyle D. Anderson (LA #38124)
CHRISTOVICH & KEARNEY
2300 Pan American Life Center
601 Poydras Street
New Orleans, LA 70130-6078
(504) 561-5700
jaholmes@christovich.com
kanderson@christovich.com

Paul D. Clement (*pro hac vice forthcoming*)
C. Harker Rhodes IV* (*pro hac vice forthcoming*)
Andrew Lawrence* (*pro hac vice forthcoming*)
James Y. Xi* (*pro hac vice forthcoming*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
harker.rhodes@clementmurphy.com
andrew.lawrence@clementmurphy.com
james.xi@clementrmurphy.com

*Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for Plaintiff American Petroleum Institute*

/s/ *Michael R. Phillips*
Michael R. Phillips (LA #21020)
Claire E. Juneau (LA #33209)
Jeffrey J. Gelpi (LA #37130)
KEAN MILLER LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112
(504) 585-3050
mike.phillips@keanmiller.com
claire.juneau@keanmiller.com
jeff.gelpi@keanmiller.com

Robert M. Kallam (LA #20242)
KEAN MILLER LLP
600 Jefferson Street, Suite 1101
Lafayette, LA  70502
(337) 235-2232

40

robert.kallam@keanmiller.com

Catherine E. Stetson (*pro hac vice forthcoming*)
Sean Marotta (*pro hac vice forthcoming*)
Dana A. Raphael (*pro hac vice forthcoming*)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

Nikesh Jindal (*pro hac vice forthcoming*)
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 737-0500
njindal@kslaw.com

Sarah C. Bordelon (*pro hac vice forthcoming*)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
(775) 327-3011
scbordelon@hollandhart.com

*Counsel for Plaintiff Chevron U.S.A. Inc.*