# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAKE CHARLES DIVISION

| | |
|---|---|
| THE STATE OF LOUISIANA, by and through its Attorney General, JEFF LANDRY; AMERICAN PETROLEUM INSTITUTE, and Chevron U.S.A. Inc., | |
| Plaintiffs, | Hon. Judge James D. Cain, Jr. |
| v. | Hon. Magistrate Judge Kathleen Kay |
| DEB HAALAND, in her official capacity as Secretary of the Interior; LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management; ELIZABETH KLEIN, in her official capacity as Director of the Bureau of Ocean Energy Management; JAMES KENDALL, in his official capacity as Director of the Gulf of Mexico Regional Office of the Bureau of Ocean Energy Management; U.S. DEPARTMENT OF THE INTERIOR; and BUREAU OF OCEAN ENERGY MANAGEMENT, | Case No. 2:23-cv-01157 |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT
## OF MOTION FOR PRELIMINARY INJUNCTION

Paul D. Clement (*pro hac vice forthcoming*)
C. Harker Rhodes IV* (*pro hac vice forthcoming*)
Andrew Lawrence* (*pro hac vice forthcoming*)
James Y. Xi* (*pro hac vice forthcoming*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
harker.rhodes@clementmurphy.com
andrew.lawrence@clementmurphy.com
james.xi@clementrmurphy.com

Jeff Landry
  Attorney General of Louisiana
Elizabeth B. Murrill (La #20685)
  Solicitor General
Joseph S. St. John (La #36682)
  Deputy Solicitor General
Jordan B. Redmon (La #37272)
  Assistant Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 485-2458
murrille@ag.louisiana.gov

*Supervised by principals of the firm
who are members of the Virginia Bar

James A. Holmes (LA #20571)
Kyle D. Anderson (LA #38124)
CHRISTOVICH & KEARNEY
2300 Pan American Life Center
601 Poydras Street
New Orleans, LA 70130-6078
(504) 561-5700
jaholmes@christovich.com
kanderson@christovich.com

*Counsel for Plaintiff American Petroleum
Institute*

stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*

Michael R. Phillips (LA #21020)
Claire E. Juneau (LA #33209)
Jeffrey J. Gelpi (LA #37130)
KEAN MILLER LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112
(504) 585-3050
mike.phillips@keanmiller.com

Robert M. Kallam (LA #20242)
KEAN MILLER LLP
600 Jefferson Street, Suite 1101
Lafayette, LA 70502
(337) 235-2232
robert.kallam@keanmiller.com

Catherine E. Stetson (*pro hac vice forthcoming*)
Sean Marotta (*pro hac vice forthcoming*)
Dana A. Raphael (*pro hac vice forthcoming*)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

Nikesh Jindal (*pro hac vice forthcoming*)
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 737-0500

Sarah C. Bordelon (*pro hac vice forthcoming*)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
(775) 327-3011

*Counsel for Plaintiff Chevron U.S.A. Inc.*

August 28, 2023

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ................................................................................................................1

STATEMENT OF THE CASE.............................................................................................2

    A.    Legal Background ..................................................................................................2

    B.    Factual Background ...............................................................................................6

            1.    The Secretary Approves The 2017-2022 Leasing Program ..............................6

            2.    BOEM Adopts Measures To Protect The Rice's Whale ...................................7

            3.    Federal Pause On Oil And Gas Leasing Disrupts The Planned Sales.................................................................................................................8

            4.    Congress Passes The Inflation Reduction Act To Require BOEM To Conduct Remaining Lease Sales According To The Five-Year Plan...................................................................................................................10

            5.    BOEM Previews Then Adopts The Challenged Provisions In The Final Notice Of Sale For Lease Sale 261 ..................................................12

ARGUMENT .....................................................................................................................14

I.    Plaintiffs Are Likely To Succeed On The Merits..................................................14

    A.    The Challenged Provisions Violate The IRA ......................................................14

    B.    The Challenged Provisions Are Procedurally Invalid. .......................................18

    C.    The Challenged Provisions Are Arbitrary And Capricious .................................21

            1.    BOEM Failed To Explain Its Dramatic Change In Position .........................22

            2.    BOEM Failed To Justify The Challenged Provisions .....................................24

            3.    BOEM Failed To Consider Other Important Factors .....................................25

II.    Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction..............................27

III.    The Remaining Factors Likewise Support A Preliminary Injunction.........................................29

CONCLUSION ..................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
  878 F.2d 806 (5th Cir. 1989) ............................................................................29

*Bennett v. Spear,*
  520 U.S. 154 (1997) ..........................................................................................25

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.,*
  17 F.4th 604 (5th Cir. 2021) ...............................................................22, 24, 30

*Cal. ex rel. Brown v. Watt,*
  668 F.2d 1290 (D.C. Cir. 1981) ...........................................................................3

*Celsis In Vitro, Inc. v. CellzDirect, Inc.,*
  664 F.3d 922 (Fed. Cir. 2012) ...........................................................................28

*Chafin v. Chafin,*
  568 U.S. 165 (2013) ..........................................................................................29

*Chem. Mfrs. Ass'n v. U.S. EPA,*
  870 F.2d 177 (5th Cir. 1989) ............................................................................21

*Daniels Health Sci., L.L.C. v. Vascular Health Sci., L.L.C.,*
  710 F.3d 579 (5th Cir. 2013) ............................................................................30

*Dep't of Com. v. New York,*
  139 S.Ct. 2551 (2019) .......................................................................................24

*Dubin v. United States,*
  143 S.Ct. 1557 (2023) .......................................................................................18

*Encino Motorcars L.L.C. v. Navarro,*
  579 U.S. 211 (2016) ..........................................................................................22

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ..........................................................................................24

*FCC v. Prometheus Radio Project,*
  141 S.Ct. 1150 (2021) .......................................................................................21

*Friends of the Earth v. Haaland,*
  2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) ...............................................9, 10

*Friends of the Earth v. Haaland,*
  583 F.Supp.3d 113 (D.D.C. 2022) ..................................................................9, 22

*Hornbeck Offshore Servs., L.L.C. v. Salazar,*
  696 F.Supp.2d 627 (E.D. La. 2010) ....................................................................30

*Kingdomware Techs., Inc. v. United States,*
  579 U.S. 162 (2016) ..........................................................................................16

*Louisiana v. Becerra,*
  577 F.Supp.3d 483 (W.D. La. 2022) ..................................................................28

*Louisiana v. Biden,*
  2021 WL 4312502 (W.D. La. Aug. 23, 2021) ............................................. 20, 27

*Louisiana v. Biden,*
  543 F.Supp.3d 388 (W.D. La. 2021) ............................................................ 9, 27

*Louisiana v. Biden,*
  55 F.4th 1017 (5th Cir. 2022) ............................................................................14

*Louisiana v. Biden,*
  622 F.Supp.3d 267 (W.D. La. 2022) ....................................................................9

*Louisiana v. Biden,*
  45 F.4th 841 (5th Cir. 2022) .................................................................................9

*Maine Cmty. Health Options v. United States,*
  140 S.Ct. 1308 (2020) .......................................................................................16

*Maine Lobstermen's Ass'n v. NMFS,*
  70 F.4th 582 (D.C. Cir. 2023) ...........................................................................25

*Mock v. Garland,*
  2023 WL 4882763 (5th Cir. Aug. 1, 2023) ........................................................21

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife,*
  551 U.S. 644 (2007) .............................................................................................5

*Portland Audubon Soc'y v. Endangered Species Comm.,*
  984 F.2d 1534 (9th Cir. 1993) ...........................................................................20

*Restaurant L. Ctr. v. Dep't of Lab.,*
  66 F.4th 593 (5th Cir. 2023) ..............................................................................29

*Texas v. United States,*
  40 F.4th 205 (5th Cir. 2022) ..................................................................16, 22, 30

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) .......................................................................28, 29

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
    985 F.3d 472 (5th Cir. 2021) ................................................................................. 25

*Wages & White Lion Invs., L.L.C. v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) .......................................................................... 22, 28

**Statutes**

5 U.S.C. §706(2) ................................................................................................... 14

5 U.S.C. §706(2)(A) .............................................................................................. 21

5 U.S.C. §706(2)(D) .............................................................................................. 18

16 U.S.C. §1536(a)(2) ............................................................................................. 4

16 U.S.C. §1536(b)(3) ............................................................................................. 5

16 U.S.C. §1536(g)(1) ............................................................................................. 5

16 U.S.C. §1536(h) ................................................................................................. 5

43 U.S.C. §1301(a) ................................................................................................. 3

43 U.S.C. §1312 ..................................................................................................... 3

43 U.S.C. §1331(a) ................................................................................................. 3

43 U.S.C. §1332(3) ................................................................................................. 3

43 U.S.C. §1332(4) ............................................................................................... 18

43 U.S.C. §1337(g)(5) ........................................................................................... 27

43 U.S.C. §1340(g)(3) ........................................................................................... 30

43 U.S.C. §1344(a) ................................................................................................. 3

43 U.S.C. §1344(a)(2) ........................................................................................ 4, 26

43 U.S.C. §1344(a)(3) ............................................................................................. 3

43 U.S.C. §1344(b)(3) ............................................................................................. 3

43 U.S.C. §1344(c)(1)-(2) ....................................................................................... 4

43 U.S.C. §1345(a) ................................................................................................. 4

43 U.S.C. §1345(a)-(b) ........................................................................... 18, 19, 21, 28

43 U.S.C. §1345(c) ........................................................................................ 4, 18, 19, 28

