# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

| | |
|---|---|
| THE STATE OF LOUISIANA, by and through its Attorney General, JEFF LANDRY; AMERICAN PETROLEUM INSTITUTE; and CHEVRON U.S.A. INC., *Plaintiffs*, v. DEB HAALAND, in her official capacity as Secretary of the Interior; LAURA DANIEL-DAVIS, in her official capacity as Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management; ELIZABETH KLEIN, in her official capacity as Director of the Bureau of Ocean Energy Management; JAMES KENDALL, in his official capacity as Director of the Gulf of Mexico Regional Office of the Bureau of Ocean Energy Management; U.S. DEPARTMENT OF THE INTERIOR; and BUREAU OF OCEAN ENERGY MANAGEMENT, *Defendants*. | Hon. Judge James D. Cain, Jr. Hon. Magistrate Judge Kathleen Kay<br><br>Consolidated cases: Case No. 2:23-cv-1157 (Lead) Case No. 2:23-cv-1167 (Member) |

**Brief of *Amici Curiae*
10 Members of the United States Congress
in Support of Plaintiffs' Motion for Preliminary Injunction**

## TABLE OF CONTENTS

Page

Interest of *Amici Curiae* ...............................................................................................................1

Introduction & Summary of Argument ........................................................................................3

Argument .......................................................................................................................................4

    I.    The Challenged Provisions Violate The IRA's Plain Text Because They Are Not "in accordance with" The 2017 Record of Decision.............................................. 4

    II.   The Challenged Provisions Are A Procedurally Unlawful "Surprise Switcheroo." ................................................................................................................... 6

    III.  Congress Already Struck The Balance Between The Various Policy Concerns That Lease Sale 261 Implicates. ..................................................................................... 8

Conclusion .....................................................................................................................................9

Certificate of Service ...................................................................................................................11

**INTEREST OF *AMICI CURIAE***

Representative Bruce Westerman, Representative Garret Graves, Representative Pete Stauber, Representative Jerry Carl, Representative August Pfluger, Representative Wesley Hunt, Senator John A. Barrasso, Senator Ted Cruz, Senator Bill Cassidy, and Senator Cindy Hyde-Smith ("*Amici*") are Members of the United States Congress.

This case presents a recurring issue of paramount significance to the *Amici*: the Executive Branch's obligation to faithfully interpret and execute statutes that the Legislative Branch enacts. It is a foundational principle of our constitutional system that the three branches of government operate via checks and balances. Congress carries responsibility to draft the Nation's laws. Executive agencies, in turn, have a duty to faithfully execute those laws—neither adding to nor subtracting from what Congress has prescribed. When agencies in the Executive Branch modify or selectively apply statutes, they usurp the role that the Constitution assigned to Congress and undermine that balance.

*Amici* also have an interest in this case's specific subject matter. *Amici* include Members of Congress in leadership positions on the relevant U.S. House and Senate Committees with jurisdiction over offshore oil and gas development, and these Members have extensive knowledge of and expertise regarding the laws in question. *Amici* also represent States and congressional districts that will be directly affected by the outcome of this lawsuit.

The Inflation Reduction Act ("IRA") requires the Bureau of Ocean Energy Management ("Bureau") to conduct "Lease Sale 261 *in accordance with* the Record of Decision approved by the Secretary on January 17, 2017." Pub. L. No. 117-169, § 502f64(e), 136 Stat. 1818, 2060 (Aug. 16, 2022) (emphasis added). The IRA was the result of considerable deliberation concerning the economic, energy, environmental, and strategic interests of the United States.

1

Mineral leases provide a significant source of revenue for state and federal governments, and they also stimulate economic activity by creating jobs and spurring technological advancements. Production from our territorial waters also reduces America's dependence on foreign sources, which bolsters our Nation's energy security and increases our resilience to fluctuations in the global market. Leasing minerals from our territorial waters also allows the United States to keep a competitive edge, ensuring we are not left behind in the race for resources.

The Bureau's authority to conduct lease sales flows only from the power that Congress vested through the Outer Continental Shelf Lands Act (OCSLA). In passing the IRA, Congress recognized the years-long environmental evaluation that the Bureau has already undertaken as part of creating the 2017 Record of Decision pursuant to the OCSLA's directions.

Congress *expressly* struck a balance between all of these interests when it directed the Bureau to conduct the sale "in accordance with" the 2017 Record of Decision. *Id*. *Amici* have an institutional interest in preventing the Bureau from attempting to revise that balance.

