## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAKE CHARLES DIVISION

**STATE OF LOUISIANA ET AL**         **CASE NO.  2:23-CV-01157**

**VERSUS**        **JUDGE JAMES D. CAIN, JR.**

**DEB HAALAND ET AL**        **MAGISTRATE JUDGE KAY**

## <u>MEMORANDUM ORDER</u>

Before the court are Motions for Preliminary Injunction[1] filed, respectively, by plaintiffs the State of Louisiana, American Petroleum Institute, and Chevron USA Inc., and by plaintiff Shell Offshore Inc. Plaintiffs seek to halt the addition of a term to Lease Sale 261 by the Bureau of Ocean Energy Management and the withdrawal of six million acres from that sale. The motion is opposed by both the government defendants originally named in the suits as well as intervenor-defendants Center for Biological Diversity, Friends of the Earth, Sierra Club, and Turtle Island Restoration Network. Docs. 55, 70. The matter came before the court for hearing on September 21, 2023, and the undersigned now issues this decision.

## I.
### INTRODUCTION

This suit arises from the Bureau of Ocean Energy Management ("BOEM")'s plans regarding "Lease Sale 261," an oil and gas lease on the Outer Continental Shelf in the Gulf

---

[1] The first motion was filed in lead case *Louisiana v. Haaland*, No. 23-cv-1157, at doc. 14. The second was filed in member case *Shell Offshore Inc. v. U.S. Department of the Interior*, No. 23-cv-1167 (W.D. La.), at doc. 4.

of Mexico. Lease Sale 261 is proposed for sale on September 27, 2023, in accordance with deadlines set under the Inflation Reduction Act ("IRA"). On August 23, 2023, BOEM issued a Final Notice of Sale that withdrew six million acres from the lease and inserted a new lease stipulation restricting vessel activity in the lease area. The agency justified both measures as necessary for the protection of Rice's whale, a species of baleen whale native to the northeastern Gulf of Mexico that is protected under the Endangered Species Act.

Plaintiffs allege that the last-minute insertion of these provisions violates (1) the IRA, which directed BOEM to conduct Lease Sale 261 in accordance with the agency's previously adopted Five-Year Plan for oil and gas leasing, (2) the procedural requirements of the Outer Continental Shelf Lands Act, and (3) the Administrative Procedure Act ("APA"), insofar as they represent an arbitrary and capricious change in position by BOEM. Accordingly, plaintiffs have filed suit in this court seeking declaratory and injunctive relief. They also seek a preliminary injunction, asserting that delaying the sale or allowing it to proceed with the challenged provisions will result in irreparable harm. Defendants and intervenor-defendants[2] oppose the motion, arguing that (1) the challenged measures are well-supported and were properly implemented, (2) plaintiffs have not met the high bar for showing that preliminary injunctive relief is warranted, and (3) the court lacks the authority to grant the requested relief. Docs. 55, 70. An amicus brief has also been filed in support of plaintiffs by ten members of the United States Congress. Doc. 66.

---

[2] The court permitted the intervention of four environmental nonprofit organizations (Sierra Club, Center for Biological Diversity, Friends of the Earth, and Turtle Island Restoration Network) as defendants, based on their advocacy on behalf of Rice's whale in a suit in the District of Maryland, described infra, and the relation between that suit and the measures challenged here. *See* doc. 58.

## II.
### BACKGROUND

**A. Statutory Background**

**1. Outer Continental Shelf Lands Act**

The Outer Continental Shelf Lands Act of 1953 ("OCSLA") provides the framework through which the Department of the Interior leases areas of the Outer Continental Shelf for oil and gas exploration and development. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009). This is accomplished through a four-stage process, "proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent." *California ex rel. Brown v. Watt*, 668 F.2d 1290, 1297 (D.C. Cir. 1981). The steps are: (1) formulation of a five-year leasing plan, (2) lease sales, (3) exploration by the lessees, and (4) development and production. *Secretary of the Interior v. California*, 464 U.S. 312, 337 (1984). The Secretary's delegated authority in this area is divided between BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE"), with BOEM overseeing lease sales and BSEE bearing primary responsibility for drilling operation safety and environmental protection. *See* 76 Fed. Reg. 64,432 (Oct. 18, 2011).

At the first stage, formulation of the leasing plan, BOEM coordinates with other agencies to evaluate the impacts of the program and to balance the potential for discovery of oil and gas with the potential for environmental damage and adverse impacts to the coast. 43 U.S.C. §§ 1344(a)(1)–(3), (b)(3); 42 U.S.C. § 4332(C). OCSLA also requires that the Secretary consider the impact on affected states and communicate with the governors of

those states regarding their concerns. 43 U.S.C. §§ 1344(a)(2)(F), 1345. This consultation results in the development of a "schedule of proposed lease sales . . . which [the Secretary] determines will best meet national energy needs" for the applicable period, consistent with the balancing of environmental and social factors with economic and energy needs. 43 U.S.C. § 1344(a).