43 U.S.C. §1351(c) ........................................................................................ 30

43 U.S.C. §1802(1) ........................................................................................ 3

43 U.S.C. §4332(2)(C) .................................................................................... 3

Pub. L. No. 109-432, 120 Stat. 2992 (2006) ................................................. 5, 27

**Regulations**

30 C.F.R. §250.101 ........................................................................................ 3

30 C.F.R. §550.101 ........................................................................................ 3

30 C.F.R. §556.301 ........................................................................................ 4

30 C.F.R. §556.302(a) .................................................................................... 26

30 C.F.R. §556.302(b) .................................................................................... 4

30 C.F.R. §556.304(a) .................................................................................... 4, 19

30 C.F.R. §556.304(c) .................................................................................... 4, 19, 28

30 C.F.R. §556.305(a) .................................................................................... 19, 21, 28

30 C.F.R. §556.307(a)-(b) .............................................................................. 19

30 C.F.R. §556.307(c) .................................................................................... 4

30 C.F.R. §556.308(a) .................................................................................... 4

30 C.F.R. §556.308(b) .................................................................................... 4

50 C.F.R. §402.02 .......................................................................................... 5

50 C.F.R. §402.12(k) ...................................................................................... 5

50 C.F.R. §402.14(g) ...................................................................................... 5

50 C.F.R. §402.14(h) ...................................................................................... 5, 26

82 Fed. Reg. 32,577 (July 14, 2017) .............................................................. 8

83 Fed. Reg. 32,897 (July 16, 2018) .............................................................. 8

83 Fed. Reg. 7,070 (Feb. 16, 2018) ............................................................... 8

84 Fed. Reg. 34,937 (July 19, 2019) ............................................................................8

84 Fed. Reg. 4,525 (Feb. 15, 2019) ..............................................................................8

85 Fed. Reg. 8,010 (Feb. 12, 2020) ..............................................................................8

85 Fed. Reg. 66,348 (Oct. 19, 2020) ............................................................................8

86 Fed. Reg. 7,619 (Jan. 27, 2021) ...............................................................................9

86 Fed. Reg. 10,132 (Feb. 18, 2021) .............................................................................9

88 Fed. Reg. 16,030 (Mar. 15, 2023) ..........................................................................12

**Other Authorities**

Compl., *Sierra Club v. NMFS*, No. 8:20-cv-3060
    (D. Md. filed Oct. 21, 2020), Dkt.1 .....................................................................8

H.R. Rep. 95-590 (1977) ....................................................................................... 18, 19

Oil and Gas Lease Sale 257, Final Bid Recap (Nov. 17, 2022), bit.ly/3OPPB8B..................9

Oil and Gas Lease Sale 259, Final Bid Recap (Mar. 29, 2023), bit.ly/3EfOhqQ ................12

Presidential Determination on the Withdrawal of Certain Areas of the United States
    Outer Continental Shelf from Leasing Disposition (Sept. 25, 2020),
    bit.ly/3EbineT .......................................................................................................7

Melissa Soldevilla, et al., *Rice's Whales in the Northwestern Gulf Of Mexico*,
    48 Endang. Species Res. 155 (2022),  https://www.int-
    res.com/articles/esr2022/48/n048p155.pdf ................................................... 23, 25

Stipulation, *Sierra Club v. NMFS*, No. 8:20-cv-3060
    (D. Md. filed July 21, 2023), Dkt.147 ............................................................ 12, 24

## INTRODUCTION

This case challenges a striking example of arbitrary and unlawful agency action.  The Outer Continental Shelf Lands Act ("OCSLA") and its implementing regulations establish detailed procedures for leasing submerged federal lands to allow exploration and sustainable development of their oil and gas resources.  For years, the Bureau of Ocean Energy Management ("BOEM") engaged with federal agencies, States, local governments, industry members, environmental groups, and other interested parties to prepare for "Lease Sale 261," which covers much of the western and central Gulf of Mexico—a lease sale that Congress has directed must occur by September 30, 2023.  Five months ago, after extensively considering tens of thousands of comments, BOEM issued its required Proposed Notice of Sale, setting out the area that Lease Sale 261 would cover and the stipulations that would attach to any leases.

Then, on August 23, BOEM changed the rules.  In its Final Notice of Sale, BOEM inserted provisions radically altering the terms of Lease Sale 261, imposing a burdensome new stipulation as part of the lease terms and withdrawing 6 million acres—larger than the state of Massachusetts— from the sale entirely.  BOEM made those last-minute changes in a claimed effort to further protect the "Rice's whale" (formerly called the "Bryde's whale"), even though BOEM had previously and repeatedly found similar measures unnecessary, even though BOEM provided no meaningful explanation for its change in position, and even though Congress directed BOEM to proceed with a specifically defined lease sale with dispatch.  BOEM now intends to hold Lease Sale 261 on September 27, 2023, subject to those new restrictions.  This effectively forces bidders into a new stipulation with burdensome vessel-transit restrictions and denies bidders any chance to bid on the withdrawn acreage, while simultaneously denying States their legal right to meaningfully participate in the leasing process and depriving them of millions of dollars from the now-diminished lease sale.

BOEM's eleventh-hour bait and switch is unlawful several times over.  The new stipulation

and acreage withdrawal ("the challenged provisions") contravene the Inflation Reduction Act ("IRA"), which explicitly directed BOEM to conduct Lease Sale 261 in accordance with BOEM's previously adopted Five-Year Plan for oil and gas leasing—not to introduce substantial new conditions and complications, let alone withdraw millions of acres, at the last minute.  They contravene OCSLA's procedural requirements and implementing regulations, which instruct BOEM to provide notice of the lease-sale terms in the Proposed Notice of Sale, not radically change them in the Final Notice.  And they contravene the Administrative Procedure Act ("APA"), as they are a wholly arbitrary and capricious departure from BOEM's prior position.  Those substantive and procedural flaws doom BOEM's attempt to impose the challenged provisions on Lease Sale 261.

This Court should grant Plaintiffs—the State of Louisiana, the American Petroleum Institute ("API"), and Chevron U.S.A. Inc. ("Chevron")—a preliminary injunction and prevent those unlawful provisions from permanently disrupting the result of the fast-approaching lease sale (which Congress has directed must occur by September 30, and which cannot be delayed without causing Plaintiffs even *more* serious injury).  Given the numerous legal flaws with BOEM's actions, Plaintiffs are very likely to succeed on the merits.  Plaintiffs also face real and irreparable harm if the challenged provisions remain effective when bids must be submitted, as they will irrevocably affect the bids placed at the upcoming sale, altering the outcome in ways that cannot be undone while permanently depriving the State of Louisiana of potential revenue.  The balance of the equities and the public interest likewise tip strongly in favor of entering an injunction, as BOEM has alternative avenues for lawfully achieving its regulatory goals, and neither equity nor the public interest are served by giving effect to unlawful agency action.  The challenged provisions must be enjoined.

## STATEMENT OF THE CASE

### A.    Legal Background

This case involves the sale of oil and gas leases on the Outer Continental Shelf ("OCS")—

submerged land lying beyond state territorial waters but within U.S. territorial waters that contains enormous oil and gas reserves. *See* 43 U.S.C. §§1301(a), 1312, 1331(a). Congress clarified ownership of these lands and passed OCSLA, which authorizes the Secretary of the Interior ("Secretary") to lease them for mineral development, in 1953. *See id.* §§ 1301-15; *id.* §§1301-1356b. After the 1973 oil crisis, recognizing that the OCS is a "vital national resource," *id.* §1331(3), Congress amended OCSLA in 1978 to "establish policies and procedures for managing the oil and natural gas resources of the [OCS]," which "are intended to result in expedited exploration and development of the [OCS] in order to achieve national and economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *Id.* §1802(1). To those ends, OCSLA directs the Secretary to make the OCS "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs." *Id.* §1332(3). The Secretary has delegated this authority to BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE"). 30 C.F.R. §§250.101, 550.101.

OCSLA facilitates the expeditious development of OCS oil and gas resources by directing the Secretary to administer a competitive leasing program. This begins with BOEM formulating a five-year leasing plan that serves as "the basis for future planning by all affected entities." *Cal. ex rel. Brown v. Watt*, 668 F.2d 1290, 1299 (D.C. Cir. 1981); *see* 43 U.S.C. §1344(a). Creating a five-year plan is a massive undertaking, requiring BOEM to balance the "potential for the discovery of oil and gas," the "potential for environmental damage," and "the potential for adverse impact on the coastal zone," as well as develop a programmatic environmental impact statement ("EIS") addressing potential environmental impacts. 43 U.S.C. §§1344(a)(3), (b)(3), 4332(2)(C). OCSLA also requires consideration of the "laws, goals, and policies of affected States," by mandating that the Secretary consider suggestions from the Governors of affected States, submit copies of the proposed program to those Governors,

3

and reply in writing to any Governor's request for modification.  *Id.* §§1344(a)(2)(F), (c)(1)-(2).