## INTRODUCTION & SUMMARY OF ARGUMENT

The Bureau made a last-minute decision to remove millions of acres from Lease Sale 261 and to impose additional and burdensome vessel-travel restrictions on the remaining acreage (together, the "challenged provisions"). *Amici* respectfully urge the Court to grant the Plaintiffs' motion for preliminary injunction, for three reasons.

*First*, the challenged provisions violate the IRA's plain text. That statute requires the Bureau to conduct Lease Sale 261 "in accordance with" the 2017 Record of Decision. This requires more than bare attention or passing consideration—it requires conformity. The challenged provisions fail that requirement. Any deviations from the terms of sale that appear in the 2017 Record of Decision (whether as added restrictions on vessels or as subtractions from acreage) by definition *do not* conform to the sale process that Congress specifically prescribed. By attempting to circumvent Congress's express instructions, the Bureau not only sidesteps its immediate obligations to follow IRA to the letter, but it also undermines the foundational and delicate balance of power that protects each Branch of government from the other's encroachment.

*Second*, even beyond IRA's text, there are considerable concerns regarding the procedural approach the Bureau took with regard to Lease Sale 261. The Bureau's unexpected pivot—without adequate explanation or consideration for stakeholders' reliance interests—exemplifies what the Fifth Circuit and other courts have dubbed an unlawful "surprise switcheroo." This procedural flaw is particularly problematic given the stakes. Louisiana and other major stakeholders like API, Chevron, and Shell risk substantial and harmful economic consequences as a result of the challenged provisions. Yet the Bureau did not explain the abrupt-about face in its reasoning for adopting the challenged provisions, nor did it exhibit awareness of the affected reliance interests. Congress has an interest in ensuring that agency decisionmaking is explained and supported by an

administrative record and is not the result of a sweetheart settlement in litigation in which an executive agency, such as the Bureau, was not even a party.

*Third*, Congress has already addressed the factors that make Lease Sale 261 so significant: bolstering the economy, incentivizing technological progress, creating jobs, maintaining geopolitical strength and energy security, reducing dependence on foreign energy, preserving the Gulf of Mexico's fragile ecosystems, and stewarding the Nation's resources by preventing them from going derelict. The challenged provisions are the Bureau's attempt to reassess and realign the balance that Congress established. The Bureau lacks any such authority.

## ARGUMENT

**I.    The Challenged Provisions Violate The IRA's Plain Text Because They Are Not "in accordance with" The 2017 Record of Decision.**

The IRA requires that the Bureau "shall" conduct Lease Sale 261 "in accordance with" the 2017 Record of Decision. IRA § 50264(e). "The traditional, commonly repeated rule is that *shall* is mandatory . . . ." Antonin Scalia & Bryan A. Garner, *Reading Law* 112 (2012). So it is here. The same instance of "shall" dictates both the sale's *timing* and its *process*. The timing is mandatory ("not later than September 30"), and thus the process is likewise mandatory ("in accordance with the [2017] Record of Decision"). IRA § 50264(e). The Bureau argues that the IRA relates to timing only, but this view leaves no role for the words "in accordance with the [2017] Record of Decision." *Contra* Federal Defendants' Opposition to Plaintiff Louisiana Et Al.'s and Plaintiff Shell Offshore Oil Inc.'s Motions for a Preliminary Injunction [Dkt. No. 55] at 15, *id.* at 18 (arguing that this language merely "parrot[s]" OCSLA). But courts are "obliged to give effect, if possible, to every word Congress used." *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128–29 (2018) (internal quotation marks and citation omitted). The only remaining interpretive question is what it means to conduct the Lease Sale "in accordance with" the 2017 Record of Decision.

4

"Accordance" means "conformity." *The American Heritage Dictionary of the English Language* 11 (5th ed. 2011); *Accordance*, Oxford English Dictionary Online. Congress chooses its words carefully. That care ensures that citizens, businesses, and agencies can understand the law—and can rely on it. Here, Congress chose the word "accordance," and that word's plain meaning carries Congress's intent. "In accordance with" is precise language that leaves no wiggle-room for the Bureau to improvise. Had Congress wished to allow the Bureau latitude to alter the 2017 Record of Decision, or to add or subtract from its terms of sale, then Congress would have used different language. But instead, Congress expressly dictated the sale process for Lease Sale 261. The Bureau cannot add terms to the process that Congress dictated any more than it can add days to the deadline that Congress specified.