At the second stage Interior solicits bids and issues leases. 43 U.S.C. § 1337. To prepare for an individual lease sale, BOEM issues a "Call for Information and Nominations" on an area proposed in the Five-Year Plan through publication in the Federal Register. 30 C.F.R. § 556.301. To this end it requests comments from industry and the public on the sale area's potential for drilling as well as its "socioeconomic, biological, and environmental information." *Id.* BOEM considers these factors in determining the scope and terms of the lease, which are published in a proposed notice of sale ("PNOS"). *Id.* at §§ 556.302(b), 556.304(a). Upon approval by the Secretary, BOEM also sends the PNOS to the governors of affected states and publishes notice of its availability in the Federal Register. *Id.* at § 556.304(c). Governors of affected states may submit comments and recommendations to BOEM on the size, timing, and location of the proposed sale. *Id.* at § 556.305(a). The Secretary will accept these recommendations if it determines that they "provide a reasonable balance between the national interest and the well-being of the citizens of the State[.]" *Id.* at § 556.307(b). Finally, BOEM considers comments received in response to the proposed notice before publishing a final notice of sale ("FNOS"). *Id.* at §§ 556.307(a); 556.308(a). The sale is then conducted by a sealed-bid auction held at least 30 days after publication of the FNOS. *Id.* at § 556.308(a)–(b).

"A lessee does not, however, acquire an immediate or absolute right" to exploration and production in the lease area upon securing the lease; "those activities require separate, subsequent federal authorization." *Interior*, 464 U.S. at 317. At the third stage, Interior reviews and determines whether to approve exploration plans. *Ctr. for Biological Diversity*, 563 F.3d at 473. The Secretary will reject a plan if he determines that it may result in, *inter alia*, serious harm to the environment and "cannot be modified to avoid such condition." 43 U.S.C. § 1340(c)(1) (citing 43 U.S.C. § 1334(a)(2)(A)(i)). Finally, at the fourth stage, more detailed plans are required and reviewed in relation to the construction of platforms, installation of processing equipment, and the laying of pipelines. *See* 43 U.S.C. § 1351. Here, again, the plan and consequently the leasing program may be terminated if Interior finds a risk of serious harm or damage "to the marine, coastal or human environments." *Ctr. for Biological Diversity*, 563 F.3d at 473 (quoting 43 U.S.C. § 1351(h)(1)(D)(i)).

## 2.  Endangered Species Act

The Department must also comply with federal environmental laws in its oversight of offshore leasing. Section 7(a)(2) of the Endangered Species Act ("ESA") provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

16 U.S.C. § 1536(a)(2). If the proposed action may affect a listed species, the agency must formally consult with either the National Marine Fisheries Service ("NMFS") or the Fish and Wildlife Service ("FWS"), depending on whether the species is marine or terrestrial. *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F.Supp.3d 147, 151 (D.D.C. 2014); *see* 50 C.F.R. §§ 402.01(b), 402.14(a).

NMFS, as applies here, then prepares a biological opinion using "the best scientific and commercial data available" to evaluate the proposed action's impact on the species. 16 U.S.C. § 1536(a)–(b); 50 C.F.R. § 402.12. Here it considers whether the proposed action is likely to violate the ESA by jeopardizing the continued existence of a listed species or resulting in the destruction or adverse modification of a critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(h)(1)(iv). If NMFS concludes that such a violation is likely and issues a "jeopardy" opinion, it must provide "reasonable and prudent alternatives" ("RPAs"). 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1)(iv), (h)(2). RPAs are defined under the regulations as:

> alternative actions identified during formal consultation [1] that can be implemented in a manner consistent with the intended purpose of the action, [2] that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, [3] that is economically and technologically feasible, and [4] that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.02. Following the issuance of a "jeopardy" opinion, Interior must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered Species Committee. *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 653 (2007).

### B. Factual Background

#### 1. Approval of the 2017-22 Leasing Program

The Secretary approved the 2017-22 Five-Year Plan on January 17, 2017, in a Record of Decision that directed BOEM to proceed with 10 scheduled leases in the Gulf and one in Alaska's Cook Inlet. Doc. 14, att. 22. The ten Gulf of Mexico sales were thereby scheduled to occur over the five years of the program, with one sale in 2017, two each in 2018–2021, and one (Lease Sale 261) in 2022. *Id.* at 4. The Gulf of Mexico sales were to be "region-wide and include unleased acreage not subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf," with the goal of "provid[ing] greater flexibility to industry, including more frequent opportunities to bid on rejected, relinquished, or expired OCS lease blocks." *Id.* This decision adopted BOEM's Proposed Final Program and Programmatic Environmental Impact Statement ("EIS"), the latter of which evaluated the environmental impact of sales of differing scopes. *Id.* at 2–4. In reference to Rice's whale (then called Bryde's whale), the Programmatic EIS concluded that the "biologically important area" for the whale off the Florida coast did not overlap with the Gulf of Mexico program areas. Doc. 14, att. 24, p. 73. The evaluation assumed the continued implementation "of protective measures required by statute, regulation, or current lease stipulations that would likely continue to be adopted in the future." Doc. 14, att. 24, p. 50. Among these were several measures relating to protection of endangered species. Doc. 14, att. 25, pp. 548–58.

### 2. Additional measures adopted for protection of Rice's whale

Following approval of the Five-Year Plan BOEM and BSEE consulted with NMFS to determine the potential impact of the plan on protected species over the next fifty years. This culminated with NMFS's issuance of a biological opinion in March 2020 ("2020 BiOp"). *See* doc. 16, att. 2, pp. 28–29. NMFS concluded that oil and gas activity posed a risk to Rice's whale in portions of the eastern Gulf, particularly from vessel strikes. *Id.* at 578–81. NMFS determined that the jeopardy could be avoided, however, with an RPA consisting of several vessel operating conditions within the purple area shown below:



*Id.* at 624–26.