BOEM then prepares for an individual lease sale by requesting information from "industry and the public" on the sale area's potential for drilling, as well as "socioeconomic, biological, and environmental information," 30 C.F.R. §556.301, which BOEM considers in determining the scope and terms of the lease sale, including "lease stipulations and conditions," that are published in a proposed notice of sale, *id.* §§556.302(b), 556.304(a).  This proposed notice of sale allows Governors of affected States and affected local governments to "submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale or with respect to a proposed development and production plan."  43 U.S.C. §1345(a); *see* 30 C.F.R. §556.304(c).  The Secretary "shall accept" those recommendations if she determines "that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State."  43 U.S.C. §1345(c).  The Secretary "shall communicate to the Governor, in writing, the reasons for his determination to accept or reject such Governor's recommendations, or to implement any alternative means identified in consultation with the Governor to provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State."  *Id.*; *see* 30 C.F.R. §556.307(c).  BOEM then publishes a Final Notice of Sale, which contains "a description of the areas offered for lease, the lease terms and conditions of sale, and stipulations to mitigate potential adverse impacts on the environment." 30 C.F.R. §556.308(a)(2).  The lease sale is then conducted by a sealed-bid auction held at least 30 days later.  *Id.* §556.308(a)-(b).

In addition to complying with OCSLA, the Secretary's ordinary leasing activities must comply with federal environmental laws, including the Endangered Species Act ("ESA").  The ESA requires BOEM to "consult[] with" the National Marine Fisheries Service ("NMFS") before taking "any action" to ensure that the action "is not likely to jeopardize" listed species.  16 U.S.C. §1536(a)(2).  If BOEM determines that its proposed action is "not likely" to adversely affect listed species and critical

habitat, and if NMFS agrees, no further consultation is necessary.  50 C.F.R. §402.12(k).  Otherwise, BOEM and NMFS engage in a formal consultation process, at the end of which NMFS issues a biological opinion setting forth its view as to "how the agency action affects" any endangered species, 16 U.S.C. §1536(b)(3)(A), and specifically, whether the action "is likely to jeopardize the continued existence" of the species, 50 C.F.R. §402.14(g)(4), (h).  If NMFS issues a "jeopardy" opinion, it "shall" suggest "reasonable and prudent alternatives" that will avoid jeopardy.  16 U.S.C. §1536(b)(3)(A); 50 C.F.R. §402.02.  These alternatives must be "economically and technologically feasible," "within the scope of the federal agency's legal authority and jurisdiction," and "implemented in a manner consistent with the intended purpose of the action."  50 C.F.R. §402.14(h).  BOEM then has the choice to "terminate the [proposed] action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee pursuant to 16 U.S.C. §1536(e)."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007).  And other parties—including "the Governor of the State in which an agency action will occur"—can seek an exemption too.  *See* 16 U.S.C. §1536(g)(1).  The Endangered Species Committee must provide an exemption when, among other requirements, the benefits of the proposed action "clearly outweigh" the benefits of alternatives and when the proposed action is "of regional or national significance."  *Id.* §1536(h).

Congress has also mandated how the massive government revenues from OCS lease sales are distributed.  Coastal States are entitled to significant portions of the proceeds from OCS leasing and production.  The Gulf of Mexico Energy Security Act provides for the sharing of 37.5% of "qualified Outer Continental Shelf revenues" among Louisiana, Alabama, Mississippi, and Texas.  Pub. L. No. 109-432, §105(a), 120 Stat. 2992, 3000 (2006).  Since 2017, the geographic area of "qualified" revenues encompasses the entire Gulf of Mexico OCS available for leasing.  *Id.* §105(b)(2).  In addition, 12.5% of "qualified" revenues is shared with the Land and Water Conservation Fund, which provides grants to States.  *Id.* §105(a).  These revenue-sharing programs provide States with substantial funds; in fiscal

year 2022, Louisiana received $124.9 million in direct revenue sharing, and its coastal political subdivisions received an additional $31.2 million.  *See* Ex. X, Dismukes Decl. ¶29.

### B.    Factual Background

This case challenges BOEM's last-minute addition of a burdensome new lease stipulation and last-minute withdrawal of acreage from Lease Sale 261, a lease sale that Congress has instructed "shall" occur "not later than September 30, 2023."  IRA §50264(e).

### 1.    The Secretary Approves The 2017-2022 Leasing Program.

After years of planning, the Secretary approved the 2017-2022 Five-Year Leasing Program in a "Record of Decision" that directed BOEM to proceed with 10 scheduled lease sales in the Gulf: one sale in 2017, two each year from 2018 to 2021, and one—Lease Sale 261—in 2022.  These sales were to be "region-wide and include unleased acreage not subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf," with the goal of "provid[ing] greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks."  Ex. Q, 2017 Record of Decision, at 3.

The Secretary decided on region-wide leasing based on the Proposed Final Program and Programmatic EIS, which considered the environmental impacts of sales of differing scope.  Among other things, the Programmatic EIS concluded that the "biologically important area" for the Rice's whale (then called the Bryde's whale) in the northeastern Gulf did not "overlap[] with the GOM Program Area" due to a congressional leasing moratorium in most of the eastern Gulf.  Ex. S, Final Programmatic EIS Vol. I, 2-26.  The Programmatic EIS also "assume[d] continuing implementation of protective measures required by statute, regulation, or current lease sale stipulations that would likely continue to be adopted in the future."  *Id.* at 2-3; *see also* Ex. T, Final Programmatic EIS Vol. II, at 1-3 ("[T]he impact analysis assumes that sale-specific stipulations that were commonly adopted in past lease sales are in effect.").  The Programmatic EIS and Gulf sale immediately preceding the 2017-

2022 Leasing Program included 10 such stipulations, including one for "Protected Species" requiring compliance with the Endangered Species Act and Marine Mammal Protection Act. *Id.* I-3 to I-4, E-34, J-11; Ex. S, Final Programmatic EIS Vol. I, 2-3, 3-52; Ex. W, Lease Sale 247 FNOS, at 8.

BOEM's subsequent environmental reviews of the 2017-2022 Leasing Program—the 2017 Multisale EIS, 2018 Supplemental EIS, and 2023 Supplemental EIS for Lease Sales 259 and 261—listed the same 10 common lease stipulations drawn from the Programmatic EIS and Lease Sale 247. *See* Ex. R, Final Multisale EIS, 2-24 to 2-28; Ex. P, 2018 Final Supp. EIS., 2-14 to -15; Ex. I, 2023 Final Supp. EIS, A-3 to -4.

### 2.     BOEM Adopts Measures To Protect The Rice's Whale.

BOEM and BSEE have engaged in numerous consultations with NMFS over the years to ensure that authorizing oil and gas leasing activity in the Gulf is consistent with the ESA. In a biological opinion issued in March 2020 ("2020 BiOp"), NMFS concluded that oil and gas activity in the Gulf was not likely to jeopardize various threatened or endangered marine species. NMFS determined, however, that oil and gas activity in the Gulf did pose a risk to the Rice's (or Bryde's) whale in the whale's habitat located in a small portion of the eastern Gulf that is already excluded from lease sales by congressional moratorium and now Presidential withdrawal. *See* Presidential Determination on the Withdrawal of Certain Areas of the United States Outer Continental Shelf from Leasing Disposition (Sept. 25, 2020), bit.ly/3EbineT. Nevertheless, NMFS concluded that BOEM and BSSE could adequately mitigate any oil and gas-related risks by adopting a "reasonable and prudent alternative" to protect the Rice's whale, consisting of operating conditions on oil and gas service "vessel[s] transiting through the Bryde's whale area" to limit the risk of oil and gas service vessel strikes, including prohibitions on nighttime transit or in low visibility conditions; a 10-knot, year-round speed restriction during daylight hours; a 500-meter minimum separation distance from any whale that could be a Rice's whale; and requiring all vessels 65 feet or greater to have a functioning Automatic

Identification System ("AIS").  Ex. K, 2020 BiOp, at 597.

BOEM disagreed with NMFS' analysis, finding that "activities and effects from a lease sale" on the Rice's whale "are not reasonably foreseeable" since "vessels expected to service leases … are … unlikely to transit across" the Rice's whale habitat as identified in the 2020 BiOp.  Ex. I , 2023 Final Supp. EIS, at 5-5.  But BOEM nevertheless agreed to include the reasonable-and-prudent alternative in the "Protected Species" stipulation in future lease sales, *see, e.g.*, Ex. O, Lease Sale 256 Stipulations, at 8; Ex. M, Lease Sale 257 Stipulations, at 8, including in the Proposed Notice of Sale for Lease Sale 261, *see* Ex. F, Lease Sale 261 Proposed Stipulations, at 8.

In October 2020, environmental groups sued NMFS (but not BOEM) in the District of Maryland, arguing (among other things) that the 2020 BiOp understated the risk of oil and gas leasing to the Rice's whale and that the reasonable-and-prudent alternative was insufficiently protective.  *See* Compl. ¶¶142-70, *Sierra Club v. NMFS*, No. 8:20-Cv-3060 (D. Md. filed Oct. 21, 2020), Dkt.1.  Various parties, including API and Chevron, intervened and aligned with NMFS in defending the 2020 BiOp.

### 3.    Federal Pause On Oil And Gas Leasing Disrupts The Planned Sales.

BOEM conducted seven of the 10 scheduled Gulf-wide lease sales consistent with the 2017-2022 Five-Year Plan's direction that the sales be "region-wide and include unleased acreage not subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf of Mexico," implementing the same 10 lease stipulations for each of those sales.[1]  Ex. Q, 2017 Record of Decision, at 3.  BOEM initially scheduled Lease Sale 257 to be a regionwide lease sale in accordance with the

---

[1] *See* Lease Sale 249, 82 Fed. Reg. 32,577, 32,577, 32,579 (July 14, 2017); Lease Sale 250, 83 Fed. Reg. 7,070, 7,070, 7,072 (Feb. 16, 2018); Lease Sale 251, 83 Fed. Reg. 32,897, 32,897, 32,900 (July 16, 2018); Lease Sale 252, 84 Fed. Reg. 4,525, 4,525, 4,527-28 (Feb. 15, 2019); Lease Sale 253, 84 Fed. Reg. 34,937, 34,937, 34,940 (July 19, 2019); Lease Sale 254, 85 Fed. Reg. 8,010, 8,010, 8,013 (Feb. 12, 2020).