The challenged provisions do not conform to—and therefore are not "in accordance with"—the process that Congress chose. The Bureau's brand-new restriction on vessel activity is not required under the 2017 Record of Decision. It makes no difference whether the restriction is viewed as an addition to the 2017 Record of Decision (a new stipulation) or as a subtraction from that Decision (removal of otherwise-available transport avenues). Neither view conforms to the 2017 Record of Decision, and thus both views deviate from the process that the IRA mandated. The Bureau's last-minute acreage withdrawal is likewise defective. It is a clear attempt to make an end-run around Congress's determination—plain in the IRA's text—that the 2017 Record of Decision is sufficient and that Lease Sale 261 should proceed in conformity with that Decision's terms. But, of course, the acreage withdrawal is not part of the 2017 Record of Decision.

The Bureau must take Congress at its word. Here that word is "accordance." As an agency in the Executive Branch, the Bureau's authority begins and ends with its responsibility to carry out the laws that Congress has enacted—all of them. By circumventing the IRA's directives regarding

Lease Sale 261, the Bureau not only dodges its statutory obligations in this particular instance, but it also arrogates power to itself and undermines the balance of power between the branches of government. The Bureau's course of action regarding Lease Sale 261 also sends the distressing message that agencies can pick and choose which laws to follow, disregarding those that do not align with their immediate interests or preferences. The IRA's clear and unambiguous language requires the Bureau to conduct Lease Sale 261 exactly as Congress prescribed, without adding to or subtracting from the process that Congress specifically identified.

**II.     The Challenged Provisions Are A Procedurally Unlawful "Surprise Switcheroo."**

Of parallel importance to IRA's text are the procedural requirements that Congress enacted as part of the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–06. As the Plaintiffs have explained, the Bureau's actions concerning Lease Sale 261 raise significant issues of procedural irregularity. *See* Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction ("Plaintiffs' Memorandum") [Dkt. No. 14-1] at 18–27. The Bureau's missteps are gravely concerning. In particular, *Amici* call the Court's attention to the Bureau's sudden about-face.

The Bureau acted unlawfully when it "pull[ed] a surprise switcheroo on" the states and the other stakeholders in Lease Sale 261. *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (Sentelle, J.); *accord Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1810 (2019) (citing the "surprise switcheroo" doctrine); *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1138 (5th Cir. 2021) (granting motion for stay after concluding that plaintiffs were likely to succeed on the merits of their "surprise switcheroo" argument). "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). Here, the Bureau neither explained its 180-degree turn nor adequately addressed the reliance interests that it was disrupting.

6

The Bureau did not explain its "change[d] course." *Id.* Despite a long-held position that existing protections were sufficient, the Bureau's new, stricter measures seem to have appeared from thin air. *See* Plaintiffs' Memorandum [Dkt. 14-1] at 22 (explaining that, "[u]ntil days ago, [the Bureau] has consistently found it unnecessary to adopt more protections for the Rice's whale outside of their 'core' habitat in the eastern Gulf that is already excluded from lease sales."). The Bureau's sudden decision to impose the challenged provisions is puzzling and unaccounted for given the Bureau's previous stance deeming additional protections unnecessary. This abrupt shift is a strong indication of arbitrary-and-capricious decision-making. Indeed, as the Plaintiffs have explained, the nature of the Bureau's decision appears to have more to do with placating parties in separate litigation than with addressing any genuinely new evidence. All the same, it is not the Plaintiffs' burden to provide convincing evidence that explains the Bureau's actions. Instead, it is the Bureau's burden to point to a reasonable explanation justifying its reversal. But despite the Lease Sale's significance, no such explanation is evident in the Bureau's decision.

The Bureau also failed to demonstrate that it was "cognizant" of the "serious reliance interests" that its decision affected. *Id.* The Plaintiffs, including Louisiana and various stakeholders like API, Chevron, and Shell, assert that they face serious and irreparable economic harm due to the challenged provisions related to Lease Sale 261. *See, e.g.*, Plaintiffs' Memorandum [Dkt. No. 14] at 27–29. For Louisiana, the harm lies in potential lost revenues, as the State is entitled to a portion of the proceeds from the Lease Sale—proceeds that the challenged provisions threaten to diminish. The Bureau has not explained whether or how its decision to implement the challenged provisions accounted for Louisiana's reasonable reliance interest in those revenues.