BOEM disagreed with NMFS's analysis and maintained that vessel traffic from the leases was unlikely to cross the identified habitat.[3] Doc. 16, att. 1, p. 232. Nevertheless, BOEM and BSEE formally accepted NMFS's RPA for Rice's whale and included it as a stipulation in future lease sales under the Five-Year Plan. *Id.*; *see* doc. 14, att. 20, p. 9 (FNOS for Lease Sale 256); doc. 14, att. 18, p. 9 (FNOS for Lease Sale 257); doc. 14, att. 10, p. 9 (PNOS for Lease Sale 261). Meanwhile, environmental groups filed suit against NMFS in the District of Maryland.[4] They argued that the 2020 BiOp understated the risks of oil and gas activity to various species, including Rice's whale, particularly through the threat of oil spills after the Deepwater Horizon disaster and the failure to consider alleged changes in habitat following that spill. *See Sierra Club v. NMFS*, No. 8:20-cv-3060 (D. Md.), at doc. 1.

### 3.  Lease sales paused and then resumed under Inflation Reduction Act

In January 2021, President Biden entered an executive order directing the Department of the Interior to pause new oil and gas lease sales pending a comprehensive review. 86 Fed. Reg. 7,619, 7,624 (Jan. 27, 2021). At this point seven of the 10 Gulf lease sales scheduled under the Five-Year Plan had been conducted, with Lease Sales 257, 259, and 261 still pending. *See Louisiana v. Biden*, 622 F.Supp.3d 267, 287–89 (W.D. La. 2022). Louisiana and several other states sued to enjoin the pause and the district court granted

---

[3] Specifically, it noted (as NMFS had in the 2020 BiOP) that the whale's habitat was largely in the area of the Gulf of Mexico which had been under a congressional moratorium from leasing and was now subject to presidential withdrawal. Doc. 16, att. 1, p. 232. BOEM determined that vessels expected to service the leases were more likely to use ports closer to the Western and Central Planning Areas, and thus "unlikely to transit across greater distances through the withdrawal area to get to the leases." *Id.*

[4] As noted above, the plaintiffs in that matter are the same groups as the defendant-intervenors in this case.

the preliminary injunction. *Louisiana v. Biden*, 543 F.Supp.3d 388 (W.D. La. 2021). BOEM then proceeded with Lease Sale 257 in November 2021. *See* doc. 14, att. 17 (Lease Sale 257 FNOS). Before the leases could be issued to the winning bidders, however, environmental groups challenged the sale through a lawsuit based on Interior's alleged failure to consider foreign oil consumption in its pre-sale EIS. *See Friends of the Earth v. Haaland*, 583 F.Supp.3d 113 (D.D.C. 2022). The court vacated BOEM's Record of Decision to conduct the lease sale and industry parties intervened and appealed. *Friends of the Earth v. Haaland*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023).

In August 2022, with the appeal of *Friends of the Earth* pending, Congress passed the Inflation Reduction Act ("IRA"), PL 117–169. There it ordered Interior to proceed with Lease Sale 257, in accordance with the terms and conditions in the FNOS. *Id.* at § 50264(b). It also ordered that the remaining lease sales be scheduled by specific dates, notwithstanding the expiration of the previous Five-Year Program, "in accordance with the Record of Decision approved by the Secretary on January 17, 2017": Lease Sale 258 (Cook Inlet) by December 31, 2022, Lease Sale 259 by March 31, 2023, and Lease Sale 261 by September 30, 2023. *Id.* at § 50264(c)–(e).

### 4. BOEM conducts further environmental review and proceeds with Lease Sale 259

In October 2022 BOEM and BSEE sent a letter to NMFS requesting reinitiation of consultation on the 2020 BiOp, based on the issues raised in the District of Maryland suit. Doc. 55, att. 1. BOEM then issued a final supplemental EIS on the two remaining Gulf

lease sales, 259 and 261, in January 2023.[5] Doc. 16, att. 1. In the public comment period on this document, environmental groups urged BOEM to remove blocks in the western and central Gulf from the leasing area for the protection of Rice's whale and to expand the areas where mitigation measures were applied. *Id.* at 469, 626–27. In support they referenced a study published in July 2022 by Melissa Soldevilla and others, positing broader distribution of Rice's whale throughout the Gulf based on passive acoustic data. *Id.* at 560.

Upon review of the study, BOEM determined that "not enough information is available at this time to confirm [the whales'] distribution or any seasonal movements outside of the core area that is already considered in this Supplemental EIS." *Id.* It also stated that its environmental analyses had not identified justifiable reasons to restrict the lease sale area and that it believed its stipulations and mitigations provided adequate environmental protection. *Id.* at 469. It further noted that "any individual lease sale could be scaled back during the prelease sale process to offer a smaller area should circumstances warrant." *Id.* BOEM also advised that "BOEM and BSEE's review of plans, permits, and/or authorizations at the post-lease stage includes review of any planned transits through the Rice's whale core habitat." It noted that "[a]t this time, critical habitat has not been identified for the Rice's whale" and that it consulted with NMFS and FWS to determine the required mitigating measures. *Id.* at 626. Accordingly, BOEM stated in the final supplemental EIS:

---

[5] There it acknowledged that it had no discretion on whether to conduct these sales, but stated that it was preparing the supplemental EIS "to follow its normal leasing process to the fullest extent possible . . . ." *Id.* at 6.