Lease Sale 256 included a revised version of the "Protected Species" stipulation reflecting the terms of the recently issued BiOp and an additional eleventh stipulation to codify limits on agency review time as part of an efficiency effort.  Lease Sale 256, Final Notice of Sale, 85 Fed. Reg. 66,348, 66,348, 66,351 (Oct. 19, 2020).

Five-Year Plan, but in January 2021, President Biden issued an executive order directing Interior to "pause new oil and natural gas leases … in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices." 86 Fed. Reg. 7,619, 7,624 (Jan. 27, 2021). Interior therefore cancelled Lease Sale 257 "to comply with [the] Executive Order," 86 Fed. Reg. 10,132, 10,132 (Feb. 18, 2021), and did not schedule the Five-Year Plan's two remaining sales, Lease Sales 259 and 261, *Louisiana v. Biden*, 622 F.Supp.3d 267, 287-89 (W.D. La. 2022).

Thirteen States, including Louisiana, sued to enjoin the "pause." The district court held that "pausing, stopping and/or cancelling lease sales scheduled in the OCSLA Five-Year Plan would be significant revisions of the plan" that "the Agency Defendants have no authority to make … without going through the procedure mandated by Congress" and preliminarily enjoined the leasing pause. *Louisiana v. Biden*, 543 F.Supp.3d 388, 413, 417 (W.D. La. 2021).[2] Interior issued a new Record of Decision to hold Lease Sale 257 "as a [Gulf] region-wide lease sale." Ex. N, Lease Sale 257 Record of Decision, at 2.

BOEM proceeded to hold Lease Sale 257 in November 2021, offering "all the available unleased acreage in the GOM" with the familiar 10 lease stipulations, with a minor modification to the "Protected Species" stipulation reflecting an amendment to the 2020 BiOp. Ex. L, Lease Sale 257 FNOS, at 4. Industry bid nearly $200 million for 308 tracts covering 1.7 million acres in the Gulf. *See* Oil and Gas Lease Sale 257, Final Bid Recap 1-2 (Nov. 17, 2022), bit.ly/3OPPB8B. But before BOEM issued leases to the winning bidders, environmental organizations persuaded a district court to vacate the results of the sale on grounds that the pre-sale environmental analysis failed to consider foreign oil consumption. *See Friends of the Earth v. Haaland*, 583 F.Supp.3d 113, 128 (D.D.C. 2022), *vacated and remanded*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) (per curiam).

---

[2] The Fifth Circuit later vacated that injunction as insufficiently specific, *see* 45 F.4th 841 (5th Cir. 2022), and the district court reissued a permanent injunction the next day, 622 F.Supp.3d at 298-300.

     **4.**     **Congress Passes The Inflation Reduction Act To Require BOEM To Conduct Remaining Lease Sales According To The Five-Year Plan.**

In August 2022, Congress intervened by passing the IRA.  Among other things, the IRA changed the law for "lease sales under the 2017-2022 Outer Continental Shelf Leasing Program," including the uncompleted sale and two remaining sales in the Gulf of Mexico:  Lease Sales 257, 259, and 261.  IRA §50264 (capitalization altered).  Congress overrode the vacatur of Lease Sale 257 and directed the Secretary to "promptly issue to the high bidder a fully executed lease."  *Id.* §50264(b) (capitalization altered).  Because of this "nondiscretionary obligation on the Department to issue the leases," the D.C. Circuit ordered the environmental groups' challenge to Lease Sale 257 dismissed as moot.  *Friends of the Earth*, 2023 WL 3144203, at *2.

The IRA likewise listed specific "requirement[s]" for the two other Gulf sales, Lease Sales 259 and 261.  IRA §50264(d)-(e) (capitalization altered).  Congress specified that, "not later than September 30, 2023, the Secretary shall conduct the Lease Sale 261 in accordance with the Record of Decision approved by the Secretary on January 17, 2017."  *Id.* §50264(e).  The IRA also specified that "[t]he term 'Lease Sale 261' means the lease sale numbered 261 described in the 2017-2022 [OCS] Oil and Gas Leasing Proposed Final Program."  *Id.* §50264(a)(4).  The IRA likewise mandated that Lease Sale 259 be held "not later than March 31, 2023."  *Id.* §50264(a)(3), (d).

BOEM acknowledged that "the Inflation Reduction Act of 2022 … requires BOEM to hold both GOM Lease Sales 259 and 261."  Ex. I, 2023 Final Supp. EIS, at viii.  And although BOEM had "no discretion on whether to hold these lease sales," it chose to prepare a "Supplemental EIS to follow its normal leasing process to the fullest extent possible."  *Id.* at 1-3.  Before finalizing that EIS, BOEM published a draft and sought public comment.  Environmental groups urged BOEM "to require lessees to follow the ship-strike prevention measures" from the reasonable-and-prudent alternative throughout the *entire* "100-400 meter isobath across the western, central, and eastern planning areas," and "prohibit oil and gas activities" in the same region, *id.* at C-191-92, but BOEM concluded it had

"not identified justifiable reasons to restrict the lease sale area" by "exclud[ing] blocks from leasing in … the 100-400m isobath in the western and central Gulf" and that the existing lease stipulation—requiring compliance with the 2020 BiOp's reasonable-and-prudent alternative in the core Rice's whale habitat in the eastern Gulf—already "provide[s] adequate environmental protection." *Id.* at C-34, C-122 to C-124.  Indeed, BOEM reiterated that "the persistent occurrence of Rice's whales" had been documented only for the "the primary core habitat … in the *northeastern* [Gulf]," *id.* at C-125, 4-59—the area already excluded from leasing and in which BOEM already required protections in accordance with the 2020 BiOp.  And given the "limited vessel routes originating from the eastern GOM, and the additional mitigations on vessels within the Rice's whale core area," BOEM determined "the potential for vessel strikes to sperm and Rice's whale" to be "extremely unlikely." *Id.* at 4-59.  BOEM made these decisions even after "review[ing] the recent July 2022 publication (Soldevilla et al. 2022) that evaluated passive acoustic data indicating that it is plausible that the Rice's whale's distribution is broader." *Id.* at C-125.  Though highly touted by environmental groups, BOEM determined that the study simply failed to "to confirm [the Rice's whale] distribution or any seasonal movements outside the core area that is already considered." *Id.* C-125.  In sum, BOEM concluded that there was not "enough conclusive data on the density, general distributions, and possible migratory behaviors" of the Rice's whale to support any additional restrictions. *Id.* at xx.

BOEM accordingly held Lease Sale 259 in March 2023 as a regionwide sale offering "all of the available unleased acreage in the GOM OCS." Ex. H, Lease Sale 259 FNOS, at 4.  BOEM included the usual list of stipulations with a few alterations.[3]  Industry bid nearly $310 million for 313 tracts covering 1.6 million acres of the Gulf.  *See* Oil and Gas Lease Sale 259, Final Bid Recap 1-2 (Mar. 29,

---

[3] BOEM converted three of the stipulations (for Baldwin County, topographic features, and live bottom) into area exclusions, and added the stipulation for "Royalties on All Produced Gas" required by §50263 of the IRA.  Ex. H, Lease Sale 259 FNOS, at 13-14.

2023), bit.ly/3EfOhqQ.  BOEM accepted bids and issued leases for 295 tracts.  *Id.* at 2.

Also in March 2023, BOEM published a Proposed Notice of Sale for Lease Sale 261 that, like the nine preceding Gulf-wide sales, offered "all of the available unleased acreage in the GOM OCS." Ex. E, Lease Sale 261 PNOS, at 3.  The Proposed Notice of Sale listed the same, familiar lease stipulations as in preceding sales, including the stipulation requiring compliance with the 2020 BiOp's reasonable-and-prudent alternative to protect the Rice's whale.  *See* Ex. F, Lease Sale 261 Proposed Stipulations, at 8.  The Proposed Notice of Sale triggered the 60-day period for "Governors of affected States" to "review and comment." 88 Fed. Reg. 16,030, 16,030 (Mar. 15, 2023).

### 5. BOEM Previews Then Adopts The Challenged Provisions In The Final Notice Of Sale For Lease Sale 261.

In July 2023, the government previewed that BOEM's approach to the Rice's whale was about to take a 180-degree turn.  This preview came in an unusual form:  buried in a legal filing in the District of Maryland BiOp case against NMFS, in which the plaintiffs and NMFS agreed stay the proceedings so that NMFS could complete its ongoing process to update the BiOp.  *See* Stipulation, *Sierra Club*, No. 8:20-cv-3060 (D. Md. filed July 21, 2023), Dkt.147.  The stay did not alter the 2020 BiOp, which remains in effect.  The background recitals of that agreement, however, contained an odd representation that BOEM—a non-party to the litigation—would impose a new, multi-pronged lease stipulation on Lease Sale 261 and exclude the area in the 100-400m isobath across the entire northern Gulf from that sale, purportedly to protect the Rice's whale.  *Id.* at 3-4.  The recitals also announced that BOEM would release a Notice to Lessees ("NTL") that would recommend—but purportedly not require—all operators in the Gulf to follow those same restrictions.  *Id.* at 2.  In other words, the agreement represented that BOEM had embraced the very additional "protections" for the Rice's whale that it had deemed unwarranted just months earlier.