Similarly, API, Chevron, and Shell face repercussions due to the challenged provisions. API's members stand to lose opportunities to purchase vast tracts of acreage. And even if these

7

acres were to be made available in the future, the delay's financial implications are significant and likely non-recoverable. Plaintiffs also point out that the challenged provisions, especially the stipulation concerning vessels, would generate hefty compliance costs and impact bidding strategy. This would alter the bidding dynamics, potentially affecting not just the prices but also the very identity of the winning bidder. If the challenged provisions remain, they threaten to distort the entire bidding process. Yet again, however, the Bureau has offered no explanation for how it treated these reliance interests.

For the foregoing procedural reasons, too, the challenged provisions are unlawful—separate and apart from the Bureau's failure to comply with the IRA's plain text.

### III. Congress Already Struck The Balance Between The Various Policy Concerns That Lease Sale 261 Implicates.

The IRA balances diverse, complex, and overlapping considerations including growth and conservation, domestic needs and global positioning, and security and diplomacy. Of crucial importance here, however, is that *Congress* struck the balance between those interests when it dictated the timing and terms of sale for Lease Sale 261. Congress rarely intervenes in individual Lease Sales, nor does it make a habit of dictating the *when* and *how* for a specific sale. But here it has. That makes the Bureau's attempted re-balancing all the more stark—and all the more startling.

Congress's special attention reflects the special significance that attaches to Lease Sale 261, and indeed to offshore leases in general. These leases represent critical investments in our national economy—as well as in state and local communities. Revenue from Lease Sale 261 will bolster federal and state coffers and will also drive economic expansion across the various sectors that service and supply operations at the Lease. Likewise, offshore leasing spurs innovation, fosters technological advancements, and paves the way for job creation. All these benefits create a ripple

8

effect that reinforces secondary industries and local businesses, and that enriches regional and local economies while also easing the energy costs that everyday Americans must face.

Offshore leasing, and Lease Sale 261 in particular, also has heightened significance because using mineral resources from our own territorial waters allows us to rely less on foreign energy suppliers. In turn, this helps insulate the American people from unpredictable geopolitical shifts and potential market manipulations. Strategic self-reliance ensures a continuous and stable energy supply, reduces our vulnerability to international disruptions, and solidifies our position, enabling us to navigate international relations from a position of self-sufficiency. Likewise, by ensuring that Lease Sale 261 complies with the 2017 Record of Decision's rigorous environmental standards, Congress has voiced its commitment to protecting the Gulf of Mexico's delicate marine ecosystems while also ensuring that the Nation's energy supply does not sit unused.

By enacting IRA, Congress has *already* weighed each of these interests.

The Bureau does not have authority to second-guess the balance that Congress chose. But the challenged provisions do just that. The acreage-withdrawal removes millions of acres from sale, and the vessel restrictions add a last-minute stipulation. Neither term is "in accordance with" the 2017 Record of Decision. Congress was aware of the potential tradeoffs between efficiency and stewardship when it enacted the IRA. Yet Congress deemed the 2017 Record of Decision to strike a proper balance between those interests. The Bureau must honor that choice.

## CONCLUSION

For the reasons set forth above, *Amici* respectfully urge that the Court grant the Plaintiffs' motion for preliminary injunction.

9

Dated: September 15, 2023                                   Respectfully submitted,

                                                                          */s/ Kenneth H. Laborde*

| | |
|---|---|
| Steven P. Lehotsky | Kenneth H. Laborde (No. 8067) |
| steve@lkcfirm.com | klaborde@glllaw.com |
| Michael B. Schon | Victoria E. Emmerling (No. 33117) |
| mike@lkcfirm.com | temmerling@glllaw.com |
| LEHOTSKY KELLER COHN LLP | GIEGER, LABORDE & LAPEROUSE, LLC |
| 200 Massachusetts Ave., NW | 701 Poydras Street, Suite 4800 |
| Washington, DC 20001 | New Orleans, Louisiana 70139 |
| | Telephone: (504) 561-0400 |
| Joshua P. Morrow | Facsimile: (504) 561-1011 |
| josh@lkcfirm.com | |
| LEHOTSKY KELLER COHN LLP | |
| 408 W. 11th Street, 5th Floor | |
| Austin, TX 78701 | |

*Attorneys for Amici Curiae*

10

## CERTIFICATE OF SERVICE

I certify that on this day I filed the foregoing with the Clerk of the Court by ECF, thus effectuating service on all counsel who are registered as electronic filers in this case.

Dated: September 15, 2023

*/s/ Kenneth H. Laborde*
Kenneth H. Laborde (No. 8067)