> BOEM believes the potential for vessel strikes to sperm and Rice's whale is extremely unlikely to occur due to the generally slow vessel transiting and surveying speeds, limited vessel routes originating from the eastern GOM, and the additional mitigations on vessels within the Rice's whale core area (as defined by the 2020 GOM Biological Opinion [BiOp]) (Soldevilla et al. 2022). The core area has been changing over the years as baseline information becomes available (Rosel and Garrison 2022). **BOEM will continue to monitor current literature and work with NMFS as it relates to consultations, though the conclusions found in the 2017-2022 GOM Multisale EIS and 2018 GOM Supplemental EIS still remain valid.**

*Id.* at 170 (emphasis added). Lease Sale 259 was then conducted as scheduled in March 2023, as a regionwide sale of "all of the available unleased acreage in the GOM OCS" with unrelated minor adjustments to the lease stipulations.[6] Doc. 14, att. 14 (Lease Sale 259 FNOS). The sale was closed with industry bidding nearly $310 million for 313 tracts covering 1.6 million acres, and BOEM accepting bids and issuing leases for 295 tracts. *See* Oil and Gas Lease Sale 259, Final Bid Recap (Mar. 29, 2023), *available at* bit.ly/3EfOhqQ.

That month, BOEM also issued a PNOS for Lease Sale 261 with the same stipulations. Doc. 14, atts. 8 & 10. BOEM indicated, however, that it was "considering removing the area comprising the northeastern Gulf of Mexico and continental shelf break between the 100 meters and 400 meters in depth isobaths to protect Rice's Whales that may transit through the area." Doc. 14, att. 8, p. 7. It also expressly "reserve[d] the right to modify the sale area in the Final NOS, including removing additional areas from Lease Sale 261." *Id.* As required by statute, the PNOS was published in the Federal Register and subject to comment from the governors of affected states. In response the governors of

---

[6] BOEM converted three stipulations (for Baldwin County, topographic features, and live bottom) into area exclusions and added a stipulation for royalties, as required by § 50263 of the IRA. *See* doc. 14, att. 14, pp. 14–15.

Alabama, Mississippi, and Texas all objected to the proposed withdrawal. Doc. 55, att. 3, p. 23.

### 5. BOEM shifts approach to Rice's whale and adopts challenged provisions for Lease Sale 261's Final Notice of Sale

Despite the conclusions of the supplemental EIS, the government soon appeared to change its mind regarding the protections needed for Rice's whale. In a stipulation filed on July 21, 2023, in the *Sierra Club* suit, NMFS and plaintiffs agreed to stay proceedings while NMFS worked to update the challenged 2020 BiOP. No. 8:20-cv-3060 (D. Md.), at doc. 147. The stipulation indicated that this consultation had been prompted by the letter from BOEM and BSEE to NMFS, requesting to reopen consultation on the 2020 BiOp. *Id.* at doc. 147, p. 2. The stipulation also indicated that NMFS might designate a critical habitat for Rice's whale and that BOEM would issue notice to lessees and operators during the reinitiated consultation. *Id.* at doc. 147, pp. 2–3; *see* 88 Fed. Reg. 47,453, 47,460 (proposed designation). Finally, the parties agreed that a lease stipulation for the protection of Rice's whale would be added to Lease Sale 261 and any subsequent Gulf of Mexico oil and gas leases during the reinitiated consultation. *Sierra Club*, No. 8:20-cv-3060, at doc. 147, pp. 2–3; *see id.* at doc. 147, att. 2 (proposed lease stipulation). The proposed stipulation would add several vessel mitigation conditions between the 100- to 400-m -isobaths across the northern Gulf of Mexico on the OCS, eastward from the Mexican border with Texas and westward of the newly designated Rice's whale area shaded in blue below:



*Id.* at doc. 147, att. 2. The new mitigation measures include the presence of visual observers

on vessels, speed restrictions, limitations on transit "after dusk and before dawn, and during

other times of low visibility," and use of Automatic Identification Systems on vessels. *Id.*

The district court granted the motion and stayed proceedings. *Id.* at doc. 154.

The FNOS for Lease Sale 261 was issued on August 23, 2023, incorporating the

new measures in Stipulation 4(B)(4) and covering a lease area of approximately 67.3

million acres. Doc. 14, att. 4, pp. 11–13; *see* doc. 16, att. 5, pp. 4–5. BOEM also confirmed

that it was withholding six million acres in the expanded Rice's whale area from the sale,

as alluded to in the PNOS. Doc. 14, att. 2, pp. 11–13. The Department of the Interior

explained the actions as follows in a Record of Decision:

> The existing 2020 Biological Opinion, as amended, remains in effect until
> the reinitiated consultation is completed and a new or amended Biological
> Opinion becomes available. During the reinitiation process, BOEM will
> continue to implement the Reasonable and Prudent Alternative for the Rice's
> whale, and comply with all Reasonable and Prudent Measures and Terms and
> Conditions under the existing 2020 Biological Opinion, as amended. This
> includes continuing to request step-down reviews for the prescribed activities
> and implementing and adaptively managing the mitigation, monitoring, and
> reporting requirements (2020 Biological Opinion Appendices and/or
> Conditions of Approval, as amended) imposed by the Bureaus on plans and
> permits, and as coordinated with NMFS and industry. **In addition, based on
> a recent study that the endangered Rice's whale occurs in portions of the**

**northern Gulf of Mexico between the 100-meter and 400-meter isobaths eastward from the Mexico border with Texas and westward of the Rice's Whale Core Area identified in the 2020 Biological Opinion (as amended in April 2021), removing this area from the lease sale could reduce risks to this species while reinitiated consultation with NMFS is ongoing.** Further, the updated Protected Species Stipulation includes interim measures to require certain speed restrictions and other measures between the 100-meter to 400-meter isobaths. These measures will remain in place while the reinitiated consultation is ongoing and until a new or amended biological opinion is issued by NMFS.

Doc. 14, att. 5, pp. 13–14 (emphasis added).