BOEM soon followed through.  The Final Notice of Sale for Lease Sale 261, issued on August 23, 2023, included a new lease stipulation—Stipulation No. 4, Part B(4)—requiring bidders to

"implement" various "measures for all oil and gas activities occurring" in an "Expanded Rice's Whale Area" (shaded in blue in the following figure), running the *entire* 100- to 400-meter isobath along the Texas, Louisiana, Mississippi, and Alabama coasts, *see* Ex. B, Lease Sale 261 Final Stipulations, at 10—a significant expansion of the "core habitat" identified in the 2020 BiOp (encircled by the dotted line).



Under the stipulation, all vessels must abide by a "10-knot or less, year-round speed restriction," "avoid transit through the Expanded Rice's Whale Area after dusk and before dawn, and during other times of low visibility" "[t]o the maximum extent practicable," "maintain a minimum separation distance of 500 m from Rice's whales," and abide by new training, monitoring, record-keeping, and reporting requirements. *Id.* at 11.  These conditions are nearly identical to those mandated by the 2020 BiOp's reasonable-and-prudent alternative applicable only to the Rice's whale's core habitat already excluded from leasing.  The same restrictions are also recommended in the NTL, which BOEM issued on August 17, 2023.  *See* Ex. D, 2023 NTL, at 3.  In addition, BOEM confirmed that it would withhold 6 million acres in the Expanded Rice's Whale Area from Lease Sale 261.  *See* Ex. A, Lease Sale 261 FNOS, at 10-12.

BOEM speculated that the new stipulation and acreage withdrawal "could" reduce risk to the Rice's whale because "a recent study" with "limited evidence" indicated that the Rice's whale "occurs" in the 100-400m isobath across the entire Gulf.  *See* Ex. C, Lease Sale 261 Record of Decision, at 2, 12.  BOEM did not deign to identify the study, but the NTL released days earlier explained that it is the "Soldevilla … (2022)" study.  Ex. D, 2023 NTL, at 1 & n.2.  BOEM did not mention that it had already "reviewed the recent July 2022 publication (Soldevilla et al. 2022)" only months before and concluded that it did not provide "enough information … to confirm [the Rice's whale] distribution or any seasonal movements outside the core area that is already considered."  Ex. I, 2023 Final Supp. EIS, at C-125.  BOEM did not offer any explanation in the Record of Decision for why it changed its mind about the study.

## ARGUMENT

A preliminary injunction is warranted where the movant shows "(1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury [if the injunction is not granted]; (3) that the threatened injury … outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest."  *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022).  Each of those factors is readily met here.

## I.      Plaintiffs Are Likely To Succeed On The Merits.

First and foremost, Plaintiffs are likely to succeed in showing that the new lease stipulation and acreage withdrawal are unlawful, as BOEM's actions contravene both the specific commands of the IRA and OCSLA as well as the general commands of the APA.

### A.      The Challenged Provisions Violate The IRA.

BOEM's attempts to add last-minute restrictions to Lease Sale 261 and to withdraw substantial acreage contemplated for that sale run headlong into the command of the IRA.  *See* 5 U.S.C. §706(2)(A), (C) (court "shall … hold unlawful and set aside agency action" that is "not in accordance

with law" or "in excess of statutory … limitations").  Less than a year ago, Congress recognized the pressing need for a robust program of lease sales in the Gulf—and with Lease Sale 261 in particular—to spur domestic energy production and lower energy costs.  To achieve those goals and overcome the years of agency delay that had left lease sales in administrative limbo, Congress gave BOEM clear marching orders:  The section entitled "Requirement for Lease Sale 261" commanded that, "not later than September 30, 2023, the Secretary *shall conduct* Lease Sale 261 *in accordance with* the Record of Decision approved by the Secretary on January 17, 2017" for the 2017-2022 Leasing Program.  IRA §50264(e) (emphases added).  That statutory directive leaves no doubt about *when* Lease Sale 261 must occur: "not later than September 30, 2023." *Id.*  And it leaves no doubt about *how* that sale must occur: "in accordance with" the Record of Decision for the 2017-2022 Five-Year Plan. *Id.*

By directing that "the Secretary shall conduct Lease Sale 261 in accordance with" the Five-Year Plan, Congress adopted and ratified the terms and scope of the lease sale as they stood in the Five-Year Plan.  The challenged provisions in the Final Notice of Sale defy that command, as the Five-Year Plan contemplates neither the vessel-restriction stipulation nor the acreage withdrawal.

BOEM's new vessel-restriction stipulation is not among the 10 common lease stipulations acknowledged in the Five-Year Plan—and so is not "in accordance with" the standard lease stipulations approved by the Five-Year Plan.  IRA §50264(e).  The Programmatic EIS only "assume[d] that sale-specific stipulations that were *commonly adopted in past lease sales* are in effect."  Ex. T, Final Programmatic EIS Vol. II, at I-3 (emphasis added); *see also* Ex. S, Final Programmatic EIS Vol. I, at 2-3 ("The Programmatic EIS assumes continuing implementation of protective measures required by statute, regulation, or current lease sale stipulations that would likely continue to be adopted in the future.").  That common list includes 10 lease stipulations, of which the new stipulation restricting vessel transit is not one.  The new stipulation is therefore not "in accordance with" the standard lease stipulations approved by the Five-Year Plan.  IRA §50264(e).

Likewise, the acreage withdrawal is not "in accordance with" with the Five-Year Plan, which scheduled "region-wide" lease sales across the "Western, Central, and Eastern Gulf" of "unleased acreage not subject to moratorium or otherwise unavailable … to provide greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks." Ex. Q, 2017 Record of Decision, at 3. By refusing to offer millions of acres for leasing, BOEM is not conducting the "region-wide" lease sale dictated by the Five-Year Plan and subsequently ratified by Congress in the IRA.

The text of the IRA reflects BOEM's inability to change the scope and terms of Lease Sale 261. Indeed, "[t]he first sign that the statute imposed an obligation is its mandatory language: 'shall.'" *Maine Cmty. Health Options v. United States*, 140 S.Ct. 1308, 1320 (2020). Congress specified that "the Secretary *shall* conduct Lease Sale 261 in accordance with" the Five-Year Plan. IRA §50264(e) (emphasis added). The requirement here was plain: BOEM *must* conduct Lease Sale 261 *as it was defined* in the Five-Year Leasing Program. To drive that point home, Congress even specified that "[t]he term 'Lease Sale 261' means the lease sale numbered 261 described in the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program." IRA §50264(a)(4).

Context confirms that Congress used "shall" in is ordinary, mandatory sense. The IRA "differentiates between when the [Interior] Secretary 'shall' take certain actions and when she 'may' exercise discretion." *Maine Cmty. Health Options*, 140 S.Ct. at 1321; *see* IRA §50251(a) ("The Secretary *may* grant leases, easements, and rights-of-way[.]" (emphasis added)); §50251(b)(2) ("The Secretary *may* conduct wind lease sales[.]" (emphasis added)). And when, as here, Congress "distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016); *see also Texas v. United States*, 40 F.4th 205, 225 (5th Cir. 2022) ("The parallel treatment of mandatory and precatory terms indicates conscious choices by Congress.").

Past agency practice offers further confirmation that "in accordance with" the Five-Year Plan includes the Plan's terms and scope for lease sales.  Before the IRA passed in 2022, each lease sale in the 2017-2022 Leasing Program included the same list of 10 lease stipulations.  *See supra*, at 8.  BOEM's later environmental analyses in the 2017 Multisale EIS and 2018 Supplemental EIS likewise listed the same 10 lease stipulations, as did the 2023 Supplemental EIS for Lease Sales 259 and 261.  *See* Ex. R, Final Multisale EIS, at 2-24 to 2-28; Ex. 2018 Final Supp. EIS, at 2-14 to 2-15; Ex. I, 2023 Final Supp. EIS, at A-3 to A-4.  This unbroken consistency in the contents of the lease stipulations, coupled with the command that Lease Sale 261 "shall" be conducted "in accordance with" the Five-Year Plan, reflects that Congress envisioned the same standard list of lease stipulations—not new stipulations added by administrative fiat.  Likewise, previous sales under the 2017-2022 Leasing Program were "region-wide," covering "the Western, Central, and Eastern Gulf of Mexico," and excluded only those areas "subject to moratorium or otherwise unavailable," Ex. Q, 2017 Record of Decision, at 3, such as blocks withdrawn by executive order or international agreements.  And in the last Gulf sale (Lease Sale 259), the fact that BOEM did not attempt to add any new lease stipulations is good evidence that BOEM likewise understood the IRA as fixing a standard set of lease stipulations.  *See* Ex. H, Lease Sale 259 FNOS, at 14.

Put simply, BOEM's decision to withdraw millions of acres from Lease Sale 261 and adopt a new lease stipulation imposing burdensome operating restrictions—on the theory that doing so *might* help protect the Rice's whale—is irreconcilable with the clear determination in the January 2017 Record of Decision.  BOEM's significant (and remarkably belated) changes in the Final Notice of Sale therefore contravene Congress' explicit command in the IRA that Lease Sale 261 take place expeditiously and "in accordance with" the January 2017 Record of Decision.  Indeed, imposing draconian restrictions on oil-and-gas operators and withholding millions of acres of the OCS from sale accomplishes the very opposite of reducing inflation—the IRA's *raison d'être*—as it will increase costs for

energy producers and consumers alike.  *Cf. Dubin v. United States*, 143 S.Ct. 1557, 1567 (2023) (statute's "title" is "tool" of statutory interpretation).