On August 24, 2023, plaintiffs filed their petition for declaratory and injunctive relief in this court. Doc. 1. Four days later they filed a motion for preliminary injunction. Docs. 9, 14. Plaintiffs ask the court to enjoin BOEM from implementing the changes in the FNOS for Lease Sale 261 and argue that these violate the APA and the IRA. Doc. 14; *Shell Offshore Inc.*, No. 2:23-cv-1167, at doc. 4. The two suits have been consolidated for briefing purposes and the environmental group plaintiffs from the District of Maryland suit have been granted leave to intervene. Docs. 52, 58. Government defendants and intervenor defendants oppose the motion. Docs. 53, 55, 56.

### III.
### LAW & APPLICATION

To obtain a preliminary injunction, the movant must show (1) a substantial likelihood of success on the merits of its claims; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the harm the injunction may do to the nonmovant; and (4) that granting the injunction will not disserve the public interest. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). "The grant of injunctive relief is an extraordinary remedy which requires the movant to

unequivocally show the need for its issuance." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). The decision lies within the district court's discretion. *Allied Mktg. Grp., Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

**A.  Likelihood of Success on the Merits**

Plaintiffs advance three legal grounds for voiding the challenged lease terms: (1) their implementation was procedurally invalid; (2) the decision amounted to arbitrary and capricious agency action; and (3) the implementation of the terms violated the IRA. Finding a sufficient showing of merit under the first two arguments, the court does not consider the third. First, however, the court considers procedural objections lodged by defendants.

**1.  Defendants' procedural objections**

Both sets of defendants have asserted that plaintiffs are unlikely to succeed on the merits based on certain procedural objections. Intervenor defendants maintain that this court is an improper venue while government defendants contend that plaintiffs have violated OCSLA's requirement that potential litigants provide Interior with notice at least 60 days before filing suit. 43 U.S.C. § 1349(a)(2).

As to venue, a civil suit against a federal agency or official may only be brought in the judicial district where:

> (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1). Plaintiffs base venue on § 1391(e)(1)(B) and (C) in both the lead case, *Louisiana v. Haaland*, and member case *Shell Offshore Inc. v. U.S. Department of Interior*. Intervenor defendants argue that venue is improper in the latter suit because Shell Offshore is the lone plaintiff and has admitted that it is headquartered in Houston, though it maintains facilities in this district in support of its offshore leasing program. *Shell Offshore Inc.*, No. 2:23-cv-1167, at doc. 1, ¶¶ 5, 13. Intervenor defendants also assert that venue is improper under § 1391(e)(1)(B) because the challenged decision-making occurred in Washington, D.C. and the stipulated agreement was signed in Maryland.

On the venue objection, the issue has not been properly raised through a motion to transfer or dismiss. The court declines to issue an advisory opinion on the issue. On government defendants' procedural objection, the court finds no merit. First, as defendants point out, these provisions apply only to citizen suits under OCSLA. They are irrelevant when plaintiffs seek review under the APA. *Hornbeck Offshore Servs., LLC v. Salazar*, 696 F.Supp.2d 627, 636 (E.D. La. 2010). And even if the notice requirements did apply, they are likely excused under § 1349(a)(3) because "the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3).[7] Plaintiffs' failure to provide notice therefore has no impact on their ability to proceed with these claims.

---

[7] Defendants maintain that plaintiffs' prospective interest in the parcels does not qualify as a legal interest and so they have no recourse for challenging any changes in the FNOS. This position is based on an unpublished decision from the D.C. Circuit, wherein the court held that a scheduled wind lease auction did not immediately affect plaintiffs' legal interests because the leases themselves did not authorize any activity in the leased area. *Fisheries Survival Fund v. Haaland*, 858 F. App'x 371, 374 (D.C. Cir. 2021). As explained in *Friends of the Earth*, however, a case involving Lease Sale 257, the lease sale stage for oil and gas leases authorizes certain ancillary activities including geological and geophysical exploration. 583 F.Supp.3d at 133. Additionally, the lease sale form grants the lessee exclusive rights to drilling and production and the applicable regulations provide "an irretrievable commitment of resources in the

## 2.  Whether the changes were procedurally valid

Plaintiffs contend that the implementation of the challenged provisions and acreage withdrawal were procedurally invalid. Specifically, they assert that BOEM/Interior were obliged under OCSLA to provide notice and an opportunity for comment before altering the terms of Lease Sale 261 in the FNOS. Defendants maintain that the PNOS provided sufficient notice of the changes, and point out that governors of certain affected states already objected to the proposed acreage withdrawal.

As to those violations, the APA requires that the court hold unlawful and set aside any agency action found to be "without observance of procedure required by law." 5 U.S.C. 706(2)(D). OCSLA carves out a significant opportunity for state stakeholders to participate in the leasing process. Within sixty days of a PNOS, state and local governments may submit recommendations on "the size, timing, or location of a proposed lease sale." 43 U.S.C. § 1345(a)–(b). The Secretary must accept these recommendations if they "provide for a reasonable balance between the national interest and the well-being of the citizens of the affected State." *Id.* at § 1345(c). The Secretary must also communicate his or her decision on the recommendation in writing to the governor of the affected state. *Id.*

BOEM's regulations facilitate this input as well comment by the public. Specifically, BOEM is required to publish each proposed notice of sale in the Federal Register to facilitate the state and local governments' input. 30 C.F.R. § 556.304(c). The publication must include "the proposed lease terms and conditions of sale, and proposed

---

sense that once a lease is issued, BOEM cannot unilaterally undo that decision for at least five years and the government must pay a penalty if it does so." *Id.* at 136. Accordingly, the lease sale stage grants the lessee a legal right and this right is immediately impacted by changes to the FNOS.

stipulations to mitigate potential adverse impacts on the environment." *Id*. BOEM must "consider **all** comments and recommendations received in response to the proposed notice of sale." 30 C.F.R. § 556.307(a) (emphasis added).