>    **B.      The Challenged Provisions Are Procedurally Invalid.**

The challenged provisions are also invalid on procedural grounds.  *See* 5 U.S.C. §706(2)(D) (court "shall … hold unlawful and set aside agency action" taken "without observance of procedure required by law").  By adding those provisions to the Final Notice of Sale at the last minute, without providing any notice whatsoever as to the new lease stipulation in the Proposed Notice of Sale or any meaningful opportunity to engage with its reasoning as to the acreage withdrawal, BOEM failed to comply with its procedural obligations and denied Plaintiffs their statutory rights.

The Proposed Notice of Sale is a critical step in the lease-sale process, as it provides the last opportunity for stakeholders—especially State and local governments—to provide their input on BOEM's plans before the Final Notice of Sale issues and the lease sale goes forward.  Congress has specifically acknowledged the importance of that input, recognizing in OCSLA itself that States and affected local governments "are entitled to an opportunity to participate" in the "policy and planning decisions made by the Federal Government" with respect to the OCS in light of the "significant impacts on coastal and non-coastal areas of the coastal States" that such decisions can have.  43 U.S.C. §1332(4); *see* H.R. Rep. 95-590, at 50 (1977) (a "major purpose of [OCSLA] is to involve the states and affected local areas … to a greater degree"); *id.* at 152 (OCSLA gives States "a leading role in OCS decisions and particularly as to potential lease sales").  To protect those interests, OCSLA provides that, "within sixty days after notice of [a] proposed lease sale," States and local governments are entitled to "submit recommendations to the Secretary regarding the size, timing, or location of a proposed lease sale."  43 U.S.C. §1345(a)-(b).  The Secretary then "shall" accept any such State recommendations as long as they "provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State" and "shall communicate to the [State], in writing, the reasons for

his determination to accept or reject" those recommendations. *Id.* §1345(c); *see* H.R. Rep. 95-590, at 123 (recognizing the need to provide States and local governments with "timely access to information, an opportunity to participate in the formulation of policy and planning decisions, and an opportunity to actually review and comment on final decisions").

To implement those statutory commands, BOEM's own regulations require it to send to affected States, including Louisiana, and publish in the Federal Register a robust Proposed Notice of Sale containing "a description of the area proposed for leasing, the proposed lease terms and conditions of sale, and proposed stipulations to mitigate potential adverse impacts on the environment." 30 C.F.R. §556.304(c); *see id.* §556.304(a) ("lease stipulations and conditions, to mitigate adverse impacts on the environment … will be contained, or referenced, in the proposed notice of sale"). Under the regulations, as under the statute, States and local governments then have 60 days to submit "comments and recommendations to BOEM regarding the size, timing, and location of the proposed sale." *Id.* §556.305(a); *see* 43 U.S.C. §1345(a)-(b). The regulations confirm that BOEM "will consider all comments and recommendations received in response to the proposed notice of sale" and "will accept the recommendations of a State and/or local government(s)" as long as they "provide a reasonable balance between the national interest and the well-being of the citizens of the State." 30 C.F.R. §556.307(a)-(b); *see* 43 U.S.C. §1345(c). That procedure guarantees States and local governments— and through them, the public at large—one last opportunity to review the terms of the proposed lease sale and provide any final comments or objections before the Final Notice of Sale issues.

BOEM egregiously failed to comply with that process as to the challenged lease stipulation here. Despite BOEM's own clear and explicit regulation requiring that the Proposed Notice of Sale contain the "proposed lease terms and conditions of sale" and "proposed stipulations to mitigate potential adverse impacts on the environment," 30 C.F.R. §556.304(c), the Proposed Notice of Sale here said *not one word* about the additional lease stipulation imposing burdensome restrictions to

purportedly protect the Rice's whale that BOEM added to the Final Notice of Sale.  Given that omission, BOEM's attempt to insert this new stipulation into the lease terms in the Final Notice of Sale plainly violates BOEM's procedural obligations and would deprive Louisiana, as well as other States and local governments (and the public at large), of their right to submit comments taking that additional stipulation into account.  *See Louisiana v. Biden*, 2021 WL 4312502 (W.D. La. Aug. 23, 2021) (States have "statutory right to participate in the [OCSLA] leasing process").  That procedural violation is especially egregious here, where BOEM previously determined (and publicly announced) that additional lease stipulations were *not* necessary to protect the Rice's whale—giving Louisiana, other States and local governments, and the public at large every reason to believe that no further comments on this issue were needed.  *See supra*, at 10-11.  Worse still, BOEM's decision to adopt these last-minute changes appears to have been developed with environmental groups in conjunction with a lawsuit against a different agency in the *Sierra Club* litigation in Maryland.   In other words, rather than consult with the stakeholders with whom BOEM is statutorily obligated to confer, BOEM effectively made this decision based on *ex parte* contacts with a small and hardly disinterested subset of stakeholders. That is not consistent with OCSLA, the APA, or basic due-process principles.  *See, e.g., Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1539 (9th Cir. 1993) (explaining that the APA's "ex parte communications prohibition" exists to ensure that "agency decisions required to be made on a public record are not influenced by private, off-the-record communications").

BOEM's procedural failures with respect to the acreage withdrawal were only slightly less blatant.  Once again, BOEM had previously concluded (and informed the public) that it had "not identified justifiable reasons" to "exclude blocks from leasing in the 100-400m isobath in the western and central Gulf."  Ex. I, 2023 Final Supp. EIS, at C-32; *see supra*, at 10-11.  The Proposed Notice of Sale nevertheless included a single sentence stating that "BOEM is considering removing the area comprising the northeastern Gulf of Mexico and continental shelf break between the 100 meters and 400

meters in depth isobaths to protect Rice's Whales that may transit through the area." Ex. E, Lease Sale 261 PNOS, at 7.  It is not even clear whether BOEM's statement that it might remove areas in "the *northeastern* Gulf of Mexico and continental shelf break," *id.* (emphasis added)—where the core Rice's whale habitat lies—meant to suggest that BOEM could reverse its prior position and remove the whole 100-400m isobath across the entire "*western and central* Gulf," Ex. I, 2023 Final Supp. EIS, at C-34, as the Final Notice of Sale attempts to do.  *See Mock v. Garland*, 2023 WL 4882763, at * 17 (5th Cir. Aug. 1, 2023) (explaining that a proposed notice must describe any potential rule with "reasonable specificity").  But at the very least, that single sentence obviously does not explain *why* BOEM thought this draconian restriction potentially necessary to protect the Rice's whale.  Such an explanation is necessary because "fairness requires that the agency afford interested parties an opportunity to challenge the underlying factual data relied on by the agency." *Chem. Mfrs. Ass'n v. U.S. EPA*, 870 F.2d 177, 200 (5th Cir. 1989).  The Proposed Notice of Sale thus deprived Louisiana and other States and local governments of their right to meaningfully "comment" on and provide "recommendations" regarding the "proposed lease sale." 43 U.S.C. §1345(a)-(b); 30 C.F.R. §556.305(a).

In short, by adding the challenged provisions into the Final Notice of Sale without affording Louisiana or other States and local governments (and through them, the public) the requisite opportunity to assess those provisions and provide comments, BOEM disregarded the collaborative process at the heart of OCSLA and the obligations imposed by the statute and regulations.

## C.    The Challenged Provisions Are Arbitrary And Capricious.

Finally, the challenged provisions are arbitrary and capricious.  The APA commands courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. §706(2)(A).  The "arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021), and agency action is only "upheld, if at all, on the basis articulated by the agency

itself, not reasons developed post hoc," *Texas*, 40 F.4th at 226-227.  Arbitrary and capricious review "has serious bite." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021).  The challenged provisions are arbitrary and capricious for at least three independently sufficient reasons.

### 1.  BOEM Failed To Explain Its Dramatic Change In Position.

The lease stipulation is a marked departure from BOEM's treatment of the Rice's whale just months ago, when it rejected additional mitigation measures.  "Because it is generally arbitrary or capricious to depart from a prior policy *sub silentio*, agencies must typically provide a detailed explanation for contradicting a prior policy, particularly when the prior policy has engendered serious reliance interests." *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 614 (5th Cir. 2021); *accord Encino Motorcars L.L.C. v. Navarro*, 579 U.S. 211, 221 (2016) (agency must "'display awareness that it is changing position' and 'show that there are good reasons for the new policy'"). The agency's explanation here fails on all counts.

Until days ago, BOEM has consistently found it unnecessary to adopt more protections for the Rice's whale outside of their "core" habitat in the eastern Gulf that is already excluded from lease sales.  *See supra*, at 10-11; *see also Friends of the Earth*, 583 F.Supp.3d at 151-55 (Rice's whale "was extensively considered" in Multisale EIS).  Indeed, BOEM determined just months ago that there were no "justifiable reasons to restrict the lease sale area" by "exclud[ing] blocks from leasing in … the 100-400m isobath in the western and central Gulf," that existing lease stipulations "provide adequate environmental protection," that "the potential for vessel strikes" remained "extremely unlikely," and that there was simply "not enough conclusive data on the density, general distributions, and possible migratory behaviors" of the Rice's whale to support any additional restrictions.  Ex. I, 2023 Final Supp. EIS, at xx, 4-59, C-34.