The PNOS for Lease Sale 261 was issued in March 2023, soon after BOEM had publicly confirmed through its supplemental EIS that it did not believe additional measures were required to protect Rice's whale. The challenged lease term for the expanded Rice's whale area only arose in a July 2023 district court filing and then appeared in the FNOS for Lease Sale 261 on August 25, 2023—one month before the statutory deadline for the sale. BOEM failed to follow its own procedures by making significant changes to the FNOS, thereby depriving both affected states and the public the opportunity for meaningful review and comment. The procedural error is particularly grave here, because of both the compressed timeline and BOEM's inexplicable about-face on the scientific record it had previously developed. As described below, Louisiana has a significant stake in offshore leasing. Because of BOEM's bait and switch tactics, however, it was deprived of its statutorily guaranteed right to address a significant modification to leasing protocols for a long-term lease sale off its coast. As emphasized at oral argument, the last-minute changes and challenged terms may also have sizable impacts on bidding dynamics and operations for the industry parties.[8] Accordingly, the insertion of the challenged provisions into the FNOS for Lease Sale 261 was procedurally invalid. Plaintiffs have carried their burden of showing a likelihood of success on the merits under this claim.

---

[8] *See, e.g.*, doc. 14, atts. 13 & 15.

### 3.  Whether the challenged provisions are arbitrary and capricious

The APA also requires that a court "hold unlawful and set aside" an agency action if it is found to be "arbitrary, capricious, [or] an abuse of discretion[.]" 5 U.S.C. § 706(2)(A). This standard "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, __ U.S. __, 141 S.Ct. 1150, 1158 (2021). The court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *Texas v. United States*, 40 F.4th 205, 226 (5th Cir. 2022) (internal quotations omitted). Put another way, the reviewing court must ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 141 S.Ct. at 1158. In reviewing an agency's action, the court may only consider the reasoning articulated by the agency itself and may not credit post hoc rationalizations. *Wages and White Lion Investments, LLC v. USDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 53 (1983)).

Plaintiffs assert that BOEM acted arbitrarily and capriciously by failing to (1) explain its change in position, (2) justify the challenged provisions, and (3) consider other important factors. They show a strong likelihood of success on the merits under all three prongs. Neither the Record of Decision announcing the new provisions nor the FNOS explains BOEM's shift in position from its supplemental EIS issued in January 2023. In the latter document BOEM concluded on review of the Soldevilla study that "not enough information is available at this time to confirm [the whales'] distribution or any seasonal

movements outside of the core area that is already considered in this Supplemental EIS." Doc. 16, att. 1, p. 560. Accordingly, it determined that "the potential for vessel strikes to sperm and Rice's whale is extremely unlikely to occur due to the generally slow vessel transiting and surveying speeds, limited vessel routes originating from the eastern GOM, and the additional mitigations on vessels within the Rice's whale core area" and "the conclusions found in the 2017-2022 GOM Multisale EIS and 2018 GOM Supplemental EIS still remain valid." *Id.* at 170. In the Record of Decision supporting the challenged provisions, however, the Secretary justified the change in position "based on a recent study that the endangered Rice's whale occurs in portions of the northern Gulf of Mexico between the 100-meter and 400-meter isobaths eastward from the Mexico border with Texas and westward of the Rice's Whale Core Area identified in the 2020 Biological Opinion," i.e., the Soldevilla study.

This is the only scientific justification offered for the challenged provisions, representing an unexplained about-face from a position taken by the agency just months before. BOEM offered no explanation for its new stance on the same body of evidence, let alone using this pivot to justify measures pending a final determination by NMFS. This leaves the impression that the 2023 Record of Decision is merely an attempt to provide scientific justification to a political reassessment of offshore drilling. Additionally, the 2023 Record of Decision does not show any reevaluation of the other factors BOEM is required to consider in recommending areas for leasing. *See* 43 U.S.C. § 1344(a)(2); 30 C.F.R. § 556.302(a)(1). Though the relevant paragraph discusses BOEM's obligations under the ESA and its other environmental obligations, it makes no reference to the impact

of the measures on production or the availability of acreage for energy exploration. BOEM devoted only one paragraph to its decision and failed to explain how these alternatives were selected, a stark contrast to the prior environmental reviews conducted with respect to the leases authorized under this Five-Year Plan.

The agreed-upon RPAs for protection of Rice's whale were added after years of deliberation. After the leasing pause, BOEM conducted a supplemental EIS with notice and comment but found no basis for altering its measures with respect to the whale. The challenged provisions inserted into these leases at the eleventh hour, and the acreage withdrawal, are based only on an unexplained change in position by BOEM on a single study a few months after that supplemental EIS. The process followed here looks more like a weaponization of the Endangered Species Act than the collaborative, reasoned approach prescribed by the applicable laws and regulations. Even when an agency's decision is based on political considerations, it is not excused from justifying the position—particularly when the decision is a pivot from a prior policy. Failure to do so leads to "surprise switcheroo" by an agency against regulated entities. *E.g.*, *Wages and White Lion Investments, LLC*, 16 F.4th at 1138 (quoting *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005)). The law requires more, especially where the prior policies have engendered reliance interests. *Id.* at 1139. Here BOEM failed to justify its pivot or account for those reliance interests, reinforcing the arbitrariness of its decision. Accordingly, plaintiffs have shown a sufficient likelihood that they will succeed on this claim.