BOEM arrived at that decision even after reviewing "new information," including "the recent July 2022 publication (Soldevilla et al. 2022) indicating that it is plausible that the Rice's whale's

distribution is broader." *Id.* at C-125.  The Soldevilla study attempted to locate Rice's whales in the Gulf by evaluating acoustic data from June 2016-August 2017, but the study acknowledged that determining "how many whales are found in the western GOM" was "a difficult question to answer from [the study's] sparse single-sensor autonomous moored passive acoustic units." Melissa Soldevilla, et al., *Rice's Whales in the Northwestern Gulf Of Mexico*, 48 Endang. Species Res. 155, 170 (2022), https://www.int-res.com/articles/esr2022/48/n048p155.pdf.  The study concluded only that there "seem to be fewer whales or more sparsely spaced whales in the western GOM compared to the eastern GOM"—perhaps just two animals, although "it remains unknown" whether those were the same whales detected in the whales' core habitat in the eastern Gulf, and it "remains unknown whether [the] animals occur in the northcentral GOM" or "in deeper waters and southern waters." *Id.* at 170, 172-73.  BOEM rightly recognized that this study did not provide "enough information" "to confirm [the Rice's whale's] distribution or any seasonal movements outside of the core area that is already considered in this Supplemental EIS."  Ex. I, Final Supp. EIS, at C-125.

BOEM now insists that additional restrictions are necessary based on "[r]ecent limited evidence show[ing] that the Rice's whale may be present" "in portions of the northern Gulf of Mexico between the 100-meter and 400-meter isobaths."  Ex. C, Lease Sale 261 Record of Decision, at 2, 12.  But as BOEM explained in its NTL issued just a few days earlier, that "limited evidence" was the same Soldevilla study that BOEM had already rejected as too speculative to support any additional restrictions.  *See* Ex. D, 2023 NTL, at 1 & n.2.

BOEM offers no explanation for its sudden about-face.  The Record of Decision does not explain how, despite the fact that BOEM's Supplemental EIS rejected the Soldevilla 2022 study as too inconclusive to warrant any additional measures, that same study now somehow justifies substantial changes to the terms and scope of Lease Sale 261.  Such unexplained reversals are a hallmark of arbitrary-and-capricious action; an agency whose action "rests upon factual findings that contradict

those which underlay its prior policy" must explain why it is discarding its prior findings in favor of its new ones. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

That BOEM's abrupt volte-face is devoid of any adequate on-the-record justification is strong evidence that its decision to expand the Rice's whale area was pretextual. *See Dep't of Com. v. New York*, 139 S.Ct. 2551, 2573-76 (2019) (pretextual reasoning is arbitrary and capricious). Although a court is usually limited to examining the existing administrative record when reviewing agency action, that does not hold true when "an explanation for agency action ... is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* at 2575. As already explained, BOEM's decisions to extend the Rice's whale area and mandate additional supposedly protective measures directly contradict all its previous conclusions, and nothing in the Record of Decision justifies this reversal. Indeed, the Record of Decision confirms that "no new information or circumstances substantially affect the conclusions" in the Supplemental EIS for Lease Sales 259 and 261. Ex. C, Lease Sale 261 Record of Decision, at 2. The surrounding context thus presents a "strong showing," *Dept. of Com.*, 139 S.Ct. at 2574, that BOEM developed the challenged provisions to placate environmental groups into agreeing to a stay in separate litigation against NMFS, *see* Dkt.147, *Sierra Club*, No. 8:20-cv-3060 (D. Md. filed Oct. 21, 2020), not out of any threat to the Rice's whale. BOEM's "reversal here strains credulity, as does its pretextual basis." *BST Holdings*, 17 F.4th at 614.

## 2. BOEM Failed To Justify The Challenged Provisions.

BOEM's unexplained flip-flopping aside, the agency also failed to justify any need for the challenged provisions. BOEM offers only the Soldevilla study suggesting that "the Rice's whale *may* be present," Ex. C, Lease Sale 261, Record of Decision, at 2 (emphasis added), even though that study was unable to make any definitive conclusions about the presence of Rice's whales in the 100- to 400-meter isobaths, as BOEM itself recognized in the Supplemental EIS. *See supra*, at 11. Indeed, one of the sites analyzed in the Soldevilla study located in the central Gulf—well-within BOEM's new

"Expanded Rice's Whale Area"—did not detect the presence of *any* Rice's whales.  Soldevilla et al., at

157, 172.  In other words, not only did BOEM fail to explain its about-face with regard to the Soldevilla

study, but BOEM was undeniably correct in rejecting the study in its first go around; the study entirely

fails on its own terms to establish a reasonable risk that Rice's whale are sufficiently present in the

"Expanded Rice's Whale Area" to justify the new provisions.

No law authorizes BOEM to impose restrictions like the lease stipulation and acreage

withdrawal based on the mere possibility that a Rice's whale "may" be present.  To the contrary, the

Endangered Species Act *prohibits* agencies from "relying upon worst-case scenarios or pessimistic

assumptions" in adopting species regulations.  *Maine Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 586

(D.C. Cir. 2023).  The ESA "is focused upon 'likely' outcomes, not worst-case scenarios."  *Id.* at 599.

Using "the best scientific and commercial data available," the ESA requires BOEM to "avoid acts that

will more likely than not jeopardize a species"—"[n]o more, and no less."  *Id.* at 595.  The goal of this

"empirical mandate" is to "avoid[] needless economic dislocation produced by agency officials

zealously but unintelligently pursuing their environmental objectives."  *Id.* (second quoting *Bennett v.

Spear*, 520 U.S. 154, 176-77 (1997)).  Yet by kowtowing to the demands of environmental groups, that

is what BOEM has effectively done.

### 3.  BOEM Failed To Consider Other Important Factors.

The Rice's whale lease stipulation is also arbitrary and capricious because it is "premised on

reasoning that fails to account for relevant factors or evinces a clear error of judgment."  *Univ. of Tex.

M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021) (citation omitted).  The Final

Notice of Sale comes nowhere near rationally justifying the specific protections that BOEM chose to

impose—let alone showing that the agency rationally balanced the purported need for those protec-

tions against all the *other* factors that Congress requires BOEM to consider, such as "the relative needs

of[] regional and national energy markets," "the interest of potential oil and gas producers," the "laws,

goals, and policies of affected States," and the "relative environmental sensitivity and marine productivity" of the areas at issue. 43 U.S.C. §1344(a)(2); *see* 30 C.F.R. §556.302(a)(1) (in recommending areas for leasing, BOEM "will consider available information concerning the environment, conflicts with other uses, resource potential, industry interest, and other relevant information"). That obligation to consider all relevant interests is key to ensuring that BOEM's leasing program serves the nation's energy needs while also providing adequate protections for the marine environment.

Similarly, under the Endangered Species Act, even a "reasonable and prudent alternative" designed as part of a formal consultation to avoid jeopardizing a species (which the vessel transit stipulation is not) must be "economically and technologically feasible," "within the scope of the federal agency's legal authority and jurisdiction," and be "implemented in a manner consistent with the intended purpose of the action." 50 C.F.R. §402.14(h).

Once again, nothing in the Record of Decision or Final Notice of Sale indicates that BOEM implemented the lease stipulation and acreage withdrawal only after considering all the relevant statutory factors. For example, BOEM does not explain why applying the restrictions to only vessels servicing the oil and gas industry—which constitute only a fraction of the vessels traveling through the "Expanded Rice's Whale Area"—would protect the Rice's whale when cruise liners, cargo ships, and other vessels will continue to travel through the same area without restriction. Nor does BOEM explain how an effective expansion of the 2020 BiOp's reasonable-and-prudent alternative to apply across the entire Gulf is necessary or "economically and technologically feasible."

\*       \*       \*

In sum, BOEM's sudden decision to add the challenged provisions to the Final Notice of Sale—without any adequate explanation for its departure from its prior position that existing measures provide sufficient protection for the Rice's whale, why it chose the specific measures, or why those measures were warranted given the other pertinent statutory factors—is the epitome of arbitrary and

capricious action.  Plaintiffs thus are more than likely to succeed on their challenge to these provisions.

## II.     Plaintiffs Will Suffer Irreparable Harm Absent A Preliminary Injunction.

Plaintiffs face irreparable economic injury from the challenged provisions.  Louisiana is statu-torily entitled to a direct share of the revenue generated from OCS lease sales and benefits from the funds deposited in the Land and Water Conservation Fund.  *See* 43 U.S.C. §1337(g)(5)(A); Pub. L. No. 109-432, 120 Stat. at 3000.  The challenged provisions will decrease the revenue generated by Lease Sale 261.  *See* Ex. X, Dismukes Decl. ¶¶28-34.  The acreage removal effectively cancels 6 million acres of potential revenue-raising sales, and the inclusion of the burdensome new stipulation will depress the amount companies are willing to bid on the remaining acres.  This will result in the loss of millions of dollars to Louisiana, which will "be difficult, if not impossible to recover, due to sovereign immun-ity." *Louisiana*, 543 F.Supp.3d at 417.  Moreover, fewer lease sales will result in depressed oil and gas production, which is a critical revenue-raising and job-creating industry in Louisiana.  In 2021, energy-based manufacturing accounted for $6.8 billion in wages in Louisiana, which represented 47.4% of its total manufacturing wages.  *See* Ex. X, Dismukes Decl. ¶43; *see also Louisiana*, 2021 WL 4312502, at *10 (describing how reduced oil and gas production leads to "lost economic benefits includ[ing] not only the loss of direct lease sale revenue, but also lost tax revenue and employment opportunities").