### B.  Substantial Threat of Irreparable Injury

Next, plaintiffs must show a substantial threat of irreparable harm. Here plaintiffs rely on their economic harm and lost business opportunities. Specifically, the acreage removal and the addition of burdensome lease stipulations will result in lost revenue from Lease Sale 261. Doc. 14, att. 27, ¶¶ 28–34. This could cause economic injury of up to $2.2 million to Louisiana, which is entitled to a share of offshore royalties. *Id.* The industry plaintiffs will also suffer economic injury and impairment to their business development. According to an affidavit from Shell's commercial manager, the new restrictions on vessel traffic apply to an area of the northern Gulf that separates Shell's existing offshore leases from the onshore infrastructure that supports them. *Shell Offshore Inc.*, No. 2:23-cv-1167, at doc. 4, att. 2, ¶¶ 23–27. Imposition of restrictions in this barrier will undermine long-term planning for and execution of its lease operations by, for example, (1) reducing the available hours for supply and increasing the number of ships necessary to make supply runs, (2) restricting Shell's ability to obtain seismic survey data for areas obtained in other lease sales because a survey cannot be designed to exclude individual blocks that are subject to the new stipulation, and (3) creating "costly and unreasonable complications" for Shell as it loses the ability to consolidate operations across leases because of the new restrictions. *Id.* at ¶¶ 23–27. These complications will increase attendant costs for all leases issued from Lease Sale 261 as well as some issued from non-Lease Sale 261 sales. *Id.* at ¶ 23. The same logistical complications apply to Chevron, whose operations manager posits that vessel delays and inefficiencies caused by the challenged stipulation will likely add to the amount of time needed to complete projects in the Lease Sale 261 and increase drilling

costs on Lease Sale 261 leases "by a significant factor."[9] Doc. 14, att. 15. Finally, the industry plaintiffs show that the last-minute changes impact their ability to bid fairly on leases under Lease Sale 261 and to bid on the six million acres withdrawn from the sale. Doc. 14, att. 11, ¶¶ 12–16; doc. 14, att. 13, ¶¶ 14–16; *Shell Offshore Inc.*, No. 2:23-cv-1167, at doc. 4, att. 2, ¶ 28.

In return defendants point out that there was low interest in the now-excluded area when it was offered during Lease Sale 259, with BOEM receiving bids on only 16 out of the circa 1200 blocks in that area. Doc. 55, att. 6, ¶ 8. They challenge Louisiana's estimate of lost revenues, arguing that the calculations are simplistic and overlook that most revenue is generated from older leases. They also argue that this harm is not irreparable because, if the court were to ultimately vacate Lease Sale 261 in a final adjudication on the merits of this case, Interior would then conduct a sale consistent with the court's orders. Finally, they maintain that the industry defendants' purported compliance costs are too speculative. They also assert that alleged harms based on bidding dynamics are based on the faulty premise that bidders are entitled to know all final conditions of sale at the time of the PNOS.

A harm is irreparable when "there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Economic loss therefore rarely qualifies as an irreparable harm. *Optimus Steel, LLC v. U.S. Army Corps of Eng'rs*, 492 F.Supp.3d 701, 725 (5th Cir. 2020). Because of the government's sovereign immunity, however, it will "be difficult, if not impossible" for plaintiffs to recover their funds.

---

[9] Robichaux estimates that this cost could rise to a million dollars or more per vessel, per day if supply disruptions cause drilling to be suspended. *Id.* at ¶ 14.

*Louisiana v. Biden*, 543 F.Supp.3d at 417. "In determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability.'" *Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) (quoting *Texas v. EPA*, 829 F.3d 405, 433–34 (5th Cir. 2016)). Accordingly, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and concurring in the judgment)).

The court observes that plaintiffs have demonstrated substantial potential costs resulting from the challenged provisions. While the government defendants largely focus on the acreage withdrawal and dynamics of the sale itself, many of plaintiffs' alleged hardships arise from the vessel restrictions. Industry plaintiffs have shown a likelihood that these will burden their operations on current and planned leases. The resulting costs would not be undone by the court's entry of a permanent injunction and order of another sale. Plaintiffs also show that no other mechanism exists for recovering the compliance costs because of the government's sovereign immunity. Accordingly, plaintiffs satisfy this step of the inquiry.

## C. Whether Balance of Equities Supports Injunctive Relief

Finally, the party seeking a preliminary injunction must show that (1) the threatened injury to the movant outweighs the harm the injunction may do to the nonmovant and (2) granting the injunction will not disserve the public interest. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). When the government is a party, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

As described above, the industry plaintiffs and the state of Louisiana face a substantial risk of irreparable economic harm if the injunction is not granted. Additionally, the sale is currently under a statutory deadline. If it does not take place as scheduled, government defendants are no longer under any congressional mandate to proceed with the lease sale. Meanwhile, if the government finds justification for additional measures to protect Rice's whale, it may pursue these through the Department of the Interior's oversight of lessees' exploration and production plans. *See* 43 U.S.C. §§ 1340(c)(1), 1351(c) (describing Interior's ability to require modifications of exploration and production plans or cancel them to avoid environmental harm); *see also Ctr. for Biological Diversity*, 563 F.3d at 473 (same). Given the shaky justification offered by BOEM, the court cannot find that the challenged provisions are so necessary that withholding them even on a preliminary basis will outweigh the risk of irreparable economic harm shown by plaintiffs. Additionally, "there is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (internal quotations omitted).