Louisiana also has a legal right to receive notice of a proposed lease sale, including "a descrip-tion of the area proposed for leasing" and the "proposed stipulations," and a legal right to submit recommendations on that proposal.  *See* 43 U.S.C. §1345(a)-(c); 30 C.F.R. §556.304(c), §556.305(a). BOEM denied Louisiana those rights and deprived it of any meaningful opportunity to comment on the challenged provisions—provisions that directly affect Louisiana's economic interests.  That is ir-reparable injury.  *See Louisiana v. Becerra*, 577 F.Supp.3d 483, 502 (W.D. La. 2022) ("Being deprived of a procedural right to protect [a state's] concrete interests … is irreparable injury.").

As for API, the challenged acreage withdrawal denies its members an opportunity to purchase

those 6 million acres worth of leases.  Even if those areas could eventually be sold in a separate later lease sale if Plaintiffs prevail on the merits—a proposition that is far from certain given that doing so would skew the bidding vis-à-vis what Congress envisioned in the IRA—the time and money that potential purchasers would lose in the interim is unrecoverable.  *See Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015); *cf. Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) ("loss of business opportunities" provides "valid grounds for finding irreparable harm").  Moreover, the challenged stipulation will substantially increase operating costs in the GOM; for example, vessel needs will increase by up to 30%.  *See* Ex. BB, Cordingley Decl. ¶14; *cf.* Ex. AA, Janiszewski Decl. ¶¶11-12 (increased vessel costs and production delays); Ex. EE, Polk Decl. ¶4 (increased crew costs).  And due to sovereign immunity, these extra costs "are likely unrecoverable."  *Wages*, 16 F.4th at 1142.

For Chevron, inclusion of the vessel-restriction stipulation will irrevocably harm Chevron's bidding strategy in ways that cannot be remedied after the sale.  The stipulation imposes substantial compliance costs on Chevron, *see* Ex. HH, Robichaux Decl. ¶¶6-14, including up to a million dollars or more per rig, per day if supply disruptions from the vessel-restriction stipulation cause drilling to be suspended or otherwise delayed, *id.* ¶14.  Because the stipulation increases anticipated drilling costs, *id.*, it will likely affect both the particular blocks on which Chevron bids as well as the amounts offered in these bids, *see* Ex. FF, Carpenter Decl. ¶¶12-15.  The last-minute changes to bidding dynamics introduced by the vessel-restriction stipulation also mean that Chevron could lose out on leases it would otherwise have won in Lease Sale 261, *id.* ¶16, particularly as companies often win their leases by incredibly slim margins, *see* Ex. GG, Webre Decl. ¶¶14-16.

If the challenged provisions remain in force, they will seriously skew the bidding process, forcing API's members, including Chevron, to calculate their bids on the assumptions that (1) any leases will come with the burdensome restrictions that the challenged stipulations impose and (2) the areas excluded by the challenged acreage withdrawal are not available.  *See* Ex. Z, Hopkins Decl. ¶¶8-

11; Ex. FF, Carpenter Decl. ¶¶4-17.  And the impact of those unlawful provisions may differ for different bidders, potentially changing not only the lease prices but the identity of the buyer.  For instance, a bidder that expects to have to traverse the expanded Rice's whale area more often (or across a wider portion of that expanded area) than others will face higher costs from BOEM's new lease stipulation and therefore its bids cannot be as competitive as they would be if the stipulation were enjoined in advance.  Worse, allowing the lease sale to go forward with the challenged stipulation will mean that bidding strategies will turn in part on the bidders' estimation that the stipulation will be struck down *after* the sale, meaning that the outcome of Lease Sale 261 will potentially depend on the bidders' assessment of litigation risks rather than anything to do with the leases being sold.

All of this is an egg that cannot be unscrambled.  If injunctive relief is denied, Lease Sale 261 cannot be redone without the challenged provisions if Plaintiffs eventually prevail, *see* Ex. FF, Carpenter Decl. ¶¶18-22; API's members cannot be financially compensated for the lost opportunity to participate in an undistorted lease sale—both because exact damages are impossible to calculate and because sovereign immunity likely bars damages.  *See Restaurant L. Ctr. v. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) ("nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm"); *Texas*, 809 F.3d at 186 (finding irreparable harm where recovering damages would be "substantially difficult—if not impossible"); *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,* 878 F.2d 806, 809 n.1 (5th Cir. 1989) (same).  These injuries confirm the need for a preliminary injunction.[4]

## III.    The Remaining Factors Likewise Support A Preliminary Injunction.

The balance of equities and public interest point in the same direction.  As to the former, the

---

[4] To be clear, Plaintiffs' challenges would not be moot if Lease Sale 261 went forward with the challenged provisions.  While allowing the sale to occur with these provisions will cause Plaintiffs certain irreparable harms, it will not make it "impossible for a court to grant any effectual relief whatever" if Plaintiffs prevail. *Chafin v. Chafin*, 568 U.S. 165, 172 (2013).  Plaintiffs also do not seek (and would oppose) postponing Lease Sale 261, which would contravene Congress's explicit instruction that BOEM "shall conduct Lease Sale 261" "not later than September 30," IRA §50264(e), and would subject Plaintiffs to even *greater* irreparable harms of lost revenue and upended business plans.

government faces no meaningful long-term harm from a preliminary injunction, as the lease sale here is only the second stage in the OCSLA leasing process; lease purchasers must still obtain government approval for both exploration and development-and-production plans before they can begin extraction, 43 U.S.C. §§1340(g)(3), 1351(c), and the government can always seek to impose additional (lawful) restrictions at those stages.  BOEM can also pursue other (lawful) options to achieve its preferred outcome; in fact, BOEM already published a nonbinding NTL recommending the same measures as the challenged lease stipulation, *see* Ex. D, 2023 NTL, and has engaged NMFS on a revised BiOp, *see* Ex. J, BOEM 2022 Letter.  By contrast, Plaintiffs have no option but to alter their bidding for the challenged provisions if a preliminary injunction is denied.  Thus, "any abstract 'harm' [an injunction] might cause the Agency pales in comparison and importance to the harms the absence of [an injunction] threatens to cause countless individuals and companies." *BST Holdings*, 17 F.4th at 618.

Finally, the public interest "is served when the law is followed." *Daniels Health Sci., L.L.C. v. Vascular Health Sci., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).  Indeed, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas*, 40 F.4th at 229 (citation omitted).  That is as true in the offshore energy context as it is anywhere else.  *See, e.g.*, *Hornbeck Offshore Servs., L.L.C. v. Salazar*, 696 F.Supp.2d 627, 639 (E.D. La. 2010).  And it is especially true here, where Congress recognized the public interest in spurring domestic energy production and curbing inflation by conducting Lease Sale 261 in accordance with the 2017-2022 Five-Year Plan by September 30.  Yet "the mere specter" of the lease stipulation and acreage withdrawal has caused great "economic uncertainty" and will "contribute[] to untold economic upheaval" absent injunctive relief.  *BST Holdings*, 17 F.4th at 618.  The public interest thus strongly favors enjoining BOEM's unlawful last-minute attempt to add the challenged provisions to the sale.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion for a preliminary injunction.

Respectfully submitted,

/s/ Joseph Scott St. John

Jeff Landry
  Attorney General of Louisiana
Elizabeth B. Murrill (La #20685)
  Solicitor General
Joseph S. St. John (La #36682)
  Deputy Solicitor General
Jordan B. Redmon (La #37272)
  Assistant Solicitor General
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third Street
Baton Rouge, Louisiana 70804
Tel: (225) 485-2458
murrille@ag.louisiana.gov
stjohnj@ag.louisiana.gov
redmonj@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana*


/s/ Michael R. Phillips

Michael R. Phillips (LA #21020)
Claire E. Juneau (LA #33209)
Jeffrey J. Gelpi (LA #37130)
KEAN MILLER LLP
909 Poydras Street, Suite 3600
New Orleans, LA 70112
(504) 585-3050
mike.phillips@keanmiller.com
claire.juneau@keanmiller.com
jeff.gelpi@keanmiller.com


Robert M. Kallam (LA #20242)
KEAN MILLER LLP
600 Jefferson Street, Suite 1101
Lafayette, LA  70502
(337) 235-2232
robert.kallam@keanmiller.com


Catherine E. Stetson (*pro hac vice forthcoming*)
Sean Marotta (*pro hac vice forthcoming*)
Dana A. Raphael (*pro hac vice forthcoming*)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.

/s/ James A. Holmes

James A. Holmes (LA #20571)
Kyle D. Anderson (LA #38124)
CHRISTOVICH & KEARNEY
2300 Pan American Life Center
601 Poydras Street
New Orleans, LA 70130-6078
(504) 561-5700
jaholmes@christovich.com
kanderson@christovich.com


Paul D. Clement (*pro hac vice forthcoming*)
C. Harker Rhodes IV* (*pro hac vice forthcoming*)
Andrew Lawrence* (*pro hac vice forthcoming*)
James Y. Xi* (*pro hac vice forthcoming*)
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
harker.rhodes@clementmurphy.com
andrew.lawrence@clementmurphy.com
james.xi@clementrmurphy.com


*Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for Plaintiff American Petroleum Institute*

Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

Nikesh Jindal (*pro hac vice forthcoming*)
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 737-0500
njindal@kslaw.com

Sarah C. Bordelon (*pro hac vice forthcoming*)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
(775) 327-3011
scbordelon@hollandhart.com

*Counsel for Plaintiff Chevron U.S.A. Inc.*

August 28, 2023