The government defendants contend that last-minute changes to the sale will create administrative chaos for BOEM and potentially disadvantage non-party bidders who have been preparing for the sale on the announced terms. They have produced no evidence on behalf of these non-party bidders, however. Meanwhile, API, as representative of nearly 600 companies in the oil and gas industry, is one of the parties to this suit requesting preliminary injunctive relief. Additionally, the plaintiffs only request that certain terms be stricken from the existing FNOS. Government defendants fail to show that this necessitates

the issuance of a new Notice of Sale.[10] The court must also balance the IRA's mandate that this sale proceed with the regulatory complications created by the unlawful agency action. Accordingly, the weight of equities supports injunctive relief.

## D. Court's Authority to Grant Injunction

Finally, defendants challenge the court's ability to grant the requested injunctive relief. They argue that (1) plaintiffs seek an improper permanent injunction; (2) a mandatory injunction is not available on plaintiffs' claims under § 706(2) of the APA; (3) alternatively, plaintiffs have not met the heightened standard for a mandatory injunction; and (4) the court lacks authority to grant mandamus relief.

### 1. Whether relief sought is improper permanent injunction

Government defendants assert that plaintiffs' motion for preliminary injunction is *per se* a motion for permanent injunction because it is indistinguishable from the final relief sought under the complaint. But certain factors in this case, namely the eleventh-hour change to the FNOS and the looming statutory deadline for the sale, necessitated that plaintiffs seek injunctive relief before the court could issue a final adjudication on the merits.[11] Additionally, plaintiffs have shown a substantial likelihood of success on the merits of their claims. Given that the statutory deadline for the sale will expire before this matter can be brought to trial, and that plaintiffs have established a legal interest in seeing

---

[10] Indeed, as plaintiffs point out, BOEM has changed actual terms less than a week prior to a sale in order to comply with the law. *See* News Releases, Fact Sheets, and Notices for Sale 196, BOEM, https://www.boem.gov/oil-gas-energy/leasing/news-releases-fact-sheets-and-notices-sale-196 (including "Change to Notice of Sale 196" on August 10, 2005, and sale results on August 16, 2005).

[11] Government defendants point out that the statutory mandate may remain in effect even if the deadline is missed. *E.g., Brock v. Pierce Cnty.*, 476 U.S. 253 (1986). Given the lengthy political fight over these sales, however, and the resulting congressional mandate, the court views the statutory deadline as a critical matter.

this sale proceed, the court can only preserve their right to relief in a final adjudication through the issuance of a preliminary injunction. Meanwhile, the government can see these preliminary measures undone if it does prevail on the merits by voiding the sales or proceeding with additional regulation through Interior's authority over further steps of offshore leasing, exploration, and production.

### 2.  Availability of mandatory injunction for APA violations

Next, the court turns to the availability of mandatory injunctive relief under the APA. Both of plaintiffs' claims arise under § 706(2) of that statute, based on government defendants' failure to follow procedures and the arbitrary and capricious agency action. Plaintiffs maintain that their requested relief is not an order for affirmative agency action but instead one prohibiting the agency from including the two challenged provisions in the sale. They therefore maintain that it is well within the scope of the court's authority. *See, e.g.*, *Cigar Ass'n of Am. v. FDA*, 480 F.Supp.3d 256, 281 (D.D.C. 2020) (enjoining only one aspect of agency action).

Assuming that the requested relief amounts to a mandatory injunction, the court finds that such relief would be available in this matter. In "rare circumstances," remand to the agency is not the appropriate solution for a § 706(2) violation and the court may instead order affirmative agency action. *O'Reilly*, 477 F.3d at 238–39 (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)). "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given the opportunity to do so" and where vacatur would be "disruptive." *Tex. Assoc. of Manufacturers v. U.S. Consumer Product Safety Comm.*, 989 F.3d 368, 389–390

(5th Cir. 2021); *Cent. & S.W. Servs.*, 220 F.3d 683, 692 (5th Cir. 2000). Here the government defendants have not shown such a possibility, even if the court credits their post hoc rationalizations. As for disruptiveness, government defendants have failed to substantiate their claims of the complications arising from changes to the sale. Additionally, the court must consider the statutory deadline imposed on this specific lease sale after multiple contentious legal battles over the remaining leases in the 2017–22 Five-Year Plan. Plaintiffs have shown that it would be significantly disruptive to their interests to allow Interior to proceed with Lease Sale 261 under the challenged terms, and that it is plaintiffs rather than defendants who lack any other recourse. Accordingly, remand is not the proper remedy here.

Finally, as defendants note, preliminary injunctions ordering a party to take a certain action must meet a higher standard. Mandatory preliminary injunctive relief, "which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (citations omitted). In this matter, plaintiffs have met the heightened standard. The imposition of the challenged terms right before a statutory sale deadline, the unavailability of any other recourse to plaintiffs, and the fact that defendants may see all this neatly undone if they prevail on the merits leave the court with only one option at this stage.

## IV.
### CONCLUSION

For the reasons stated above, the court hereby **ORDERS** that the Motions for Preliminary Injunction be **GRANTED.** Accordingly, the government defendants are enjoined from implementing the acreage withdrawal and Stipulation 4(B)(4) as described in the Final Notice of Sale and Record of Decision for Lease Sale 261. Government defendants are ordered to proceed with Lease Sale 261, absent the challenged terms, by September 30, 2023.

**THUS DONE AND SIGNED** in Chambers on the 21st day of September, 2023.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**